## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RICK HARRISON, JOHN BUCKLEY III,
MARGARET LOPEZ, ANDY LOPEZ,
KEITH LORENSEN, LISA LORENSEN,
EDWARD LOVE, ROBERT
MCTUREOUS, DAVID MORALES,
GINA MORRIS, MARTIN SONGER, JR.,
SHELLY SONGER, JEREMY STEWART,
KESHA STIDHAM, AARON TONEY,
ERIC WILLIAMS, CARL WINGATE, AND
TRACEY SMITH, as Personal
Representative of the Estate of Rubin Smith,

     Plaintiffs,

  v.

THE REPUBLIC OF SUDAN,

     Defendant.

**13 CV 3127**

Case No.

## NOTICE OF PENDING ACTION -
## <u>28 U.S.C. § 1605A(g)</u> *LIS PENDENS*



Edward H. Rosenthal, Esq.
Beth I. Goldman, Esq.
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York 10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175

Andrew C. Hall, Esq.*
Roarke Maxwell, Esq.*
HALL, LAMB AND HALL P.A.
2665 South Bayshore Drive, PH1
Miami, Florida 33133
Tel.: (305) 374-5030
Fax: (305) 374-5033
* admitted *pro hac vice*

*Attorneys for Plaintiffs, Rick Harrison, et al.*

1

PURSUANT TO 28 U.S.C. § 1605A(g), NOTICE IS HEREBY GIVEN that on March 30, 2012, Plaintiffs (1) Rick Harrison; (2) John Buckley; (3) Margaret Lopez; (4) Andy Lopez; (5) Keith Lorensen; (6) Lisa Lorensen; (7) Edward Love; (8) Robert McTureous; (9) David Morales; (10) Gina Morris; (11) Tracey Smith as the Personal Representative of the Estate of Rubin Smith; (12) Martin Songer, Jr.; (13) Shelly Songer; (14) Jeremy Stewart; (15) Kesha Stidham; (16) Aaron Toney; (17) Eric Williams; and (18) Carl Wingate obtained a judgment in the aggregate amount of $314,705,896.00 (the "Judgment") against the Republic of Sudan in the United States District Court for the District of Columbia, Case No. 1:10-cv-01689 (RCL).

Pursuant to 18 U.S.C. 1605A(g), the Plaintiffs hereby provide notice of the Judgment, which affects all property located in this judicial district owned by the Defendant, Republic of Sudan, and of the following controlled entities:

1.   REPUBLIC OF SUDAN (a.k.a. SUDAN);

2.   ACCOUNTS & ELECTRONICS EQUIPMENTS (a.k.a. ACCOUNTS AND ELECTRONICS EQUIPMENTS);

3.   ACCOUNTS AND ELECTRONICS EQUIPMENTS (a.k.a. ACCOUNTS & ELECTRONICS EQUIPMENTS);

4.   ADVANCED CHEMICAL WORKS (a.k.a. ADVANCED COMMERCIAL AND CHEMICAL WORKS COMPANY LIMITED; a.k.a. ADVANCED TRADING AND CHEMICAL WORKS COMPANY LIMITED);

5.   ADVANCED COMMERCIAL AND CHEMICAL WORKS COMPANY LIMITED (a.k.a. ADVANCED CHEMICAL WORKS; a.k.a. ADVANCED TRADING AND CHEMICAL WORKS COMPANY LIMITED);

6.   ADVANCED ENGINEERING WORKS;

7.   ADVANCED MINING WORKS COMPANY LIMITED;

8.   ADVANCED PETROLEUM COMPANY (a.k.a. APCO);

9.   ADVANCED TRADING AND CHEMICAL WORKS COMPANY LIMITED

10. (a.k.a. ADVANCED CHEMICAL WORKS; a.k.a. ADVANCED COMMERCIAL AND CHEMICAL WORKS COMPANY LIMITED);

11. AFRICAN DRILLING COMPANY;

12. AFRICAN OIL CORPORATION;

13. AGRICULTURAL BANK OF SUDAN;

14. AL PHARAKIM (a.k.a. ALFARACHEM COMPANY LIMITED; a.k.a. ALFARACHEM

15. PHARMACEUTICALS INDUSTRIES LIMITED; a.k.a. ALFARAKIM);

16. AL SUNUT DEVELOPMENT COMPANY (a.k.a. ALSUNUT DEVELOPMENT COMPANY);

17. ALAKTAN COTTON TRADING COMPANY (a.k.a. ALAKTAN TRADING COMPANY);

18. ALAKTAN TRADING COMPANY (a.k.a. ALAKTAN COTTON TRADING COMPANY);

19. ALFARACHEM COMPANY LIMITED (a.k.a. AL PHARAKIM; a.k.a. ALFARACHEM

20. PHARMACEUTICALS INDUSTRIES LIMITED; a.k.a. ALFARAKIM);

21. ALFARACHEM PHARMACEUTICALS INDUSTRIES LIMITED (a.k.a. AL PHARAKIM; a.k.a. ALFARACHEM COMPANY LIMITED; a.k.a. ALFARAKIM);

22. ALFARAKIM (a.k.a. AL PHARAKIM; a.k.a. ALFARACHEM COMPANY LIMITED; a.k.a. ALFARACHEM PHARMACEUTICALS INDUSTRIES LIMITED);

23. ALSUNUT DEVELOPMENT COMPANY (a.k.a. AL SUNUT DEVELOPMENT COMPANY);

24. AMIN EL GEZAI COMPANY (a.k.a. EL AMIN EL GEZAI COMPANY);

25. APCO (a.k.a. ADVANCED PETROLEUM COMPANY);

26. ARAB CEMENT COMPANY;

27. ARAB SUDANESE BLUE NILE AGRICULTURAL COMPANY;

28.     ARAB SUDANESE SEED COMPANY;

29.     ARAB SUDANESE VEGETABLE OIL COMPANY;

30.     ASSALAYA SUGAR COMPANY LIMITED;

31.     ATBARA CEMENT COMPANY LIMITED;

32.     AUTOMOBILE CORPORATION;

33.     BABANOUSA MILK PRODUCTS FACTORY;

34.     BANK OF KHARTOUM;[1]

35.     BANK OF SUDAN;

36.     BASHAIER;

37.     BLUE NILE BREWERY;

38.     BLUE NILE PACKING CORPORATION;

39.     BUILDING MATERIALS AND REFRACTORIES CORPORATION;

40.     CENTRAL BUREAU OF STATISTICS OF THE REPUBLIC OF SUDAN;

41.     CENTRAL ELECTRICITY AND WATER CORPORATION (a.k.a. PUBLIC ELECTRICITY AND WATER CORPORATION);

42.     COPTRADE COMPANY LIMITED - PHARMACEUTICAL AND CHEMICAL DIVISION;

43.     COPTRADE ENG AND AUTOMOBILE SERVICES CO LTD. (f.k.a. KORDOFAN AUTOMOBILE COMPANY);

44.     DUTY FREE SHOPS CORPORATION;

45.     EL AMIN EL GEZAI COMPANY (a.k.a. AMIN EL GEZAI COMPANY);

46.     EL GEZIRA AUTOMOBILE COMPANY (a.k.a. GEZIRA AUTOMOBILE COMPANY);

47.     EL NILEIN BANK (n.k.a. EL NILEIN INDUSTRIAL DEVELOPMENT BANK (SUDAN); n.k.a. EL NILEIN INDUSTRIAL DEVELOPMENT BANK GROUP; n.k.a. NILEIN INDUSTRIAL DEVELOPMENT BANK (SUDAN));

---

[1] As to property of the Bank of Khartoum that was frozen or blocked prior to May 2011.

48.  EL NILEIN INDUSTRIAL DEVELOPMENT BANK (SUDAN) (a.k.a. EL NILEIN BANK; n.k.a. EL NILEIN INDUSTRIAL DEVELOPMENT BANK GROUP; n.k.a. NILEIN INDUSTRIAL DEVELOPMENT BANK (SUDAN));

49.  EL NILEIN INDUSTRIAL DEVELOPMENT BANK GROUP (a.k.a. EL NILEIN BANK; n.k.a. EL NILEIN INDUSTRIAL DEVELOPMENT BANK (SUDAN); n.k.a. NILEIN INDUSTRIAL DEVELOPMENT BANK (SUDAN));

50.  EL NILEIN INDUSTRIAL DEVELOPMENT BANK GROUP (a.k.a. INDUSTRIAL BANK OF SUDAN);

51.  EL TAKA AUTOMOBILE COMPANY (a.k.a. TAKA AUTOMOBILE COMPANY);

52.  EMIRATES AND SUDAN INVESTMENT COMPANY LIMITED;

53.  ENGINEERING EQUIPMENT COMPANY;

54.  ENGINEERING EQUIPMENT CORPORATION;

55.  EXPLORATION AND PRODUCTION AUTHORITY (SUDAN);

56.  FARMERS BANK FOR INVESTMENT & RURAL DEVELOPMENT (a.k.a. FARMERS BANK FOR INVESTMENT AND RURAL DEVELOPMENT; a.k.a. FARMERS COMMERCIAL BANK; f.k.a. SUDAN COMMERCIAL BANK);

57.  FARMERS BANK FOR INVESTMENT AND RURAL DEVELOPMENT (f.k.a. FARMERS BANK FOR INVESTMENT & RURAL DEVELOPMENT; a.k.a. FARMERS COMMERCIAL BANK; f.k.a. SUDAN COMMERCIAL BANK);

58.  FARMERS COMMERCIAL BANK (f.k.a. FARMERS BANK FOR INVESTMENT & RURAL DEVELOPMENT; a.k.a. FARMERS BANK FOR INVESTMENT AND RURAL DEVELOPMENT; f.k.a. SUDAN COMMERCIAL BANK);

59.  FOOD INDUSTRIES CORPORATION;

60.  FORESTS NATIONAL CORPORATION;

61.  FRIENDSHIP SPINNING FACTORY;

62.  GEZIRA AUTOMOBILE COMPANY (a.k.a. EL GEZIRA AUTOMOBILE COMPANY);

63.  GEZIRA SCHEME (a.k.a. SUDAN GEZIRA BOARD);

64.      GEZIRA TANNERY;

65.      GEZIRA TRADE & SERVICES COMPANY LIMITED (a.k.a. GEZIRA TRADE AND SERVICES COMPANY LIMITED;

66.      GEZIRA TRADE AND SERVICES COMPANY LIMITED (a.k.a. GEZIRA TRADE & SERVICES COMPANY LIMITED);

67.      GIAD AUTOMOTIVE AND TRUCK (a.k.a. GIAD AUTOMOTIVE COMPANY; a.k.a. GIAD

68.      AUTOMOTIVE INDUSTRY COMPANY LIMITED; a.k.a. GIAD CARS & HEAVY TRUCKS COMPANY; a.k.a. GIAD CARS AND HEAVY TRUCKS COMPANY);

69.      GIAD AUTOMOTIVE COMPANY (a.k.a. GIAD AUTOMOTIVE AND TRUCK; a.k.a GIAD AUTO; a.k.a GIAD AUTOMOTIVE; a.k.a. GIAD AUTOMOTIVE INDUSTRY COMPANY LIMITED; a.k.a. GIAD CARS & HEAVY TRUCKS COMPANY; a.k.a. GIAD CARS AND HEAVY TRUCKS COMPANY);

70.      GIAD AUTOMOTIVE INDUSTRY COMPANY LIMITED (a.k.a. GIAD AUTOMOTIVE AND TRUCK; a.k.a. GIAD AUTOMOTIVE COMPANY; a.k.a. GIAD CARS & HEAVY TRUCKS COMPANY; a.k.a. GIAD CARS AND HEAVY TRUCKS COMPANY);

71.      GIAD CARS & HEAVY TRUCKS COMPANY (a.k.a. GIAD AUTOMOTIVE AND TRUCK; a.k.a. GIAD AUTOMOTIVE COMPANY; a.k.a. GIAD AUTOMOTIVE INDUSTRY COMPANY LIMITED; a.k.a. GIAD CARS AND HEAVY TRUCKS COMPANY);

72.      GIAD CARS AND HEAVY TRUCKS COMPANY (a.k.a. GIAD AUTOMOTIVE AND TRUCK; a.k.a. GIAD AUTOMOTIVE COMPANY; a.k.a. GIAD AUTOMOTIVE INDUSTRY COMPANY LIMITED; a.k.a. GIAD CARS & HEAVY TRUCKS COMPANY);

73.      GIAD INDUSTRIAL CITY (a.k.a. GIAD INDUSTRIAL GROUP; a.k.a. SUDAN MASTER TECH; a.k.a. SUDAN MASTER TECHNOLOGY);

74.      GIAD INDUSTRIAL GROUP (a.k.a. GIAD INDUSTRIAL CITY; a.k.a. SUDAN MASTER TECH; a.k.a. SUDAN MASTER TECHNOLOGY);

75.      GIAD MOTOR COMPANY (a.k.a. GIAD MOTOR INDUSTRY COMPANY LIMITED);

76.      GIAD MOTOR INDUSTRY COMPANY LIMITED (a.k.a. GIAD MOTOR

COMPANY);

77.   GINEID SUGAR FACTORY;

78.   GNPOC (a.k.a. GREATER NILE PETROLEUM OPERATING COMPANY LIMITED);

79.   GREATER NILE PETROLEUM OPERATING COMPANY LIMITED (a.k.a. GNPOC);

80.   GROUPED INDUSTRIES CORPORATION;

81.   GUM ARABIC COMPANY LTD. (a.k.a. GUM ARABIC COMPANY; a.k.a. GAC);

82.   GUNEID SUGAR COMPANY LIMITED (a.k.a. GUNEID SUGAR FACTORY);

83.   GUNEID SUGAR FACTORY (a.k.a. GUNEID SUGAR COMPANY LIMITED);

84.   HAGGAR ASSALAYA SUGAR FACTORY;

85.   HI TECH GROUP (a.k.a. HIGH TECH GROUP; a.k.a. HIGHTECH GROUP; a.k.a. HITECH GROUP);

86.   HICOM (a.k.a. HI-COM);

87.   HI-COM (a.k.a. HICOM);

88.   HICONSULT (a.k.a. HI-CONSULT);

89.   HI-CONSULT (a.k.a. HICONSULT);

90.   HIGH TECH GROUP (a.k.a. HI TECH GROUP; a.k.a. HIGHTECH GROUP; a.k.a. HITECH GROUP);

91.   HIGHTECH GROUP (a.k.a. HI TECH GROUP; a.k.a. HIGH TECH GROUP; a.k.a. HITECH GROUP);

92.   HI-TECH CHEMICALS;

93.   HITECH GROUP (a.k.a. HI TECH GROUP; a.k.a. HIGH TECH GROUP; a.k.a. HIGHTECH GROUP);

94.   HI-TECH PETROLEUM GROUP;

95.      ICDB (a.k.a. ISLAMIC CO-OPERATIVE DEVELOPMENT BANK);

96.      INDUSTRIAL BANK COMPANY FOR TRADE & DEVELOPMENT LIMITED (a.k.a. INDUSTRIAL BANK COMPANY FOR TRADE & DEVELOPMENT LIMITED);

97.      INDUSTRIAL BANK COMPANY FOR TRADE & DEVELOPMENT LIMITED (a.k.a. INDUSTRIAL BANK COMPANY FOR TRADE & DEVELOPMENT LIMITED);

98.      INDUSTRIAL BANK OF SUDAN (n.k.a. EL NILEIN INDUSTRIAL DEVELOPMENT BANK GROUP);

99.      INDUSTRIAL PRODUCTION CORPORATION;

100.    INDUSTRIAL RESEARCH AND CONSULTANCY INSTITUTE;

101.    INGASSANA MINES HILLS CORPORATION (a.k.a. INGESSANA HILLS MINES CORPORATION);

102.    INGESSANA HILLS MINES CORPORATION (a.k.a. INGASSANA MINES HILLS CORPORATION);

103.    ISLAMIC CO-OPERATIVE DEVELOPMENT BANK (a.k.a. ICDB);

104.    JUBA DUTY FREE SHOP;

105.    KARIMA DATE FACTORY;

106.    KARIMA FRUIT AND VEGETABLE CANNING FACTORY;

107.    KASSALA FRUIT PROCESSING COMPANY;

108.    KASSALA ONION DEHYDRATION FACTORY;

109.    KENAF SOCKS FACTORY;

110.    KENANA SUGAR COMPANY LTD.;

111.    KENANA ENGINEERING AND TECHNICAL SERVICES;

112.    KENANA INTEGRATED AGRICULTURAL SOLUTIONS;

113.    KENANA FRIESLAND DAIRY;

114.    KHARTOUM CENTRAL FOUNDRY;

115.    KHARTOUM COMMERCIAL AND SHIPPING COMPANY LIMITED;

116.    KHARTOUM GUM ARABIC PROCESSING COMPANY;

117.    KHARTOUM REFINERY COMPANY LTD.;

118.    KHARTOUM TANNERY;

119.    KHOR OMER ENGINEERING COMPANY;

120.    KORDOFAN AUTOMOBILE COMPANY (a.k.a. COPTRADE ENG AND AUTOMOBILE SERVICES CO LTD.);

121.    KORDOFAN COMPANY;

122.    KRIKAH INDUSTRIES GROUP;

123.    LEATHER INDUSTRIES CORPORATION (a.k.a. LEATHER INDUSTRIES TANNERIES);

124.    LEATHER INDUSTRIES TANNERIES (a.k.a. LEATHER INDUSTRIES CORPORATION);

125.    MALUT SUGAR FACTORY;

126.    MANGALA SUGAR FACTORY;

127.    MASPIO CEMENT CORPORATION;

128.    MAY ENGINEERING COMPANY;

129.    MILITARY COMMERCIAL CORPORATION;

130.    MINISTRY OF AGRICULTURE AND IRRIGATION OF THE REPUBLIC OF SUDAN;

131.    MINISTRY OF ANIMAL AND FISHERY RESOURCES AND PASTURES OF THE REPUBLIC OF SUDAN;

132.    MINISTRY OF COMMERCE OF THE REPUBLIC OF SUDAN;

133.    MINISTRY OF CULTURE AND INFORMATION OF THE REPUBLIC OF SUDAN;

134.  MINISTRY OF ELECTRICITY & WATER RESOURCES OF THE REPUBLIC OF SUDAN;

135.  MINISTRY OF ENERGY AND MINING OF THE REPUBLIC OF SUDAN;

136.  MINISTRY OF ENVIRONMENT, FORESTS AND PHYSICAL DEVELOPMENT OF THE REPUBLIC OF SUDAN;

137.  MINISTRY OF FEDERAL GOVERNANCE OF THE REPUBLIC OF SUDAN;

138.  MINISTRY OF FINANCE AND NATIONAL ECONOMY OF THE REPUBLIC OF SUDAN;

139.  MINISTRY OF FOREIGN AFFAIRS OF THE REPUBLIC OF SUDAN;

140.  MINISTRY OF FOREIGN TRADE OF THE REPUBLIC OF SUDAN;

141.  MINISTRY OF GUIDANCE AND ENDOWMENTS OF THE REPUBLIC OF SUDAN;

142.  MINISTRY OF HEALTH OF THE REPUBLIC OF SUDAN;

143.  MINISTRY OF HIGHER EDUCATION AND SCIENTIFIC RESEARCH OF THE REPUBLIC OF SUDAN;

144.  MINISTRY OF HUMAN RESOURCES DEVELOPMENT & LABOR OF THE REPUBLIC OF SUDAN;

145.  MINISTRY OF HUMANITARIAN AFFAIRS OF THE REPUBLIC OF SUDAN;

146.  MINISTRY OF INFORMATION AND COMMUNICATIONS OF THE REPUBLIC OF SUDAN;

147.  MINISTRY OF INDUSTRY OF THE REPUBLIC OF SUDAN;

148.  MINISTRY OF INTERIOR OF THE REPUBLIC OF SUDAN;

149.  MINISTRY OF INVESTMENT OF THE REPUBLIC OF SUDAN;

150.  MINISTRY OF JUSTICE OF THE REPUBLIC OF SUDAN;

151.  MINISTRY OF MINERALS OF THE REPUBLIC OF SUDAN;

152.  MINISTRY OF OIL OF THE REPUBLIC OF SUDAN;

153.   MINISTRY OF PARLIAMENTARY AFFAIRS OF THE REPUBLIC OF SUDAN;

154.   MINISTRY OF PUBLIC EDUCATION OF THE REPUBLIC OF SUDAN;

155.   MINISTRY OF SCIENCE AND TECHNOLOGY OF THE REPUBLIC OF SUDAN;

156.   MINISTRY OF SOCIAL WELFARE, WOMAN AND CHILD AFFAIRS OF THE REPUBLIC OF SUDAN;

157.   MINISTRY OF TOURISM, ANTIQUITIES AND WILDLIFE OF THE REPUBLIC OF SUDAN;

158.   MINISTRY OF TRANSPORT, ROADS AND BRIDGES OF THE REPUBLIC OF SUDAN;

159.   MINISTRY OF YOUTH AND SPORT OF THE REPUBLIC OF SUDAN;

160.   MINISTRY OF WELFARE AND SOCIAL SECURITY OF THE REPUBLIC OF SUDAN;

161.   MODERN ELECTRONIC COMPANY;

162.   MODERN LAUNDRY BLUE FACTORY (a.k.a. THE MODERN LAUNDRY BLUE FACTORY);

163.   MODERN PLASTIC & CERAMICS INDUSTRIES COMPANY (a.k.a. MODERN PLASTIC AND CERAMICS INDUSTRIES COMPANY);

164.   MODERN PLASTIC AND CERAMICS INDUSTRIES COMPANY (a.k.a. MODERN PLASTIC & CERAMICS INDUSTRIES COMPANY);

165.   NATIONAL CIGARETTES CO. LTD.;

166.   NATIONAL COTTON AND TRADE COMPANY;

167.   NATIONAL ELECTRICITY CORPORATION (a.k.a. SUDAN NATIONAL ELECTRICITY CORPORATION; a.k.a NATIONAL ELECTRICITY CORPORATION (SUDAN));

168.   NATIONAL REINSURANCE COMPANY (SUDAN) LIMITED;

169.   NEW HAIFA SUGAR FACTORY;

170.   NEW HALFA SUGAR COMPANY (a.k.a. NEW HALFA SUGAR FACTORY

COMPANY LIMITED);

171. NEW HALFA SUGAR FACTORY COMPANY LIMITED (a.k.a. NEW HALFA SUGAR COMPANY;

172. NEW KHARTOUM TANNERY;

173. NILE CEMENT COMPANY LIMITED;

174. NILE CEMENT FACTORY;

175. NILEIN INDUSTRIAL DEVELOPMENT BANK (SUDAN) (a.k.a. EL NILEIN BANK; n.k.a. EL NILEIN INDUSTRIAL DEVELOPMENT BANK (SUDAN); n.k.a. EL NILEIN INDUSTRIAL DEVELOPMENT BANK GROUP);

176. NORTHWEST SENNAR SUGAR FACTORY;

177. OIL CORPORATION;

178. OMDURMAN SHOE FACTORY;

179. PETROHELP PETROLEUM COMPANY LIMITED;

180. PETROLEUM GENERAL ADMINISTRATION;

181. PLASTIC SACKS FACTORY (a.k.a. SACKS FACTORY);

182. PORT SUDAN COTTON AND TRADE COMPANY (a.k.a. PORT SUDAN COTTON COMPANY);

183. PORT SUDAN COTTON COMPANY (a.k.a. PORT SUDAN COTTON AND TRADE COMPANY);

184. PORT SUDAN DUTY FREE SHOP;

185. PORT SUDAN EDIBLE OILS STORAGE CORPORATION;

186. PORT SUDAN REFINERY LIMITED;

187. PORT SUDAN SPINNING FACTORY;

188. POSTS AND TELEGRAPHS PUBLIC CORPORATION (a.k.a POSTS & TELEGRAPHS CORP.);

189. PUBLIC CORPORATION FOR BUILDING AND CONSTRUCTION;

190.    PUBLIC CORPORATION FOR IRRIGATION AND EXCAVATION;

191.    PUBLIC CORPORATION FOR OIL PRODUCTS AND PIPELINES;

192.    PUBLIC ELECTRICITY AND WATER CORPORATION (a.k.a. CENTRAL ELECTRICITY AND WATER CORPORATION);

193.    RABAK OIL MILL;

194.    RAINBOW FACTORIES;

195.    RAM ENERGY COMPANY LIMITED;

196.    REA SWEET FACTORY;

197.    RED SEA HILLS MINERALS COMPANY;

198.    RED SEA STEVEDORING;

199.    REFRIGERATION AND ENGINEERING IMPORT COMPANY;

200.    ROADS AND BRIDGES PUBLIC CORPORATION;

201.    SACKS FACTORY (a.k.a. PLASTIC SACKS FACTORY);

202.    SENNAR SUGAR COMPANY LIMITED;

203.    SFZ (a.k.a. SUDANESE FREE ZONES AND MARKETS COMPANY);

204.    SHEIKAN INSURANCE AND REINSURANCE COMPANY LIMITED (a.k.a. SHEIKAN INSURANCE COMPANY);

205.    SHEIKAN INSURANCE COMPANY (a.k.a. SHEIKAN INSURANCE AND REINSURANCE COMPANY LIMITED);

206.    SHEREIK MICA MINES COMPANY (a.k.a. SHERIEK MICA PROJECT);

207.    SHERIEK MICA PROJECT (a.k.a. SHEREIK MICA MINES COMPANY);

208.    SILOS AND STORAGE CORPORATION;

209.    SPINNING AND WEAVING CORPORATION;

210.    SRC (a.k.a. SUDAN RAILWAYS CORPORATION);

211.    SRDC (a.k.a. SUDAN RURAL DEVELOPMENT COMPANY LIMITED);

212. STATE CORPORATION FOR CINEMA;

213. STATE TRADING COMPANY (a.k.a. STATE TRADING CORPORATION);

214. STATE TRADING CORPORATION (a.k.a. STATE TRADING COMPANY);

215. SUDAN ADVANCED RAILWAYS;

216. SUDAN AIR (a.k.a. SUDAN AIRWAYS; a.k.a SUDAN AIRWAYS CO. LTD.);

217. SUDAN AIRWAYS (a.k.a. SUDAN AIR; a.k.a SUDAN AIRWAYS CO. LTD.);

218. SUDAN COMMERCIAL BANK (f.k.a. FARMERS BANK FOR INVESTMENT & RURAL DEVELOPMENT; a.k.a. FARMERS BANK FOR INVESTMENT AND RURAL DEVELOPMENT; a.k.a. FARMERS COMMERCIAL BANK);

219. SUDAN COTTON COMPANY;

220. SUDAN COTTON COMPANY LIMITED;

221. SUDAN DEVELOPMENT CORPORATION;

222. SUDAN EXHIBITION AND FAIRS CORPORATION;

223. SUDAN GEZIRA BOARD (a.k.a. GEZIRA SCHEME);

224. SUDAN MASTER TECH (a.k.a. GIAD INDUSTRIAL CITY; a.k.a. GIAD INDUSTRIAL GROUP; a.k.a. SUDAN MASTER TECHNOLOGY)

225. SUDAN MASTER TECHNOLOGY (a.k.a. GIAD INDUSTRIAL CITY; a.k.a. GIAD INDUSTRIAL GROUP; a.k.a. SUDAN MASTER TECH);

226. SUDAN NATIONAL BROADCASTING CORPORATION (a.k.a. SUDAN RADIO & TV CORP.; a.k.a. SUDAN RADIO AND TV CORP.; a.k.a. SUDAN T.V. CORPORATION);

227. SUDAN NATIONAL INFORMATION CENTER;
228. SUDAN NATIONAL PETROLEUM COMPANY (a.k.a. SUDAN PETROLEUM COMPANY LIMITED;a.k.a. SUDAPET;a.k.a. SUDAPET LTD.);

229. SUDAN OIL CORPORATION;

230. SUDAN OIL SEEDS COMPANY LIMITED;

231.   SUDAN OLYMPIC COMMITTEE;

232.   SUDAN PETROLEUM COMPANY LIMITED (a.k.a. SUDAPET; a.k.a. SUDAPET LTD.; a.k.a SUDAN NATIONAL PETROLEUM COMPANY);

233.   SUDAN RADIO & TV CORP. (a.k.a. SUDAN NATIONAL BROADCASTING CORPORATION; a.k.a. SUDAN RADIO AND TV CORP.; a.k.a. SUDAN T.V. CORPORATION);

234.   SUDAN RADIO AND TV CORP. (a.k.a. SUDAN NATIONAL BROADCASTING CORPORATION; a.k.a. SUDAN RADIO & TV CORP.; a.k.a. SUDAN T.V. CORPORATION);

235.   SUDAN RAILWAYS CORPORATION (a.k.a. SRC);

236.   SUDAN-REN CHEMICALS & FERTILIZERS LTD.;

237.   SUDAN RURAL DEVELOPMENT COMPANY LIMITED;

238.   SUDAN SHIPPING LINE (a.k.a. SUDAN SHIPPING);

239.   SUDAN SOAP CORPORATION;

240.   SUDAN T.V. CORPORATION (a.k.a. SUDAN NATIONAL BROADCASTING CORPORATION; a.k.a. SUDAN RADIO & TV CORP.; a.k.a. SUDAN RADIO AND TV CORP.);

241.   SUDAN TEA COMPANY, LTD.;

242.   SUDAN TELECOM (a.k.a. SUDAN TELECOM GROUP; a.k.a. SUDATEL TELECOM GROUP ; a.k.a. SUDATEL);

243.   SUDAN TELECOM GROUP (a.k.a. SUDAN TELECOM; a.k.a. SUDATEL TELECOM GROUP ; a.k.a. SUDATEL);

244.   SUDAN TELECOMMUNICATIONS COMPANY LIMITED (a.k.a. SUDATEL);

245.   SUDATEL TELECOM GROUP (a.k.a. SUDAN TELECOM GROUP; a.k.a. SUDAN TELECOM GROUP ; a.k.a. SUDATEL);

246.   SUDATEL (a.k.a. SUDAN TELECOM GROUP; a.k.a. SUDATEL TELECOM GROUP; a.k.a. SUDAN TELECOM);

247.   SUDATEL INVESTMENTS;

248.     SUDAN WAREHOUSING COMPANY;

249.     SUDANESE COMPANY FOR BUILDING AND CONSTRUCTION LIMITED;

250.     SUDANESE ESTATES BANK;

251.     SUDANESE FREE ZONES AND MARKETS COMPANY (a.k.a. SFZ);

252.     SUDANESE INTERNATIONAL TOURISM COMPANY;

253.     SUDANESE MINING CORPORATION;

254.     SUDANESE PETROLEUM CORPORATION;

255.     SUDANESE REAL ESTATE SERVICES COMPANY;

256.     SUDANESE SAVINGS BANK;

257.     SUDANESE STANDARDS & METEROLOGY ORGANIZATION;

258.     SUDANESE SUGAR COMPANY (a.k.a. SUDANESE SUGAR PRODUCTION
         COMPANY LIMITED);

259.     SUDANESE   SUGAR   PRODUCTION   COMPANY   LIMITED   (a.k.a.
         SUDANESE SUGAR COMPANY);

260.     SUDAPET (a.k.a. SUDAN PETROLEUM COMPANY LIMITED; a.k.a SUDAN
         NATIONAL PETROLEUM COMPANY; a.k.a. SUDAPET LTD.),;

261.     SUDAPET LTD. (a.k.a. SUDAN PETROLEUM COMPANY LIMITED; a.k.a
         SUDAN NATIONAL PETROLEUM COMPANY; a.k.a. SUDAPET);

262.     SUDATEL   (a.k.a.   SUDAN   TELECOMMUNICATIONS   COMPANY
         LIMITED);

263.     SUGAR   AND   DISTILLING   CORPORATION   (a.k.a.   SUGAR   AND
         DISTILLING INDUSTRY
264.     CORPORATION);

265.     SUGAR   AND   DISTILLING   INDUSTRY   CORPORATION   (a.k.a.   SUGAR
         AND DISTILLING
266.     CORPORATION);

267.     TAHEER PERFUMERY CORPORATION;

268.     TAHREER PERFUMERY CORPORATION;

269.    TAKA AUTOMOBILE COMPANY (a.k.a. EL TAKA AUTOMOBILE COMPANY);

270.    TEA PACKETING AND TRADING COMPANY;

271.    THE MODERN LAUNDRY BLUE FACTORY (a.k.a. MODERN LAUNDRY BLUE FACTORY);

272.    TOURISM AND HOTELS CORPORATION;

273.    WAD MADANI DUTY FREE SHOP;

274.    WAFRA CHEMICALS & TECHNO-MEDICAL SERVICES LIMITED (a.k.a. WAFRA CHEMICALS AND TECHNO-MEDICAL SERVICES LIMITED);

275.    WAFRA CHEMICALS AND TECHNO-MEDICAL SERVICES LIMITED (a.k.a. WAFRA CHEMICALS & TECHNO-MEDICAL SERVICES LIMITED);

276.    WAFRA PHARMA LABORATORIES (a.k.a. WAFRA PHARMACEUTICALS; a.k.a. WAFRAPHARMA LABORATORIES);

277.    WAFRA PHARMACEUTICALS (a.k.a. WAFRA PHARMA LABORATORIES; a.k.a. WAFRAPHARMA LABORATORIES);

278.    WAFRAPHARMA LABORATORIES (a.k.a. WAFRA PHARMA LABORATORIES; a.k.a. WAFRA PHARMACEUTICALS);

279.    WAU FRUIT AND VEGETABLE CANNING FACTORY;

280.    WHITE NILE BATTERY COMPANY;

281.    WHITE NILE BREWERY;

282.    WHITE NILE PETROLEUM OPERATING COMPANY (a.k.a. WNPOC);

283.    WHITE NILE TANNERY.

Attached hereto as Exhibits are true and correct copies of the Complaint (Exhibit A), the March 30, 2012 Order & Judgment (Exhibit B), and the Clerk's Certificate of registration of the Order & Judgment in the Southern District of New York, dated October 2, 2012 (Exhibit C).

Dated: May ___, 2013

_____
Edward H. Rosenthal, Esq.
Beth I. Goldman, Esq.
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York 10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175

Andrew C. Hall, Esq.*
Roarke Maxwell, Esq.*
Brandon R. Levitt, Esq.
HALL, LAMB AND HALL P.A.
2665 South Bayshore Drive, PH1
Miami, Florida 33133
Tel: (305) 374-5030
Fax: (305) 374-5033
* admitted *pro hac vice*

*Attorneys for Plaintiffs, Rick Harrison, et al.*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RICK HARRISON<br>1376 IRON CAP DRIVE<br>STEVENSVILLE, MT 59870 | ) ) ) ) | |
| JOHN BUCKLEY<br>164 PETERS HOLLOW RD.<br>ELIZABETHTON, TN 37643 | ) ) ) ) | Civil Action No.: |
| MARGARET LOPEZ<br>608 COUNTY RD. 343<br>MARBLE FALLS, TX 78654 | ) ) ) ) | |
| ANDREW LOPEZ<br>608 COUNTY RD. 343<br>MARBLE FALLS, TX 78654 | ) ) ) ) | |
| ROBERT MCTUREOUS<br>115 BRAIDED BLANKET BLUFF<br>JOHNS CREEK, GA 30022 | ) ) ) ) | |
| DAVID MORALES<br>c/o HALL, LAMB AND HALL, P.A.<br>2665 S. BAYSHORE DR., PH 1<br>MIAMI, FL 33133 | ) ) ) ) ) | |
| GINA MORRIS<br>521 SE ST.<br>CROWN POINT, IN 46307 | ) ) ) ) | |
| MARTIN SONGER, JR.<br>P.O. BOX 374<br>MERRYVILLE, LA 70653 | ) ) ) ) | |
| SHELLY SONGER<br>P.O. BOX 374<br>MERRYVILLE, LA 70653 | ) ) ) ) | |
| KESHA STIDHAM<br>6516 HUDSON AVE.<br>NORFOLK, VA 23502 | ) ) ) ) ) | |
| Plaintiffs, | ) | |

{10012\00184440.1}                                                1

```
                                    )
v.                                  )
                                    )
REPUBLIC OF SUDAN,                  )
                                    )
              Defendant.            )
                                    )
_____    )
```

## COMPLAINT

Plaintiffs, Rick Harrison, John Buckley, Margaret Lopez, Andrew Lopez, Robert McTureous, David Morales, Gina Morris, Martin Songer, Jr., Shelly Songer, and Kesha Stidham, bring this action against Defendant Republic of Sudan, seeking damages arising out of injuries sustained as a result of the attack on the U.S.S. Cole, on October 12, 2000. Plaintiffs, as persons who have claims under 28 U.S.C. § 1605A, seek judgment for damages against Defendant Republic of Sudan, which provided material support, in the form of funding, direction, training and cover to Al Qaeda, a worldwide terrorist organization whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole. In support of their Complaint, Plaintiffs allege that:

## JURISDICTION AND VENUE

1.     Jurisdiction over the subject matter of this case arises from the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A. Plaintiffs have complied with all conditions precedent to this action. Plaintiffs have made an offer to arbitrate this action, pursuant to the international rules of arbitration, contemporaneously with the service of this Complaint.

2.     This Court has subject matter and personal jurisdiction over Defendant. Venue is proper in this Judicial District, pursuant to 28 U.S.C. § 1391(f)(4).

3.     Service of the Summons, Complaint, Notice of Suit and Offer to Arbitrate can be

made upon Defendant Republic of Sudan by service on the Defendant's Ministry of Foreign Affairs, in care of the Embassy of the Republic of the Sudan located at 2210 Massachusetts Avenue NW, Washington, D.C. 20008, pursuant to 28 U.S.C. § 1608(a)(3).

## THE PARTIES

4.       The Plaintiffs are American citizens, who were severely and permanently injured, on October 12, 2000, as a result of the wrongful attack and bombing of the U.S.S. Cole. The bombing of the U.S.S. Cole was an act of international terrorism as defined in 18 U.S.C. § 2331.

### Rick Harrison

5.       Plaintiff Rick Harrison was a sailor stationed on board the U.S.S. Cole on October 12, 2000. At the time of the attack, Mr. Harrison was below deck on the starboard side of the vessel, within thirty-five to forty feet of the site of the blast.

6.       As a result of the blast, Mr. Harrison suffered severe and permanent injuries to his knees, lower back, and ear drums. Despite his injuries, he was not immediately medevaced off the ship. Mr. Harrison, acting in his capacity as fire marshal, remained on board to assist in the fire containment and rescue operations. While he remained on board, Mr. Harrison inhaled toxic smoke in a room where wiring was burning and later developed a lung condition as a result.

7.       Mr. Harrison has undergone intense medical treatment for his injuries, including numerous surgeries. He has been deemed unemployable by the Veteran's Administration and suffers from severe post-traumatic stress disorder.

### John Buckley

8.       Plaintiff John Buckley was a sailor stationed on board the U.S.S. Cole on October 12, 2000. At the time of the attack, Mr. Buckley was located below the main deck, directly

above the water line, within ten feet of the site of the blast.

9.     As a result of the blast, Mr. Buckley suffered severe and permanent injuries to his knees and lower back.

10.     Mr. Buckley has undergone intense medical treatment for his injuries, including numerous surgeries.  He has been deemed totally disabled by the Veteran's Administration and suffers from severe post-traumatic stress disorder.

**Margaret Lopez and Andrew Lopez**

11.     Plaintiff Margaret Lopez was a sailor stationed on board the U.S.S. Cole on October 12, 2000.  At the time of the attack, Ms. Lopez was located below the main deck, in the oil lab, at the water line.

12.     As a result of the blast, Ms. Lopez suffered second and third degree burns, resulting in permanent scars, blunt force trauma, whiplash, rupture of the tympanic membrane of both of her ears (resulting in permanent hearing loss).

13.     Ms. Lopez has undergone intense medical treatment for her injuries.  She has been deemed totally disabled by the Veteran's Administration and suffers from severe migraines and post-traumatic stress disorder.

14.     Plaintiff Andrew Lopez is the spouse of Margaret Lopez and was married to Ms. Lopez at the time of the attack on the U.S.S. Cole.  Mr. Lopez was also a sailor in the employ of the United States Navy, but was not stationed onboard the U.S.S. Cole.  Mr. Lopez was aware that the bombing of the U.S.S. Cole had taken place, and that Ms. Lopez was on board and severely injured in the attack.  Mr. Lopez suffered severe emotional distress and mental anguish, upon learning of the attack on the U.S.S. Cole and the injuries to his wife.

15.     As a result of the emotional distress and mental anguish he suffered as a result of the attack on the U.S.S. Cole, Mr. Lopez suffers from severe post-traumatic stress disorder and has been deemed 40% disabled by the Veteran's Administration.

### David Morales

16.     Plaintiff David Morales was a sailor stationed on board the U.S.S. Cole on October 12, 2000.  At the time of the attack, Mr. Morales was located below the main deck, below the water line, within twenty-five feet of the site of the blast.

17.     The explosion caused Mr. Morales to be thrown from his bunk to the deck.  Mr. Morales suffered whiplash and trauma to his face from the impact.  As a result of the injury to his neck, Mr. Morales now suffers from degenerative disk disease.

18.     Mr. Morales has undergone intense medical treatment for his injuries.  He has been deemed 30% disabled by the Veteran's Administration and suffers from severe post-traumatic stress disorder.

### Robert McTureous

19.     Plaintiff Robert McTureous was a sailor stationed on board the U.S.S. Cole on October 12, 2000.  At the time of the attack, Mr. McTureous was located below the main deck, in the oil lab, at the water line.

20.     As a result of the blast, Mr. McTureous suffered severe and permanent injuries. These injuries include, but are not limited to, the following: rupture of the tympanic membrane of both of his ears, resulting in permanent hearing loss and tinnitus; blunt and penetrating trauma (shrapnel), resulting in permanent scarring; and second degree burns, resulting in permanent scarring.

21.    Mr. McTureous has undergone intense medical treatment for his injuries. He has been deemed 70% disabled by the Veteran's Administration and suffers from severe post-traumatic stress disorder.

### Gina Morris

22.    Plaintiff Gina Morris was a sailor stationed on board the U.S.S. Cole on October 12, 2000. At the time of the attack, Ms. Morris was located below the main deck, in the Engineering Log Room, one deck above the blast.

23.    As a result of the attack on the U.S.S. Cole, Ms. Morris suffered emotional distress and mental anguish. Ms. Morris was diagnosed with severe post-traumatic stress disorder and was discharged from the Navy in August 2001.

### Martin Songer, Jr. and Shelly Songer

24.    Plaintiff Martin Songer, Jr. was a sailor stationed on board the U.S.S. Cole on October 12, 2000. At the time of the attack, Mr. Songer was located in the boatswain's shop.

25.    As a result of the attack on the U.S.S. Cole, Mr. Songer suffered emotional distress, mental anguish and blunt force trauma. Mr. Songer continues to suffer from post-traumatic stress disorder.

26.    Plaintiff Shelly Songer is the spouse of Martin Songer, Jr. and was married to Mr. Songer at the time of the attack on the U.S.S. Cole. Ms. Songer was aware that the bombing of the U.S.S. Cole had taken place, and that Mr. Songer was on board at the time of the attack. Ms. Songer suffered severe emotional distress and mental anguish, upon learning of the attack on the U.S.S. Cole.

27.    As a result of the post-traumatic stress disorder, emotional distress and mental

anguish from which Mr. Songer continues to suffer, Ms. Songer has suffered a loss of consortium.

## Kesha Stidham

28.     Plaintiff Kesha Stidham was a sailor stationed on board the U.S.S. Cole on October 12, 2000.  At the time of the attack, Ms. Stidham was located in the outside galley near the end of the mess line.

29.     As a result of the blast, Ms. Stidham suffered severe and permanent injuries. These injuries include, but are not limited to, the following: broken ribs; rupture of the tympanic membrane of both of her ears, resulting in permanent hearing loss; and facial trauma that has left her with permanent scars.

30.     Ms. Stidham has undergone intense medical treatment for her injuries.   She suffers from severe post-traumatic stress disorder and has not worked in two years as a result.

## The Republic of Sudan

31.     Defendant Republic of Sudan is a foreign state that, at all times material to this action, has been designated a state sponsor of terrorism pursuant to § 6(j) of the Export Administration Act, 50 U.S.C. § 2405(j).  It was first designated a state sponsor of terrorism by U.S. Secretary of State Warren Christopher on August 12, 1993.  It remained so designated at the time of the attack on the U.S.S. Cole and is still so designated.  The Republic of Sudan has provided material support and resources to Al Qaeda, a worldwide paramilitary terrorist organization.  The Republic of Sudan has sponsored Al Qaeda, within the meaning of 28 U.S.C. § 1605A, by providing it with funding, direction, training and cover for its terrorist activities worldwide.

## ALLEGATIONS OF LIABILITY AS TO ALL COUNTS

32.     The acts of Defendant Republic of Sudan created civil liability on the part of Defendant Republic of Sudan under 28 U.S.C. § 1605A for the physical and mental injuries suffered by the Plaintiffs.

33.     The acts of Defendant Republic of Sudan in knowingly and materially providing support to the perpetrators of the bombing of the U.S.S. Cole were and are acts of international terrorism under 18 U.S.C. §§ 2331 and 2333(a).

34.     At approximately 8:30 a.m. on October 12, 2000, the U.S.S. Cole ("Cole") entered the Port of Aden, Yemen, to temporarily stop for refueling.  At approximately 8:49 a.m., the Cole moored starboard side to a refueling station, near the mouth of the harbor.  The ship began refueling at approximately 10:31 a.m.  At approximately 11:10 a.m., one of the sailors standing watch over the refueling noticed a small boat heading "fast and hard" toward the Cole from the direction of the city.  The boat was manned by two males, both of whom appeared to be in their early thirties.  As they approached the Cole, the two men slowed the boat and maneuvered it parallel to the ship, coming down the port side headed aft. Seconds later, the boat exploded.

35.     The blast ripped a thirty-two-foot by thirty-six-foot hole in the port side.  The main engine room, auxiliary machine room, and the dry provisions storeroom were flooded. Several chambers, including the Crew and Chief Petty Officer's Galley, were structurally destroyed.  The blast and its after-effects killed seventeen Navy sailors, all of them American citizens.  Forty-two others were injured, some of them sustaining serious burns to their faces, hands and arms, as well as lacerations and fractures.

36.     Plaintiffs are American sailors who sustained serious and permanent injuries as a result of the attack on the Cole and their spouses.

37.     Sudan is a country of 41.2 million inhabitants.  It is located at the east end of the Sahara desert in northern Africa.  Sudan is bounded on the northeast by the Red Sea.  Directly across the Red Sea from Sudan is the Republic of Yemen, and the span between the two countries can be easily crossed by boat.

38.     Sudan's population is a majority Sunni Muslim, most of whom are in the north. The country has for years been ravaged by war and humanitarian crises, including an ongoing conflict that began in the mid-1980s between the Muslim government in the north and rebels in the rural south, which is populated largely by tribal and Christian groups.

39.     In 1989, General Omar Bashir assumed the presidency of Sudan in a military coup that overthrew the elected government and converted Sudan into an Islamic Arab state. Bashir remains Sudan's President today.  The coup was orchestrated by Hassan Abdallah Turabi, head of the Sudanese political party the National Islamic Front ("NIF") and leader of the Muslim Brotherhood.  Turabi was the regime's de facto leader from 1989 until late 1999, when he was ousted and later put in jail.  During the 1990s, Turabi and the NIF transformed Sudan into a centralized, radical Islamic state that openly supported movements and organizations with militant Islamic, anti-American, anti-Western ideologies.

40.     Since 1993, the United States has continuously designated Sudan as a state sponsor of terrorism. 58 Fed. Reg. 52523-01 (Oct. 8, 1993).

41.     Al Qaeda is a worldwide terrorist network led by Osama Bin Laden that has declared war against the United States and others who do not share its militant brand of Islam.

Al Qaeda was founded by Bin Laden in Afghanistan in approximately 1990 to serve as a base for like-minded Sunni Islamic extremists.

42.     During the Afghanistan war from 1979 to 1989, Bin Laden, the son of a wealthy Saudi construction magnate, organized and financed the recruitment and training of Arab nationals to fight alongside the Afghan mujahadin against the Soviet Union.

43.     As is well known today, Al-Qaeda has organized, executed or inspired acts of terrorism around the world that killed or injured thousands of innocent people, including the September 11, 2001, attacks on the United States.   Al Qaeda has supported terrorists in Afghanistan, Bosnia, Chechnya, Tajikistan, Somalia, Yemen, and Kosovo, and has trained terrorists from countries including the Philippines, Algeria, and Eritrea.

44.     Following the Soviet withdrawal from Afghanistan in 1989, Bin Laden's group was no longer welcome in Afghanistan.  Bin Laden briefly returned to his home country of Saudi Arabia but was expelled in 1990 for his support of terrorism.  At a time when Al Qaeda found itself without a territory from which it could base its terrorist operations, Turabi offered the organization refuge in Sudan.

45.     As stated by a 1996 U.S. Department of State report on Bin Laden, Bin Laden "relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hassan al-Turabi." Bin Laden lived in Sudan from 1991 until May 1996, when he was expelled from the country under international pressure.  He then relocated to Afghanistan.

46.     Turabi and Bin Laden shared a common extremist ideological and religious outlook. Turabi, who was dean of the University of Khartoum law school in the 1960s, envisioned a pan-Islamic force consisting of both Shiites and Sunnis to counterbalance Western

powers militarily, economically, and politically.  As the de facto leader of the Sudanese regime,
Turabi sought to impose *sharia*, or Islamic law, as the only source of law in Sudan, a goal shared
by Al Qaeda.  Bin Laden agreed to help Turabi in the regime's ongoing war against African
Christian separatists in southern Sudan, and also to invest his wealth in the poor country's
infrastructure.

47.    In exchange, Sudan provided Bin Laden's fledgling terrorist group with a
sanctuary within which it could freely meet, organize, and train militants for operations.  Bin
Laden established several joint business ventures with the Sudanese regime that began to flourish
upon his arrival in the Sudanese capital of Khartoum in 1991.  Bin Laden formed symbiotic
business relationships with wealthy NIF members by undertaking civil infrastructure
development projects on the regime's behalf.

48.    Bin Laden's businesses in Sudan included:

(1) Al-Hijrah for Construction and Development, Ltd., which built the Tahaddi
road between Khartoum and Port Sudan on the Red Sea coast, as well as a modern
international airport near Port Sudan;

(2) An import-export firm, Wadi al-Aqiq Company, Ltd., which, in conjunction
with Bin Laden's Taba Investment Company, Ltd., and with the cooperation of
prominent NIF members, secured a near monopoly over Sudan's agricultural
exports of gum, corn, sunflower, and sesame products; and

(3) Al-Themar al-Mubarak-ah Agriculture Company, Ltd., which acquired large
tracts of land near Khartoum and in eastern Sudan.

These businesses provided income to Al Qaeda, as well as cover for the procurement of

explosives, weapons, and technical equipment, and for the travel of Al Qaeda operatives. Bin Laden continued to maintain his substantial business interests and facilities in Sudan even after his departure to Afghanistan in 1996.

49.   Sudan allowed its banking institutions to be used by Al Qaeda to launder money. Bin Laden and wealthy members of the NIF capitalized Al-Shamal Islamic Bank in Khartoum; Bin Laden personally invested $50 million in the bank. In the late 1980s, Sudan adopted an Islamic banking system that forbids interest and lacks the rigorous accounting standards used by Western banking systems. The lack of scrutiny associated with this system was ideal for Al Qaeda because it allowed the group to move large sums of money in support of its operations without detection. As Mr. Farah, who is the author of "Blood From Stones: The Secret Financial Network of Terror," testified, Sudan "provided [Al Qaeda] fundamentally with a banking structure, Islamic structure that's out of the norm of the banking rules that we're acquainted with in the west, and allowed them channels to move money through that would be virtually undiscoverable to the outside world." He added that Sudan "clearly had control over the banking system . . . . [Al Qaeda] couldn't have operated with that degree of freedom and openness if they had not been sanctioned by the central government to do so."

50.   In addition, as reported by the U.S. Department of State in its annual "Patterns of Global Terrorism" reports, the Sudanese military cooperated with Bin Laden and Al Qaeda to finance at least three terrorist training camps in northern Sudan by January 1994.

51.   Bin Laden's Al-Hijrah for Construction and Development company worked directly with Sudanese military officials to transport and provision the camps, where terrorists of Egyptian, Algerian, Tunisian, and Palestinian origin received training. From as early as 1997 to

at least 1999, Sudan served as a "training hub" for Al Qaeda and other terrorist groups that used Sudan as a secure base for assisting compatriots elsewhere.

52.     Furthermore, starting as early as 1997 the Sudanese Government provided paramilitary training to terrorist organizations in Sudan.

53.     Starting in the early 1990s, Turabi and the Sudanese regime convened annual conferences in Sudan under the label Popular Arab and Islamic Conference. At these conferences, Bin Laden and other top leaders and operatives from the most violent Islamic terrorist organizations, including Bin Laden's Islamic Army Shura, the Palestinian Liberation Organization, Hamas, and Hezbollah, congregated to exchange information and plan terrorist activities. Turabi saw the conferences as a means of bringing together Sunnis and Shiites in the fight against the common enemy, i.e. the United States and other Western powers. Although the conference was closed down in approximately 2000, Sudan "continued to be used as a safehaven" by Al Qaeda and other terrorist groups.

54.     As early as 1998, Sudan provided Al Qaeda members with Sudanese diplomatic passports as well as regular Sudanese travel documentation that facilitated the movement of Al Qaeda operatives in and out of Sudan. Diplomatic passports allow the holder to pass through airport security in airports and ports around the world without his bags being checked and without the same level of scrutiny or searches normally given to regular passport holders. A diplomatic passport typically lasts between five and ten years. Thus, these diplomatic passports issued in 1998 would not have expired prior to 2003. The use of diplomatic passports allowed Al Qaeda agents to enter and leave Sudan and cross borders in other countries with diplomatic pouches carrying secret materials to prepare for attacks without arousing suspicion.

55.     The Government of Sudan's provision of diplomatic passports to Al Qaeda, which was necessarily a government function carried out by government officers or agents, was critical to Al Qaeda's method of training its operatives in one country and then dispatching them with their materials to other countries to carry out operations or await instructions.  By giving Al Qaeda diplomatic passports, as well as diplomatic pouches that could be carried without inspection, Sudan enabled Al Qaeda to transport weapons and munitions outside the country and into other countries undetected by customs agents.

56.     In addition, Sudan exempted Al Qaeda and its members from paying any taxes or import duties and permitted it to bring containers into the country without inspection by customs.

57.     Sudan's support of Al Qaeda continued even after Bin Laden's expulsion from the country in 1996 and lasted at least until the Cole bombing in October 2000.  As reported in the U.S. Department of State's annual "Patterns of Global Terrorism" reports, each year from 1997 through 2000 Sudan continued to serve as a meeting place, safe haven, and training hub for Al Qaeda and other terrorist groups including Lebanese Hizballah, Palestinian Islamic Jihad, Abu Nidal Organization, and Hamas. As of 1999, this support included "paramilitary training, money, religious indoctrination, travel, documents, safe passage, and refuge" and as of 2000 it "included the provision of travel documentation, safe passage, and refuge.  Most of the groups maintained offices and other forms of representation in the capital, using Sudan primarily as a secure base for organizing terrorist operations and assisting compatriots elsewhere."

58.     The strike against the Cole was part of a decade-long plan conceived and executed by Bin Laden and Al Qaeda to attack U.S. interests in the Middle East, specifically American military forces.  The Cole plot was an Al Qaeda operation supervised directly by Bin

Laden. As stated in the 9/11 Commission Report, Bin Laden "chose the target and location of the attack, selected the suicide operatives, and provided the money needed to purchase explosives and equipment."

59.     The U.S.S. Cole attack's "mastermind" was Qaed Salim Sinan al-Harethi, also known as Ali Qaed Sinan Harthi, who was one of Bin Laden's bodyguards.  Al-Harethi was trained by Al Qaeda *in Sudan* in the 1990s before being dispatched to Yemen where he became the chief of operations of Al Qaeda in Yemen.

60.     The explosives used in the Cole attack were sent by Al Qaeda operatives in Sudan.  This finding is corroborated by the testimony of one of Bin Laden's lieutenants in Sudan, Jamal Al-Fadl, who testified in criminal proceedings against Bin Laden arising out of the 1998 embassy bombings.  Mr. Al-Fadl stated in sworn testimony in a trial before the United States District Court for the Southern District of New York that he worked under Bin Laden in Sudan; that he stored four crates of weapons and explosives at a farm in Sudan owned by Bin Laden; and that he shipped the four crates in an Al Qaeda-owned boat from a facility owned by the Sudanese military in Port Sudan to Yemen, where they were to be used to "fight the Communists."

61.     Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to transform into a sophisticated, worldwide terrorist network, and that such support was critical to Al Qaeda developing the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack that killed the seventeen American sailors on the Cole.

62.     Ayman Al-Zawahiri, a top-ranking member of Al Qaeda, reached an agreement in 1998 with Sudan's national Islamic groups to establish budgets to finance terror operations.

63.     Sudanese Foreign Minister Mustafa Osman Ismail admitted Sudan's role in supporting terrorism and Al Qaeda specifically on a C-SPAN broadcast on May 21, 2003.

64.     As a result of the support in facilities, as a safe haven, and of materials including radios, weapons and explosives by the Republic of Sudan to Al Qaeda, the Republic of Sudan caused Al Qaeda to be able to plan and execute its attack against an American naval vessel, and in particular the attack against the U.S.S. Cole, which lead to the injuries sustained by the Plaintiffs named herein.   As a result, the Republic of Sudan is liable to Plaintiffs for their damages.

65.     Each of the Plaintiffs have suffered physical and psychological injuries for which they are entitled to damages consistent with their status as recognized by the law, applicable to this matter pursuant to 28 U.S.C. § 1605A.

## COUNT I – STATUTORY PERSONAL INJURY ACTION
## UNDER 28 US.C. § 1605A - RICK HARRSION

66.     Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 65.

67.     In 2000, Rick Harrison, in the course of his service in the United States Navy, was a crew member aboard the U.S.S. Cole wherever its missions and orders directed it.

68.     On October 12, 2000, during the course of the voyage, and while the vessel was in Aden Harbor, Yemen, Mr. Harrison was intentionally physically injured by Al Qaeda operatives supported by the Defendant Republic of Sudan.   The Al Qaeda operatives drove a boat laden with explosives into the side of the vessel and detonated the explosives.   The resultant explosion

tore a 40 foot hole in the side of the vessel, causing Mr. Harrison to suffer severe and permanent physical and psychological injuries.

69.     The injuries caused to Mr. Harrison aboard the U.S.S. Cole on October 12, 2000, were intentional and malicious and in willful, wanton and reckless disregard of Mr. Harrison's rights.

70.     Mr. Harrison's injuries were not caused or contributed to by any negligence on his part, but were caused solely by the wrongful act, neglect, and default of Defendant, its agents and employees.  In particular, Mr. Harrison's injuries were caused solely by the Defendant Republic of Sudan's wrongful acts described specifically in this Complaint.

### a. Assault and Battery

71.     The bombing of the U.S.S. Cole was a terrorist act intended to cause a harmful contact with the person of the sailors aboard the ship, including Rick Harrison, or an imminent apprehension of such a contact.

72.     The bombing of the U.S.S. Cole directly and indirectly caused the intended harmful contact with the person of the sailors aboard, including Rick Harrison, and the imminent apprehension of such contact.

73.     As a direct and proximate result of the bombing of the U.S.S. Cole, Rick Harrison suffered severe and permanent physical injuries.  These physical injuries include, but are not limited to, the following: compression of his ten lower vertebrae; damage to the cartilage in both of his knees; rupture of the tympanic membrane of both of his ears; a major concussion; and contusions and abrasions.

74.     Despite his injuries, Mr. Harrison was not immediately medevaced off the ship.

He remained on board to assist in the fire containment and rescue operations, acting in his capacity as fire marshal. While conducting the fire containment and rescue operations, Mr. Harrison inhaled toxic smoke in a room where electrical wiring was burning. As a result of inhaling the toxic smoke, Mr. Harrison has developed a lung condition.

75.    Further, as a result of the foregoing harmful contact and the imminent apprehension of such contact, Mr. Harrison has also developed severe post-traumatic stress disorder.

76.    For his injuries, Mr. Harrison has undergone extensive medical treatment including, but not limited to, the following: surgery and chiropractic treatment for the injury sustained to his back; arthroscopic surgery for the injuries sustained to both of his knees; and psychological treatment for post-traumatic stress disorder.

77.    Before the attack on the U.S.S. Cole, Mr. Harrison was an able bodied sailor in the employ of the United States Navy. Despite medical treatment, Mr. Harrison continues to suffer pain and physical limitation from the injuries he sustained in the attack. The Veteran's Administration has deemed him to be totally physically disabled and in need of permanent chiropractic assistance.

78.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Rick Harrison suffering the physical and psychological injuries described herein.

### b. Intentional Infliction of Emotional Distress

79.    Further, the actions of Defendant Republic of Sudan of providing material support leading to the bombing of the U.S.S. Cole constitute extreme and outrageous conduct intended to

cause the sailors aboard, including Rick Harrison, to suffer mental anguish, emotional distress, and pain and suffering.

80.    These actions by Defendant Republic of Sudan were taken deliberately and recklessly, with knowledge that they would cause the sailors aboard the U.S.S. Cole, including Rick Harrison, to suffer severe mental anguish, emotional distress, and pain and suffering.

81.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Rick Harrison suffering severe mental anguish, emotional distress, and pain and suffering.

82.    As a direct and proximate result of the bombing of the U.S.S. Cole, Rick Harrison suffered pain, mental anguish, and emotional distress.  Mr. Harrison's psychological injuries stem not only from his own personal physical injuries, but also from witnessing the injuries caused to his fellow sailors while he remained onboard the ship during rescue and fire containment operations.  Mr. Harrison maintained friendships with several of the sailors killed in the attack.

83.    Mr. Harrison has been diagnosed with severe post-traumatic stress disorder and suffers ongoing mental anguish and distress, as a result of the attack.

### c. Damages – Economic, Pain and Suffering, and Punitive

84.    Pursuant to 28 U.S.C. § 1605A(c), as a result of its provision of material support, in the form of funding, direction, training and cover to Al Qaeda, whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole, the Defendant Republic of Sudan is liable for economic damages and damages for pain and suffering caused by the physical and psychological injuries suffered by Mr. Harrison.

85.     Pursuant to 28 U.S.C. § 1605A(c), the Republic of Sudan is also liable to Mr. Harrison for punitive damages for his personal injuries, the proper amount of which shall be later determined by the Court.

## COUNT II – STATUTORY PERSONAL INJURY ACTION UNDER 28 US.C. § 1605A - JOHN BUCKLEY

86.     Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 65.

87.     In 2000, John Buckley, in the course of his service in the United States Navy, was a crew member aboard the U.S.S. Cole wherever its missions and orders directed it.

88.     On October 12, 2000, during the course of the voyage, and while the vessel was in Aden Harbor, Yemen, Mr. Buckley was intentionally physically injured by Al Qaeda operatives supported by the Defendant Republic of Sudan.  The Al Qaeda operatives drove a boat laden with explosives into the side of the vessel and detonated the explosives.  The resultant explosion tore a 40 foot hole in the side of the vessel, causing Mr. Buckley to suffer severe and permanent physical and psychological injuries.

89.     The injuries caused to Mr. Buckley aboard the U.S.S. Cole on October 12, 2000, were intentional and malicious and in willful, wanton and reckless disregard of Mr. Buckley's rights.

90.     Mr. Buckley's injuries were not caused or contributed to by any negligence on his part, but were caused solely by the wrongful act, neglect, and default of Defendant, its agents and employees.  In particular, Mr. Buckley's injuries were caused solely by the Defendant Republic of Sudan's wrongful acts described specifically in this Complaint.

### a. Assault and Battery

91.     The bombing of the U.S.S. Cole was a terrorist act intended to cause a harmful contact with the person of the sailors aboard the ship, including Mr. Buckley, or an imminent apprehension of such a contact.

92.     The bombing of the U.S.S. Cole directly and indirectly caused the intended harmful contact with the person of the sailors aboard, including Mr. Buckley, and the imminent apprehension of such contact.

93.     As a direct and proximate result of the bombing of the U.S.S. Cole, Mr. Buckley suffered severe and permanent physical injuries.  These physical injuries include, but are not limited to, the following: damage to his lower back; damage to both of his knees.

94.     Further, as a result of the foregoing harmful contact and the imminent apprehension of such contact, Mr. Buckley has also developed severe post-traumatic stress disorder.

95.     For his injuries, Mr. Buckley has undergone extensive medical treatment including, but not limited to, the following: surgery, physical therapy and chiropractic treatment for the injury sustained to his back; surgery on both of his knees; and psychological treatment for post-traumatic stress disorder.

96.     Before the attack on the U.S.S. Cole, Mr. Buckley was an able bodied sailor in the employ of the United States Navy.  Despite medical treatment, Mr. Buckley continues to suffer pain and physical limitation from the injuries he sustained in the attack.  The Veteran's Administration has deemed him to be totally physically disabled.

97.     The actions of Defendant Republic of Sudan did in fact cause the bombing and

subsequently was the cause in fact of Mr. Buckley suffering the physical and psychological injuries described herein.

### b. Intentional Infliction of Emotional Distress

98.     Further, the actions of Defendant Republic of Sudan of providing material support leading to the bombing of the U.S.S. Cole constitute extreme and outrageous conduct intended to cause the sailors aboard, including Mr. Buckley, to suffer mental anguish, emotional distress, and pain and suffering.

99.     These actions by Defendant Republic of Sudan were taken deliberately and recklessly, with knowledge that they would cause the sailors aboard the U.S.S. Cole, including Mr. Buckley, to suffer severe mental anguish, emotional distress, and pain and suffering.

100.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Mr. Buckley suffering severe mental anguish, emotional distress, and pain and suffering.

101.    As a direct and proximate result of the bombing of the U.S.S. Cole, Mr. Buckley suffered pain, mental anguish, and emotional distress.  Mr. Buckley's psychological injuries stem not only from his own personal physical injuries, but also from witnessing the injuries caused to his fellow sailors.

102.    Mr. Buckley has been diagnosed with severe post-traumatic stress disorder and suffers ongoing mental anguish and distress, as a result of the attack.

### c. Damages – Economic, Pain and Suffering, and Punitive

103.    Pursuant to 28 U.S.C. § 1605A(c), as a result of its provision of material support, in the form of funding, direction, training and cover to Al Qaeda, whose operatives facilitated the

planning and execution of the bombing of the U.S.S. Cole, the Defendant Republic of Sudan is liable for economic damages and damages for pain and suffering caused by the physical and psychological injuries suffered by Mr. Buckley.

104.   Pursuant to 28 U.S.C. § 1605A(c), the Republic of Sudan is also liable to Mr. Buckley for punitive damages for his personal injuries, the proper amount of which shall be later determined by the Court.

## COUNT III – STATUTORY PERSONAL INJURY ACTION UNDER 28 US.C. § 1605A – MARGARET LOPEZ

105.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 65.

106.   In 2000, Margaret Lopez, in the course of her service in the United States Navy, was a crew member aboard the U.S.S. Cole wherever its missions and orders directed it.

107.   On October 12, 2000, during the course of the voyage, and while the vessel was in Aden Harbor, Yemen, Ms. Lopez was intentionally physically injured by Al Qaeda operatives supported by the Defendant Republic of Sudan.   The Al Qaeda operatives drove a boat laden with explosives into the side of the vessel and detonated the explosives.   The resultant explosion tore a 40 foot hole in the side of the vessel, causing Ms. Lopez to suffer severe and permanent physical and psychological injuries.

108.   The injuries caused to Ms. Lopez aboard the U.S.S. Cole on October 12, 2000, were intentional and malicious and in willful, wanton and reckless disregard of Ms. Lopez's rights.

109.   Ms. Lopez's injuries were not caused or contributed to by any negligence on her part, but were caused solely by the wrongful act, neglect, and default of Defendant, its agents and

employees. In particular, Mr. Lopez's injuries were caused solely by the Defendant Republic of Sudan's wrongful acts described specifically in this Complaint.

### a. Assault and Battery

110. The bombing of the U.S.S. Cole was a terrorist act intended to cause a harmful contact with the person of the sailors aboard the ship, including Ms. Lopez, or an imminent apprehension of such a contact.

111. The bombing of the U.S.S. Cole directly and indirectly caused the intended harmful contact with the person of the sailors aboard, including Ms. Lopez, and the imminent apprehension of such contact.

112. As a direct and proximate result of the bombing of the U.S.S. Cole, Ms. Lopez suffered severe and permanent physical injuries. These physical injuries include, but are not limited to, the following: second and third degree burns, resulting in scarring; blunt force trauma; whiplash; and rupture of the tympanic membrane of both of her ears.

113. Further, as a result of the foregoing harmful contact and the imminent apprehension of such contact, Ms. Lopez has also developed severe migraines and post-traumatic stress disorder.

114. For her injuries, Ms. Lopez has undergone extensive medical treatment for her physical injuries and psychological treatment for post-traumatic stress disorder.

115. Before the attack on the U.S.S. Cole, Ms. Lopez was an able bodied sailor in the employ of the United States Navy. Despite medical treatment, Ms. Lopez continues to suffer pain and physical limitation from the injuries she sustained in the attack. The Veteran's Administration has deemed her to be totally physically disabled.

116.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Ms. Lopez suffering the physical and psychological injuries described herein.

### b. Intentional Infliction of Emotional Distress

117.    Further, the actions of Defendant Republic of Sudan of providing material support leading to the bombing of the U.S.S. Cole constitute extreme and outrageous conduct intended to cause the sailors aboard, including Ms. Lopez, to suffer mental anguish, emotional distress, and pain and suffering.

118.    These actions by Defendant Republic of Sudan were taken deliberately and recklessly, with knowledge that they would cause the sailors aboard the U.S.S. Cole, including Ms. Lopez, to suffer severe mental anguish, emotional distress, and pain and suffering.

119.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Ms. Lopez suffering severe mental anguish, emotional distress, and pain and suffering.

120.    As a direct and proximate result of the bombing of the U.S.S. Cole, Ms. Lopez suffered pain, mental anguish, and emotional distress.  Ms. Lopez's psychological injuries stem not only from her own personal physical injuries, but also from witnessing the injuries caused to his fellow sailors.

121.    Ms. Lopez has been diagnosed with severe post-traumatic stress disorder and suffers ongoing migraines, mental anguish and distress, as a result of the attack.

### c. Damages – Economic, Pain and Suffering, and Punitive

122.    Pursuant to 28 U.S.C. § 1605A(c), as a result of its provision of material support,

in the form of funding, direction, training and cover to Al Qaeda, whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole, the Defendant Republic of Sudan is liable for economic damages and damages for pain and suffering caused by the physical and psychological injuries suffered by Ms. Lopez.

123.    Pursuant to 28 U.S.C. § 1605A(c), the Republic of Sudan is also liable to Ms. Lopez for punitive damages for her personal injuries, the proper amount of which shall be later determined by the Court.

### COUNT IV – STATUTORY PERSONAL INJURY ACTION UNDER 28 US.C. § 1605A – ANDREW LOPEZ

124.    Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 65.

125.    In 2000, Andrew Lopez was a sailor in the service of the United States Navy, but was not stationed aboard the U.S.S. Cole.  Mr. Lopez was the spouse of Plaintiff Margaret Lopez, who was a crew member aboard the U.S.S. Cole.

126.    On October 12, 2000, during the course of the voyage, and while the vessel was in Aden Harbor, Yemen, Ms. Lopez was intentionally physically injured by Al Qaeda operatives supported by the Defendant Republic of Sudan.  The Al Qaeda operatives drove a boat laden with explosives into the side of the vessel and detonated the explosives.  The resultant explosion tore a 40 foot hole in the side of the vessel, causing Ms. Lopez to suffer severe and permanent physical and psychological injuries.

127.    Mr. Lopez was aware that the bombing of the U.S.S. Cole had taken place, and that Ms. Lopez was on board and severely injured in the attack.  Mr. Lopez suffered severe emotional distress and mental anguish, upon learning of the attack on the U.S.S. Cole and the

injuries to his wife.

128.    Mr. Lopez's injuries were not caused or contributed to by any negligence on his part, but were caused solely by the wrongful act, neglect, and default of Defendant, its agents and employees.  In particular, Mr. Lopez's injuries were caused solely by the Defendant Republic of Sudan's wrongful acts described specifically in this Complaint.

### a. Intentional Infliction of Emotional Distress

129.    Further, the actions of Defendant Republic of Sudan of providing material support leading to the bombing of the U.S.S. Cole constitute extreme and outrageous conduct intended to cause the family members of the victims of attack, including Mr. Lopez, mental anguish, emotional distress, and pain and suffering.

130.    These actions by Defendant Republic of Sudan were taken deliberately and recklessly, with knowledge that they would cause severe mental anguish, emotional distress, and pain and suffering on the family members of the victims of the attack.

131.    Mr. Lopez was aware that the bombing of the U.S.S. Cole had taken place, and that Margaret Lopez on board was injured in the attack.

132.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Mr. Lopez suffering severe mental anguish, emotional distress, and pain and suffering.

133.    Ms. Lopez has been diagnosed with severe post-traumatic stress disorder and suffers ongoing mental anguish and distress, as a proximate result of the attack.  Mr. Lopez has been designated 40% disabled by the Veteran's Administration.

***b. Loss of Solatium***

134.     Because of the psychological injuries suffered by Ms. Lopez, Ms. Lopez's spouse,

Mr. Lopez, has been deprived of Ms. Lopez's love, affection, companionship, advice, comfort,

support and services.

135.     The actions of Defendant Republic of Sudan did in fact cause the bombing and

subsequently was the cause in fact of Ms. Lopez's injuries and Mr. Lopez suffering loss of

solatium.

136.     Mr. Lopez has been damaged for the loss of solatium of his spouse Ms. Lopez, as

a result of the injuries suffered by Ms. Lopez.

***c. Damages – Pain and Suffering, Solatium and Punitive***

137.     Pursuant to 28 U.S.C. § 1605A(c), as a result of its provision of material support,

in the form of funding, direction, training and cover to Al Qaeda, whose operatives facilitated the

planning and execution of the bombing of the U.S.S. Cole, the Defendant Republic of Sudan is

liable for damages for pain and suffering caused by the psychological injuries, and loss of

solatium suffered by Mr. Lopez.

138.     Pursuant to 28 U.S.C. § 1605A(c), the Republic of Sudan is also liable to Mr.

Lopez for punitive damages for his personal injuries, the proper amount of which shall be later

determined by the Court.

## COUNT V – STATUTORY PERSONAL INJURY ACTION
## UNDER 28 US.C. § 1605A - ROBERT MCTUREOUS

139.     Plaintiffs reallege and incorporate herein by reference the allegations of

paragraphs 1 through 65.

140.     In 2000, Robert McTureous, in the course of his service in the United States

Navy, was a crew member aboard the U.S.S. Cole wherever its missions and orders directed it.

141.    On October 12, 2000, during the course of the voyage, and while the vessel was in Aden Harbor, Yemen, Mr. McTureous was intentionally physically injured by Al Qaeda operatives supported by the Defendant Republic of Sudan.  The Al Qaeda operatives drove a boat laden with explosives into the side of the vessel and detonated the explosives.  The resultant explosion tore a 40 foot hole in the side of the vessel, causing Mr. McTureous to suffer severe and permanent physical and psychological injuries.

142.    The injuries caused to Mr. McTureous aboard the U.S.S. Cole on October 12, 2000, were intentional and malicious and in willful, wanton and reckless disregard of Mr. McTureous' rights.

143.    Mr. McTureous' injuries were not caused or contributed to by any negligence on his part, but were caused solely by the wrongful act, neglect, and default of Defendant, its agents and employees.  In particular, Mr. McTureous' injuries were caused solely by the Defendant Republic of Sudan's wrongful acts described specifically in this Complaint.

### *a. Assault and Battery*

144.    The bombing of the U.S.S. Cole was a terrorist act intended to cause a harmful contact with the person of the sailors aboard the ship, including Mr. McTureous, or an imminent apprehension of such a contact.

145.    The bombing of the U.S.S. Cole directly and indirectly caused the intended harmful contact with the person of the sailors aboard, including Mr. McTureous, and the imminent apprehension of such contact.

146.    As a direct and proximate result of the bombing of the U.S.S. Cole, Mr.

McTureous suffered severe and permanent physical injuries.  These physical injuries include, but are not limited to, the following: rupture of the tympanic membrane of both of his ears, resulting in permanent hearing loss and tinnitus; and blunt and penetrating trauma (shrapnel), resulting in permanent scarring; and second degree burns, resulting in permanent scarring.

147.    Further, as a result of the foregoing harmful contact and the imminent apprehension of such contact, Mr. McTureous has also developed severe post-traumatic stress disorder.

148.    Before the attack on the U.S.S. Cole, Mr. McTureous was an able bodied sailor in the employ of the United States Navy.  Despite medical treatment, Mr. McTureous continues to suffer pain and physical limitation from the injuries he sustained in the attack.  The Veteran's Administration has deemed him to be 70% disabled.

149.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Mr. McTureous suffering the physical and psychological injuries described herein.

### b. Intentional Infliction of Emotional Distress

150.    Further, the actions of Defendant Republic of Sudan of providing material support leading to the bombing of the U.S.S. Cole constitute extreme and outrageous conduct intended to cause the sailors aboard, including Mr. McTureous, to suffer mental anguish, emotional distress, and pain and suffering.

151.    These actions by Defendant Republic of Sudan were taken deliberately and recklessly, with knowledge that they would cause the sailors aboard the U.S.S. Cole, including Mr. McTureous, to suffer severe mental anguish, emotional distress, and pain and suffering.

152.   The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Mr. McTureous suffering severe mental anguish, emotional distress, and pain and suffering.

153.   As a direct and proximate result of the bombing of the U.S.S. Cole, Mr. McTureous suffered pain, mental anguish, and emotional distress.   Mr. McTureous' psychological injuries stem not only from his own personal physical injuries, but also from witnessing the injuries caused to his fellow sailors.

154.   Mr. McTureous has been diagnosed with severe post-traumatic stress disorder and suffers ongoing mental anguish and distress, as a result of the attack.

### c. Damages – Economic, Pain and Suffering, and Punitive

155.   Pursuant to 28 U.S.C. § 1605A(c), as a result of its provision of material support, in the form of funding, direction, training and cover to Al Qaeda, whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole, the Defendant Republic of Sudan is liable for economic damages and damages for pain and suffering caused by the physical and psychological injuries suffered by Mr. McTureous.

156.   Pursuant to 28 U.S.C. § 1605A(c), the Republic of Sudan is also liable to Mr. McTureous for punitive damages for his personal injuries, the proper amount of which shall be later determined by the Court.

### COUNT VI – STATUTORY PERSONAL INJURY ACTION UNDER 28 US.C. § 1605A - DAVID MORALES

157.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 65.

158.   In 2000, David Morales, in the course of his service in the United States Navy,

was a crew member aboard the U.S.S. Cole wherever its missions and orders directed it.

159.    On October 12, 2000, during the course of the voyage, and while the vessel was in Aden Harbor, Yemen, Mr. Morales was intentionally physically injured by Al Qaeda operatives supported by the Defendant Republic of Sudan.   The Al Qaeda operatives drove a boat laden with explosives into the side of the vessel and detonated the explosives.   The resultant explosion tore a 40 foot hole in the side of the vessel, causing Mr. Morales to suffer severe and permanent physical and psychological injuries.

160.    The injuries caused to Mr. Morales aboard the U.S.S. Cole on October 12, 2000, were intentional and malicious and in willful, wanton and reckless disregard of Mr. Morales' rights.

161.    Mr. Morales' injuries were not caused or contributed to by any negligence on his part, but were caused solely by the wrongful act, neglect, and default of Defendant, its agents and employees.   In particular, Mr. Morales' injuries were caused solely by the Defendant Republic of Sudan's wrongful acts described specifically in this Complaint.

### a. Assault and Battery

162.    The bombing of the U.S.S. Cole was a terrorist act intended to cause a harmful contact with the person of the sailors aboard the ship, including Mr. Morales, or an imminent apprehension of such a contact.

163.    The bombing of the U.S.S. Cole directly and indirectly caused the intended harmful contact with the person of the sailors aboard, including Mr. Morales, and the imminent apprehension of such contact.

164.    As a direct and proximate result of the bombing of the U.S.S. Cole, Mr. Morales

suffered severe and permanent physical injuries.  These physical injuries include, but are not limited to, the following: severe whiplash resulting in the development of degenerative disk disease and chronic neck spasms; blunt and penetrating trauma to his face.

165.    Further, as a result of the foregoing harmful contact and the imminent apprehension of such contact, Mr. Morales has also developed severe post-traumatic stress disorder.

166.    For his injuries, Mr. Morales has undergone extensive medical treatment for his injuries; and psychological treatment for post-traumatic stress disorder.

167.    Before the attack on the U.S.S. Cole, Mr. Morales was an able bodied sailor in the employ of the United States Navy.  Despite medical treatment, Mr. Morales continues to suffer pain and physical limitation from the injuries he sustained in the attack.  The Veteran's Administration has deemed him to be 30% disabled.

168.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Mr. Morales suffering the physical and psychological injuries described herein.

### b. Intentional Infliction of Emotional Distress

169.    Further, the actions of Defendant Republic of Sudan of providing material support leading to the bombing of the U.S.S. Cole constitute extreme and outrageous conduct intended to cause the sailors aboard, including Mr. Morales, to suffer mental anguish, emotional distress, and pain and suffering.

170.    These actions by Defendant Republic of Sudan were taken deliberately and recklessly, with knowledge that they would cause the sailors aboard the U.S.S. Cole, including

Mr. Morales, to suffer severe mental anguish, emotional distress, and pain and suffering.

171.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Mr. Morales suffering severe mental anguish, emotional distress, and pain and suffering.

172.    As a direct and proximate result of the bombing of the U.S.S. Cole, Mr. Morales suffered pain, mental anguish, and emotional distress.  Mr. Morales' psychological injuries stem not only from his own personal physical injuries, but also from witnessing the injuries caused to his fellow sailors.

173.    Mr. Morales has been diagnosed with severe post-traumatic stress disorder and suffers ongoing mental anguish and distress, as a result of the attack.

### c. Damages – Economic, Pain and Suffering, and Punitive

174.    Pursuant to 28 U.S.C. § 1605A(c), as a result of its provision of material support, in the form of funding, direction, training and cover to Al Qaeda, whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole, the Defendant Republic of Sudan is liable for economic damages and damages for pain and suffering caused by the physical and psychological injuries suffered by Mr. Morales.

175.    Pursuant to 28 U.S.C. § 1605A(c), the Republic of Sudan is also liable to Mr. Morales for punitive damages for his personal injuries, the proper amount of which shall be later determined by the Court.

### COUNT VII – STATUTORY PERSONAL INJURY ACTION
### UNDER 28 US.C. § 1605A – GINA MORRIS

176.    Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 65.

177.    In 2000, Gina Morris, in the course of her service in the United States Navy, was a crew member aboard the U.S.S. Cole wherever its missions and orders directed it.

178.    On October 12, 2000, during the course of the voyage, and while the vessel was in Aden Harbor, Yemen, Ms. Morris was intentionally psychologically injured by Al Qaeda operatives supported by the Defendant Republic of Sudan.  The Al Qaeda operatives drove a boat laden with explosives into the side of the vessel and detonated the explosives.  The resultant explosion tore a 40 foot hole in the side of the vessel, causing Ms. Morris to suffer severe and permanent psychological injury.

179.    The injuries caused to Ms. Morris aboard the U.S.S. Cole on October 12, 2000, were intentional and malicious and in willful, wanton and reckless disregard of Ms. Morris's rights.

180.    Ms. Morris' injuries were not caused or contributed to by any negligence on her part, but were caused solely by the wrongful act, neglect, and default of Defendant, its agents and employees.  In particular, Ms. Morris's injuries were caused solely by the Defendant Republic of Sudan's wrongful acts described specifically in this Complaint.

### a. Assault

181.    The bombing of the U.S.S. Cole was a terrorist act intended to cause a harmful contact with the person of the sailors aboard the ship, including Ms. Morris, or an imminent apprehension of such a contact.

182.    The bombing of the U.S.S. Cole directly and indirectly caused the intended harmful contact with the person of the sailors aboard and Ms. Morris to have the imminent apprehension of such contact.

183.   As a direct and proximate result of the bombing of the U.S.S. Cole, Ms. Morris suffered severe and permanent psychological injuries.  As a result of the foregoing imminent apprehension of harmful contact, Ms. Morris has developed severe post-traumatic stress disorder.

184.   Before the attack on the U.S.S. Cole, Ms. Morris was an able bodied sailor in the employ of the United States Navy.  Ms. Morris continues to suffer psychological limitation from the injuries she sustained in the attack.

185.   The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Ms. Morris suffering the psychological injuries described herein.

### b. Intentional Infliction of Emotional Distress

186.   Further, the actions of Defendant Republic of Sudan of providing material support leading to the bombing of the U.S.S. Cole constitute extreme and outrageous conduct intended to cause the sailors aboard, including Ms. Morris, to suffer mental anguish, emotional distress, and pain and suffering.

187.   These actions by Defendant Republic of Sudan were taken deliberately and recklessly, with knowledge that they would cause the sailors aboard the U.S.S. Cole, including Ms. Morris, to suffer severe mental anguish, emotional distress, and pain and suffering.

188.   The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Ms. Morris suffering severe mental anguish, emotional distress, and pain and suffering.

189.   As a direct and proximate result of the bombing of the U.S.S. Cole, Ms. Morris suffered pain, mental anguish, and emotional distress.  Ms. Morris has been diagnosed with

severe post-traumatic stress disorder and suffers ongoing mental anguish and distress, as a result of the attack.

### c. Damages – Economic, Pain and Suffering, and Punitive

190.    Pursuant to 28 U.S.C. § 1605A(c), as a result of its provision of material support, in the form of funding, direction, training and cover to Al Qaeda, whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole, the Defendant Republic of Sudan is liable for economic damages and damages for pain and suffering caused by the physical and psychological injuries suffered by Ms. Morris.

191.    Pursuant to 28 U.S.C. § 1605A(c), the Republic of Sudan is also liable to Ms. Morris for punitive damages for her personal injuries, the proper amount of which shall be later determined by the Court.

### COUNT VIII – STATUTORY PERSONAL INJURY ACTION UNDER 28 US.C. § 1605A - MARTIN SONGER, JR.

192.    Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 65.

193.    In 2000, Martin Songer, Jr., in the course of his service in the United States Navy, was a crew member aboard the U.S.S. Cole wherever its missions and orders directed it.

194.    On October 12, 2000, during the course of the voyage, and while the vessel was in Aden Harbor, Yemen, Mr. Songer was intentionally physically injured by Al Qaeda operatives supported by the Defendant Republic of Sudan.  The Al Qaeda operatives drove a boat laden with explosives into the side of the vessel and detonated the explosives.  The resultant explosion tore a 40 foot hole in the side of the vessel, causing Mr. Songer to suffer physical injury and severe and permanent psychological injury.

195.    The injuries caused to Mr. Songer aboard the U.S.S. Cole on October 12, 2000, were intentional and malicious and in willful, wanton and reckless disregard of Mr. Songer's rights.

196.    Mr. Songer's injuries were not caused or contributed to by any negligence on his part, but were caused solely by the wrongful act, neglect, and default of Defendant, its agents and employees.  In particular, Mr. Songer's injuries were caused solely by the Defendant Republic of Sudan's wrongful acts described specifically in this Complaint.

### a. Assault and Battery

197.    The bombing of the U.S.S. Cole was a terrorist act intended to cause a harmful contact with the person of the sailors aboard the ship, including Mr. Songer, or an imminent apprehension of such a contact.

198.    The bombing of the U.S.S. Cole directly and indirectly caused the intended harmful contact with the person of the sailors aboard, including Mr. Songer, and the imminent apprehension of such contact.

199.    As a direct and proximate result of the bombing of the U.S.S. Cole, Mr. Songer suffered severe and permanent physical injuries.  These physical injuries include, but are not limited to, the following: blunt force trauma resulting in swelling and contusions.

200.    Further, as a result of the foregoing harmful contact and the imminent apprehension of such contact, Mr. Songer has also developed severe post-traumatic stress disorder.

201.    Before the attack on the U.S.S. Cole, Mr. Songer was an able bodied sailor in the employ of the United States Navy.  Mr. Songer continues to suffer psychological limitation from

the injuries he sustained in the attack.

202.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Mr. Songer suffering the physical and psychological injuries described herein.

### b. Intentional Infliction of Emotional Distress

203.    Further, the actions of Defendant Republic of Sudan of providing material support leading to the bombing of the U.S.S. Cole constitute extreme and outrageous conduct intended to cause the sailors aboard, including Mr. Songer, to suffer mental anguish, emotional distress, and pain and suffering.

204.    These actions by Defendant Republic of Sudan were taken deliberately and recklessly, with knowledge that they would cause the sailors aboard the U.S.S. Cole, including Mr. Songer, to suffer severe mental anguish, emotional distress, and pain and suffering.

205.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Mr. Songer suffering severe mental anguish, emotional distress, and pain and suffering.

206.    As a direct and proximate result of the bombing of the U.S.S. Cole, Mr. Songer suffered pain, mental anguish, and emotional distress. Mr. Songer's psychological injuries stem not only from his own personal physical injuries, but also from witnessing the injuries caused to his fellow sailors.

207.    Mr. Songer has severe post-traumatic stress disorder and suffers ongoing mental anguish and distress, as a result of the attack.

### c. Damages – Economic, Pain and Suffering, and Punitive

208.    Pursuant to 28 U.S.C. § 1605A(c), as a result of its provision of material support, in the form of funding, direction, training and cover to Al Qaeda, whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole, the Defendant Republic of Sudan is liable for economic damages and damages for pain and suffering caused by the physical and psychological injuries suffered by Mr. Songer.

209.    Pursuant to 28 U.S.C. § 1605A(c), the Republic of Sudan is also liable to Mr. Songer for punitive damages for his personal injuries, the proper amount of which shall be later determined by the Court.

## COUNT IX – STATUTORY PERSONAL INJURY ACTION
## UNDER 28 US.C. § 1605A – SHELLY SONGER

210.    Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 65.

211.    In 2000, Shelly Songer was the spouse of Plaintiff Martin Songer, Jr., who was a sailor in the service of the United States Navy and a crew member aboard the U.S.S. Cole.

212.    On October 12, 2000, during the course of the voyage, and while the vessel was in Aden Harbor, Yemen, Mr. Songer was intentionally physically and psychologically injured by Al Qaeda operatives supported by the Defendant Republic of Sudan. The Al Qaeda operatives drove a boat laden with explosives into the side of the vessel and detonated the explosives. The resultant explosion tore a 40 foot hole in the side of the vessel, causing Mr. Songer to suffer severe and permanent psychological injuries.

213.    Ms. Songer was aware that the bombing of the U.S.S. Cole had taken place, and that Mr. Songer was on board. Ms. Songer suffered severe emotional distress and mental

anguish, upon learning of the attack on the U.S.S. Cole.

214.     Ms. Songer's injuries were not caused or contributed to by any negligence on her part, but were caused solely by the wrongful act, neglect, and default of Defendant, its agents and employees.  In particular, Ms. Songer's injuries were caused solely by the Defendant Republic of Sudan's wrongful acts described specifically in this Complaint.

### a. Intentional Infliction of Emotional Distress

215.     Further, the actions of Defendant Republic of Sudan of providing material support leading to the bombing of the U.S.S. Cole constitute extreme and outrageous conduct intended to cause the family members of the victims of attack, including Ms. Songer, mental anguish, emotional distress, and pain and suffering.

216.     These actions by Defendant Republic of Sudan were taken deliberately and recklessly, with knowledge that they would cause severe mental anguish, emotional distress, and pain and suffering to the family members of the victims of the attack.

217.     Ms. Songer was aware that the bombing of the U.S.S. Cole had taken place, and that Mr. Songer was on board the ship at the time of the attack.

218.     The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Ms. Songer suffering severe mental anguish, emotional distress, and pain and suffering.

### b. Loss of Solatium

219.     Because of the psychological injuries suffered by Mr. Songer, Ms. Songer's spouse, Ms. Songer, has been deprived of Mr. Songer's love, affection, companionship, advice, comfort, support and services.

{10012\00184440.1}                                        41

220.    The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Mr. Songer's injuries and Ms. Songer suffering loss of solatium.

221.    Ms. Songer has been damaged for the loss of solatium of her spouse Mr. Songer, as a result of the injuries suffered by Mr. Songer.

### c. Damages – Pain and Suffering, Solatium and Punitive

222.    Pursuant to 28 U.S.C. § 1605A(c), as a result of its provision of material support, in the form of funding, direction, training and cover to Al Qaeda, whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole, the Defendant Republic of Sudan is liable for damages for pain and suffering caused by the psychological injuries, and loss of solatium suffered by Ms. Songer.

223.    Pursuant to 28 U.S.C. § 1605A(c), the Republic of Sudan is also liable to Ms. Songer for punitive damages for her injuries, the proper amount of which shall be later determined by the Court.

### COUNT X – STATUTORY PERSONAL INJURY ACTION UNDER 28 US.C. § 1605A - KESHA STIDHAM

224.    Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 65.

225.    In 2000, Kesha Stidham, in the course of her service in the United States Navy, was a crew member aboard the U.S.S. Cole wherever its missions and orders directed it.

226.    On October 12, 2000, during the course of the voyage, and while the vessel was in Aden Harbor, Yemen, Ms. Stidham was intentionally physically injured by Al Qaeda operatives supported by the Defendant Republic of Sudan.  The Al Qaeda operatives drove a boat laden

with explosives into the side of the vessel and detonated the explosives. The resultant explosion tore a 40 foot hole in the side of the vessel, causing Ms. Stidham to suffer severe and permanent physical and psychological injuries.

227.   The injuries caused to Ms. Stidham aboard the U.S.S. Cole on October 12, 2000, were intentional and malicious and in willful, wanton and reckless disregard of Ms. Stidham's rights.

228.   Ms. Stidham's injuries were not caused or contributed to by any negligence on her part, but were caused solely by the wrongful act, neglect, and default of Defendant, its agents and employees. In particular, Ms. Stidham's injuries were caused solely by the Defendant Republic of Sudan's wrongful acts described specifically in this Complaint.

### a. Assault and Battery

229.   The bombing of the U.S.S. Cole was a terrorist act intended to cause a harmful contact with the person of the sailors aboard the ship, including Ms. Stidham, or an imminent apprehension of such a contact.

230.   The bombing of the U.S.S. Cole directly and indirectly caused the intended harmful contact with the person of the sailors aboard, including Ms. Stidham, and the imminent apprehension of such contact.

231.   As a direct and proximate result of the bombing of the U.S.S. Cole, Ms. Stidham suffered severe and permanent physical injuries. These physical injuries include, but are not limited to, the following: blunt and penetrating trauma to her face, resulting in permanent scarring; rupture of the tympanic membrane of both of her ears, resulting in permanent hearing loss; and broken ribs.

{10012\00184440.1}                                        43

232.   Further, as a result of the foregoing harmful contact and the imminent apprehension of such contact, Ms. Stidham has also developed severe post-traumatic stress disorder.

233.   For her injuries, Ms. Stidham has undergone extensive medical treatment for her injuries; and psychological treatment for post-traumatic stress disorder.

234.   Before the attack on the U.S.S. Cole, Ms. Stidham was an able bodied sailor in the employ of the United States Navy.  Despite medical treatment, Ms. Stidham continues to suffer pain and physical limitation from the injuries she sustained in the attack.  As a result of her condition, Ms. Stidham has not worked in two years.

235.   The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Ms. Stidham suffering the physical and psychological injuries described herein.

### b. Intentional Infliction of Emotional Distress

236.   Further, the actions of Defendant Republic of Sudan of providing material support leading to the bombing of the U.S.S. Cole constitute extreme and outrageous conduct intended to cause the sailors aboard, including Ms. Stidham, to suffer mental anguish, emotional distress, and pain and suffering.

237.   These actions by Defendant Republic of Sudan were taken deliberately and recklessly, with knowledge that they would cause the sailors aboard the U.S.S. Cole, including Ms. Stidham, to suffer severe mental anguish, emotional distress, and pain and suffering.

238.   The actions of Defendant Republic of Sudan did in fact cause the bombing and subsequently was the cause in fact of Ms. Stidham suffering severe mental anguish, emotional

distress, and pain and suffering.

239.     As a direct and proximate result of the bombing of the U.S.S. Cole, Ms. Stidham

suffered pain, mental anguish, and emotional distress.  Ms. Stidham's psychological injuries

stem not only from her own personal physical injuries, but also from witnessing the injuries

caused to her fellow sailors.

240.     Ms. Stidham has been diagnosed with severe post-traumatic stress disorder and

suffers ongoing mental anguish and distress, as a result of the attack.

### c. Damages – Economic, Pain and Suffering, and Punitive

241.     Pursuant to 28 U.S.C. § 1605A(c), as a result of its provision of material support,

in the form of funding, direction, training and cover to Al Qaeda, whose operatives facilitated the

planning and execution of the bombing of the U.S.S. Cole, the Defendant Republic of Sudan is

liable for economic damages and damages for pain and suffering caused by the physical and

psychological injuries suffered by Ms. Stidham.

242.     Pursuant to 28 U.S.C. § 1605A(c), the Republic of Sudan is also liable to Ms.

Stidham for punitive damages for her personal injuries, the proper amount of which shall be later

determined by the Court.

### PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS respectfully request the following relief:

1.     Economic damages against Defendant Republic of Sudan for their physical and

psychological injuries;

2.     Damages for pain and suffering against Defendant Republic of Sudan for their

psychological trauma, mental anguish, and emotional distress;

{10012\00184440 1}                            45

2.      Damages for loss of consortium against Defendant Republic of Sudan for Plaintiffs Andrew Lopez and Shelly Songer, as a result of the deprivation of their spouse's love, affection, companionship, advice, comfort, support and services;

3.      Punitive damages against Defendant Republic of Sudan in an appropriate amount to be determined at trial;

5.      Costs of this suit, including reasonable attorney's fees set by the Court; and any further relief which the Court deems just and proper.

Respectfully submitted,

_____
**NELSON M. JONES, III**
D.C. Bar # 320266
440 Louisiana St., Suite 1575
Houston, Texas 77002
Tel: (713) 236-8736
Fax: (713) 278-0490
Email: njonesiii@aol.com

**ANDREW C. HALL***
Florida Bar # 111480
2665 S. Bayshore Dr., PH 1
Miami, Florida 33133
Tel: (305) 374-5030
Fax: (305) 374-5033
Email: andyhall@hlhlawfirm.com

**JAMES COOPER-HILL***
Texas Bar # 04789300
320 Olympic Dr.
Rockport, Texas 78382
Tel: (361) 729-3923
Fax: (361) 727-0447
Email: corpuslaw@aol.com

Attorneys for Plaintiffs
(* *pro hac vice* admission pending)

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RICK HARRISON, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**REPUBLIC OF SUDAN,**<br><br>**Defendant.** | **Civil Action 10-1689 (RCL)** |

## ORDER AND JUDGMENT

In accordance with the Memorandum Opinion issued this day, it is hereby

**ORDERED** that final judgment is entered in favor of plaintiffs and against defendant;

**ORDERED** that plaintiffs are awarded $78,676,474 in compensatory damages and

$236,029,422 in punitive damages, for a total award of $314,705,896 to be distributed as follows:

| | Economic | Pain and Suffering | Solatium | Punitive | Total |
|---|---|---|---|---|---|
| Aaron Toney | 196,040 | 1,500,000 | 0 | 5,088,120 | 6,784,160 |
| Carl Wingate | 198,365 | 5,000,000 | 0 | 15,595,095 | 20,793,460 |
| David Morales | 248,108 | 2,000,000 | 0 | 6,744,324 | 8,992,432 |
| Edward Love | 279,613 | 2,000,000 | 0 | 6,838,839 | 9,118,452 |
| Eric Williams | 553,253 | 3,000,000 | 0 | 10,659,759 | 14,213,012 |
| Gina Morris | 562,577 | 1,500,000 | 0 | 6,187,731 | 8,250,308 |
| Jeremy Stewart | 515,627 | 7,500,000 | 0 | 24,046,881 | 32,062,508 |
| Kesha Stidham | 873,104 | 5,000,000 | 0 | 17,619,312 | 23,492,416 |
| Margaret Lopez | 52,594 | 7,500,000 | 0 | 22,657,782 | 30,210,376 |
| Martin Songer | 509,174 | 2,000,000 | 0 | 7,527,522 | 10,036,696 |
| Rick Harrison | 286,083 | 5,000,000 | 0 | 15,858,249 | 21,144,332 |
| Robert McTureous | 901,936 | 5,000,000 | 0 | 17,705,808 | 23,607,744 |
| John Buckley III | 0 | 7,500,000 | 0 | 22,500,000 | 30,000,000 |
| Keith Lorenson | 0 | 5,000,000 | 0 | 15,000,000 | 20,000,000 |
| Rubin Smith | 0 | 5,000,000 | 0 | 15,000,000 | 20,000,000 |
| Shelly Songer | 0 | 0 | 1,000,000 | 3,000,000 | 4,000,000 |
| Lisa Lorenson | 0 | 0 | 4,000,000 | 12,000,000 | 16,000,000 |
| Andy Lopez | 0 | 0 | 4,000,000 | 12,000,000 | 16,000,000 |

and it is further

      **ORDERED** that plaintiffs shall, at their own cost and consistent with the requirements of

28 U.S.C. § 1608(e), send a copy of this Order and Judgment, and the Memorandum Opinion

issued this date, to defendants.

**SO ORDERED**.

                Signed by Royce C. Lamberth, Chief Judge, on March 30, 2012.

# EXHIBIT C

AO 451 (Rev. 01/09; DC 4/10)  Clerk's Certification of a Judgment to be Registered in Another District

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| RICK HARRISON et al | ) | |
| *Plaintiff* | ) | Civil Action  No.  10cv1689-RCL |
| v. | ) | |
| REPUBLIC OF SUDAN | ) | |
| *Defendant* | ) | |

## CLERK'S CERTIFICATION OF A JUDGMENT TO BE REGISTERED IN ANOTHER DISTRICT

I certify that the attached judgment is a copy of a judgment entered by this court on *(date)*     03/30/2012     .

I also certify that, as appears from this court's records, no motion listed in Fed. R. App. P. 4(a)(4)(A) is pending before this court and that no appeal has been filed or, if one was filed, that it is no longer pending.

Date:     07/16/2012

ANGELA D. CAESAR, CLERK OF COURT

*Signature of Clerk or Deputy Clerk*

RECEIVED
OCT 02 2012
U.S.D.C. S.D. N.Y.
CASHIERS

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICK HARRISON, et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>REPUBLIC OF SUDAN,<br><br>        Defendant. | Civil Action 10-1689 (RCL) |

## ORDER AND JUDGMENT

In accordance with the Memorandum Opinion issued this day, it is hereby

    **ORDERED** that final judgment is entered in favor of plaintiffs and against defendant;

    **ORDERED** that plaintiffs are awarded $78,676,474 in compensatory damages and

$236,029,422 in punitive damages, for a total award of $314,705,896 to be distributed as follows:

| | Economic | Pain and Suffering | Solatium | Punitive | Total |
|---|---|---|---|---|---|
| Aaron Toney | 196,040 | 1,500,000 | 0 | 5,088,120 | 6,784,160 |
| Carl Wingate | 198,365 | 5,000,000 | 0 | 15,595,095 | 20,793,460 |
| David Morales | 248,108 | 2,000,000 | 0 | 6,744,324 | 8,992,432 |
| Edward Love | 279,613 | 2,000,000 | 0 | 6,838,839 | 9,118,452 |
| Eric Williams | 553,253 | 3,000,000 | 0 | 10,659,759 | 14,213,012 |
| Gina Morris | 562,577 | 1,500,000 | 0 | 6,187,731 | 8,250,308 |
| Jeremy Stewart | 515,627 | 7,500,000 | 0 | 24,046,881 | 32,062,508 |
| Kesha Stidham | 873,104 | 5,000,000 | 0 | 17,619,312 | 23,492,416 |
| Margaret Lopez | 52,594 | 7,500,000 | 0 | 22,657,782 | 30,210,376 |
| Martin Songer | 509,174 | 2,000,000 | 0 | 7,527,522 | 10,036,696 |
| Rick Harrison | 286,083 | 5,000,000 | 0 | 15,858,249 | 21,144,332 |
| Robert McTureous | 901,936 | 5,000,000 | 0 | 17,705,808 | 23,607,744 |
| John Buckley III | 0 | 7,500,000 | 0 | 22,500,000 | 30,000,000 |
| Keith Lorenson | 0 | 5,000,000 | 0 | 15,000,000 | 20,000,000 |
| Rubin Smith | 0 | 5,000,000 | 0 | 15,000,000 | 20,000,000 |
| Shelly Songer | 0 | 0 | 1,000,000 | 3,000,000 | 4,000,000 |
| Lisa Lorenson | 0 | 0 | 4,000,000 | 12,000,000 | 16,000,000 |
| Andy Lopez | 0 | 0 | 4,000,000 | 12,000,000 | 16,000,000 |

and it is further

ORDERED that plaintiffs shall, at their own cost and consistent with the requirements of 28 U.S.C. § 1608(e), send a copy of this Order and Judgment, and the Memorandum Opinion issued this date, to defendants.

SO ORDERED.

Signed by Royce C. Lamberth, Chief Judge, on March 30, 2012.

ECF
DOCUMENT
I hereby attest and certify that this is a printed copy of a document which was electronically filed with the United States District and Bankruptcy Courts for the District of Columbia.
Date Filed: 3-30-12

ANGELA D. CAESAR, CLERK
By: Michael Darby 7/13/12