**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

RICK HARRISON, JOHN BUCKLEY III,
MARGARET LOPEZ, ANDY LOPEZ,
KEITH LORENSEN, LISA LORENSEN,
EDWARD LOVE, ROBERT
MCTUREOUS, DAVID MORALES,
GINA MORRIS, MARTIN SONGER, JR.,
SHELLY SONGER, JEREMY STEWART,
KESHA STIDHAM, AARON TONEY,
ERIC WILLIAMS, CARL WINGATE, AND
TRACEY SMITH, as Personal
Representative of the Estate of Rubin Smith,

        Plaintiffs/Judgment Creditors,

v.

THE REPUBLIC OF SUDAN,

        Defendant/Judgment Debtor.

Case No. 13 Civ. 3127 (AT)

---

**MOTION FOR ENTRY OF ORDER FINDING SUFFICIENT TIME HAS PASSED
TO SEEK ATTACHMENT AND EXECUTION OF DEFENDANT/JUDGMENT
DEBTOR'S ASSETS AND AUTHORIZING PLAINTIFFS TO ATTACH
DEFENDANT/JUDGMENT DEBTOR'S ASSETS WITHIN THIS
JURISDICTION PURSUANT TO 28 U.S.C. § 1610(c)**

Plaintiffs/Judgment Creditors Rick Harrison, John Buckley, Margaret Lopez, Andy

Lopez, Keith Lorensen, Lisa Lorensen, Edward Love, Robert McTureous, David Morales, Gina

Morris, Tracey Smith as the Personal Representative of the Estate of Rubin Smith, Martin

Songer, Jr., Shelly Songer, Jeremy Stewart, Kesha Stidham, Aaron Toney, Eric Williams, and

Carl Wingate, move this Court to enter an Order, pursuant to 28 U.S.C. § 1610(c), and Rule 69,

Federal Rules of Civil Procedure, holding that Plaintiffs have satisfied all conditions precedent to

the attachment of, and execution upon assets of the Defendant/Judgment Debtor, Republic of

Sudan, and authorizing Plaintiffs to seek attachment of the blocked assets of

Defendant/Judgment Debtor within this jurisdiction.

## INTRODUCTION

In Case No. 1:10-cv-01689 (RCL), in the United States District Court for the District of Columbia, the Plaintiffs brought suit against the Defendant/Judgment Debtor, Republic of Sudan ("Judgment Debtor"), for personal injuries suffered as a result of the Judgment Debtor's terrorist acts, pursuant to the statutory cause of action described in 28 U.S.C. § 1605A. On March 30, 2012, following a non-jury trial in which evidence was presented regarding the Judgment Debtor's liability and the Plaintiffs' damages, the District Court entered a final judgment, awarding the Plaintiffs, in the aggregate, $314,705,896. (True and correct copies of the Order and Judgment and Memorandum Opinion are attached hereto as Exhibits "A" and "B").

On October 2, 2012, the Plaintiffs registered their final judgment in this district, initiating this matter as a miscellaneous matter (12 MISC. 0328), which is the basis of the instant case. (See Certification of Registration of Judgment at ECF Entry No. 1).

The Plaintiffs are currently in the process of locating assets of the Judgment Debtor, for the purposes of attachment and execution. Through discovery the Plaintiffs have learned that certain entities within this jurisdiction hold assets of the Judgment Debtor that were frozen as a result of the Sudan Sanctions Regulations, 31 C.F.R. Part 538. As described herein, the frozen assets of the Judgment Debtor and its agencies and instrumentalities are subject to attachment and execution in satisfaction of the Plaintiffs' final judgment, under the Terrorism Risk Insurance Act of 2002 ("TRIA"). As such, the Plaintiffs respectfully request that the Court enter an Order holding, pursuant to the requirements of 28 U.S.C. § 1610(c), that (1) for the purposes of attachment and execution, a reasonable period of time has elapsed following the entry of judgment and the giving of notice to the Judgment Debtor, and (2) authorizing the Plaintiffs to use all procedures available under local law to attach blocked property of the Judgment Debtor located within this jurisdiction.

## FACTUAL BACKGROUND

Fifteen of the Plaintiffs are members of the crew of the U.S.S. Cole, who were severely and permanently injured, on October 12, 2000, as a result of the bombing of the U.S.S. Cole by agents of Al Qaeda.[1]  The remaining three Plaintiffs are spouses of crew member Plaintiffs, who suffered severe emotional distress and mental anguish as a result of the bombing and injuries suffered by their spouses.

In *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007), the District Court for the Eastern District of Virginia set forth a detailed factual description of the events that led to the bombing of the U.S.S. Cole and the assistance provided to Al Qaeda by the Judgment Debtor. The District Court, in the Plaintiffs' case in the District of Columbia, took judicial notice of the findings made in *Rux* as well as making its own further findings of fact.  *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012).  In *Rux*, the District Court described the events surrounding the bombing of the U.S.S Cole as follows:

> At approximately 8:30 a.m. on October 12, 2000, the U.S.S. Cole ("Cole") entered the Port of Aden, Yemen, to temporarily stop for refueling. The Republic of Yemen is a country of 203,850 square miles located on the southern coast of the Arabian Peninsula. Aden is a city of approximately 440,000 located on Yemen's south coast. The Port of Aden is a natural harbor with a deep draft in most areas and natural land protection on all sides. In February 1999, the Navy began using Aden instead of Djibouti as the primary refueling stop for American ships during their 3,000-mile journey to the Arabian Gulf from the Mediterranean Sea. Under a contract entered into between the United States and Yemen, U.S. Navy vessels could obtain fuel at one of two fueling "dolphins" located near the mouth of the harbor without going to the pier.
>
> The Cole, an Arleigh Burke Class Destroyer, was the twenty-fifth Navy ship to stop in Aden Harbor for refueling over the previous nineteen months. As of October 2000, the ship had a crew of twenty-six officers and 270 enlisted personnel. The Cole departed from its home port of Norfolk, Virginia, on August 8, 2000, before patrolling the Mediterranean Sea. On October 9, 2000, the ship

---

[1] During the course of the case in the District of Columbia, Plaintiff Rubin Smith, a U.S.S. Cole crew member died.  His estate was substituted as a party and is represented by his widow Tracey Smith.

transited the Suez Canal and headed for Yemen. At the time that the ship entered the Port of Aden on October 12, 2000, the U.S. Department of Defense terrorist threat level in Aden was "Threat Condition (THREATCON) BRAVO," which indicated an "increased and more predictable threat of terrorist activity."

At approximately 8:49 a.m., the Cole moored starboard side to Refueling Dolphin Seven, near the mouth of the harbor. The ship began refueling at approximately 10:31 a.m. At approximately 11:10 a.m., one of the sailors standing watch over the refueling noticed a small boat heading "fast and hard" toward the Cole from the direction of the city. The boat, painted white with fire red trim, was about thirty-five feet long and six to seven feet wide and had a shallow V-hull. It looked "brand new." The boat was similar in size and shape to many other small vessels in the harbor, including the service craft that had been alongside the Cole. The boat was manned by two males, both of whom appeared to be in their early thirties. The two men slowed the boat as they approached the Cole, maneuvered it parallel to the ship and came down the port side headed aft. As they did so, the two men in the boat were smiling, and waved to the crew. Some crew members returned the greeting. Seconds later, the boat exploded.

The explosion occurred between approximately 11:15 and 11:18 a.m., just as some of the crew was sitting down for lunch. The blast ripped a thirty-two- by thirty-six-foot hole in the port side. . . . Smoke, dust, and fuel vapors filled the air. The main engine room, auxiliary machine room, and the dry provisions storeroom were flooded. Several chambers, including the Crew and Chief Petty Officer's Galley, were structurally destroyed. The blast and its after-effects killed seventeen Navy sailors, all of them American citizens. Forty-two others were injured, some of them sustaining serious burns to their faces, hands and arms, as well as lacerations and fractures.

495 F. Supp. 2d at 544-45; *see also Harrison*, 882 F. Supp. 2d at 31.

The horrific injuries suffered by the Plaintiffs as a result of the bombing and the mental anguish suffered by their spouses is described in detail in the D.C. District Court's Memorandum Opinion.  See Exhibit B; *see also Harrison*, 882 F. Supp. 2d at 35-45.

The D.C. District Court found as follows regarding the Judgment Debtor's support of Al Qaeda and facilitation of the attack on the U.S.S. Cole:

Since 1993, the United States has designated Sudan as a state sponsor of terrorism. During the 1990s, Hassan Abdallah Turabi, head of the Sudanese political party and leader of the Muslim Brotherhood and the National Islamic Front ("NIF"), transformed Sudan into a centralized, Islamic state that supported movements and organizations with militant Islamic ideologies.

As is well-known today, Al Qaeda is a worldwide terrorist network. Founded by Osama Bin Laden in approximately 1990, it has organized, executed or inspired acts of terrorism around the world that killed or injured thousands of innocent people, including the September 11, 2001 attacks on the United States.

According to the U.S. State Department, Bin Laden relocated to Sudan from Afghanistan in 1991, where he was welcomed by Turabi. Turabi and Bin Laden shared a common extremist ideological and religious outlook. Bin Laden agreed to help Turabi in the regime's ongoing war against African Christian separatists in southern Sudan, and also to invest his wealth in the poor country's infrastructure. In exchange, Sudan provided Bin Laden's fledgling terrorist group with a sanctuary within which it could freely meet, organize, and train militants for operations. In 1996, he was expelled from the country under international pressure and returned to Afghanistan. Both before and after this departure, the effects of Sudan's support of Al Qaeda were substantial.

\* \* \* \*

While receiving support from Sudan, Al Qaeda prepared the strike against the Cole. The attack was part of a decade-long plan conceived and executed by Bin Laden and Al Qaeda to confront U.S. interests in the Middle East. Bin Laden supervised the Cole plot directly.  As stated in the 9/11 Commission Report, Bin Laden "chose the target and location of the attack, selected the suicide operatives, and provided the money needed to purchase explosives and equipment." Id. Mr. Emerson[2] and Mr. Vidino[3] both testified that the attack's "mastermind" was Qaed Salim Sinan al-Harethi, also known as Ali Qaed Sinan Harthi, who was one of Bin Laden's bodyguards. They further assert that Al–Harethi was trained by Al Qaeda in Sudan in the 1990s before being dispatched to Yemen where, according to Mr. Vidino, he became "the chief of operation[s] of Al Qaeda in Yemen."

In addition to training, Sudan was "more likely than not" the source of the explosives used in the Cole bombing, according to CIA Director Woolsey. Mr. Emerson testified, "I have no doubt the source [of the explosives used on the Cole] came from Al Qaeda and was transported to Yemen from Al Qaeda or by the Sudanese government through most probably the diplomatic pouch." Mr. Farah testified that his "best guess" as to the source of the explosives used in the Cole, based on his "studied opinion and having discussed this case with

---

[2] Steve Emerson is an Executive Director of The Investigative Project on Terrorism and an expert on Islamic extremist networks. The D.C. District Court accepted Mr. Emerson as an expert witness on terrorism, the relationship between Al Qaeda and Sudan, and the material support Sudan provided to Al Qaeda for the Cole bombing. *Harrison*, 882 F. Supp. 2d at 31 fn. 10.

[3] Lorenzo Vidino is a Research Program Manager at the Jebsen Center for Counter–Terrorism Studies at The Fletcher School of Tufts University.  The D.C. District Court accepted Mr. Vidino as an expert witness on terrorism, the relationship between Al Qaeda and Sudan, and the material support Sudan provided to Al Qaeda for the Cole bombing. *Id.*

intelligence officials," is Sudan, "which was the closest place to Yemen in which they had the safe quarter in which to be able to move this type of goods across the border." As well, according to Mr. Emerson, the explosives used in the Cole attack were sent by Al Qaeda operatives in Sudan. In criminal proceedings arising out of the 1998 embassy bombings, one of Bin Laden's lieutenants in Sudan, Jamal Al–Fadl, corroborated this fact when he testified against Bin Laden. Specifically, Mr. Al–Fadl stated under oath that he worked under Bin Laden in Sudan; that he stored four crates of weapons and explosives at a farm in Sudan owned by Bin Laden; and that he shipped the four crates in an Al Qaeda-owned boat from a facility owned by the Sudanese military in Port Sudan to Yemen, where they were to be used to "fight the Communists."

In sum, the evidence suggests that Sudan provided Al Qaeda with the support, guidance, and resources that allowed it to transform into a sophisticated, terrorist network, and that such support was critical to Al Qaeda developing the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the Cole attack. As Mr. Woolsey testified, "[t]he proximity of Sudan to Yemen, the need for a protected logistics infrastructure, the confused situation in the Government of Yemen at the time ..., the amount of explosives that needed to be put in the boat that attacked the Cole, all that suggests to me that the logistical support and base of operations that could have been available in Sudan could have been of substantial assistance to an attack in Yemen, such as the one that occurred." He summarized: the Cole attack "might have been possible, but it would not have been as easy" without Sudan's support. In addition, Mr. Vidino stated that the bombing would have been "close to impossible" without Sudan's assistance because "simply all they needed, starting from the training to the explosives, to all what a terrorist cell needs, even the ideological aspect of it, came from Sudan. It was clearly necessary to have all these things in place to carry out an operation such as the attack on the Cole." In addition, Mr. Emerson asserted that the Cole attack would not have occurred without Sudan. According to Emerson, by removing Sudan's support, "[y]ou would have deprived them of the oxygen needed to operate." Moreover, Mr. Farah testified that he did not think the bombing of the Cole could have happened "without the active support of the Government of Sudan ... from 1992 through the Cole bombing, Sudan provided an incredibly necessary and vital infrastructure for Al–Qaeda to be able to prepare and move the explosives and carry out the attacks on the Cole. And it was not clandestine or hidden presence, but rather fairly overt and knowing presence by senior members of the NIF government in Sudan."

In light of the submitted reports, testimony, and other uncontroverted evidence, the Court finds that Sudan provided material support to Al Qaeda such that the terrorist organization could attack the Cole. The conforms to the findings of the *Rux* court, discussed above.

*Id.* at 31-32, 34-35 (internal citations omitted).

A.      **The Court has Subject Matter Jurisdiction Over this Enforcement Proceeding.**

Upon registration of the judgment, this Court obtained subject matter jurisdiction over the enforcement proceeding through ancillary jurisdiction to enforce a judgment. *See Rubin v. Islamic Republic of Iran*, No. 06 Civ. 11053, 2006 WL 2879759, at *1 (D.Mass. Sept. 30, 2006) ("This Court acquired jurisdiction over the present controversy [to attach assets purportedly belonging to Iran] when the plaintiffs registered here the judgment they had obtained against Iran in the United States District Court for the District of Columbia."); *see also Weininger v. Castro*, 462 F. Supp. 2d 457, 490 (S.D.N.Y. 2006). No independent basis of jurisdiction is needed to commence an enforcement proceeding against a garnishee not a party to the original suit. *See RCA Corp. v. Tucker*, 696 F.Supp. 845, 850 (E.D.N.Y.1988) ("[A]s to subject matter jurisdiction, the authorities are unanimous that a federal court maintains ancillary jurisdiction to enforce its own judgments, and that, under Rule 69, Fed.R.Civ.P., no independent jurisdictional basis is necessary to commence an enforcement proceeding against a garnishee not a party to the original suit.").

B.      **Plaintiffs Have Satisfied Their Obligations under 28 U.S.C. § 1610(c) by Providing Cuba with Notice of this Proceeding**

"Section 1610(c) of the FSIA imposes two basic requirements on a plaintiff seeking to enforce a judgment against a foreign state or its agencies and instrumentalities: first, each defendant must receive notice that judgment has been entered against it; and second, each defendant must be given an adequate opportunity to respond." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 798 F. Supp. 2d 260, 266-67 (D.D.C. 2011) (citing *Murphy v. Islamic Republic of Iran*, No. 06 Civ. 596, 778 F.Supp.2d 70, 72–73, 2011 WL 1517985, at *2, 2011 U.S. Dist. LEXIS 43363, at *5–6 (D.D.C.2011)).

In cases in which a claim is made pursuant to the cause of action described in 28 U.S.C. § 1605A, the plaintiff is required to serve a default judgment on the defendant in the same manner in which service of the complaint can be accomplished, under 28 U.S.C. § 1608. *See* 28 U.S.C. § 1608(e); *see also* 22 C.F.R. § 93.2.

The FSIA distinguishes between the requirements for service upon a foreign state and requirements for service on agencies and instrumentalities of that foreign state. *See* 28 U.S.C. § 1608(a) and (b). Section 1608(a), governing service of process on a foreign state, prescribes a hierarchy of four alternative procedures to use when serving process on a foreign state or political subdivision. The first two procedures provide for service according to either special arrangements between the parties, or international conventions governing service of process. 28 U.S.C. § 1608(a)(1)–(2). If neither private arrangements nor formal conventions exist, service can be made under § 1608(a)(3),

> by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned,

or according to § 1608(a)(4), which provides for service,

> by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court, to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a)(3)–(4).

Section 1608(b) governs service of process on an agency or instrumentality of a foreign state. Under § 1608(b), service may be made first in accordance with any special arrangement

between the parties, or alternatively, in accordance with applicable international conventions. 28

U.S.C. § 1608(b)(1)-(2). If neither of these conditions exist, then the plaintiff is required to serve

notice

> if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state-
>
> (A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or
>
> (B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or
>
> (C) as directed by order of the court consistent with the law of the place where service is to be made.

28 U.S.C. § 1608(b)(3).

Because there are no special arrangements or international conventions for service with

the Judgment Debtor Republic of Sudan, service on the Judgment Debtor could have been

accomplished only through subsections 1608(a)(3) or (a)(4). *See e.g., Abur v. Republic of Sudan*,

437 F. Supp. 2d 166, 173 (D.D.C. 2006) ("Because plaintiffs had no "special arrangement" for

service with either Sudan or Iran and because neither country is a party to an "international

convention on service of judicial documents," the preferred method of service is provided by

section 1608(a)(3) – that is, any form of mail requiring a signed receipt."). In the instant case,

service was made upon the Judgment Debtor pursuant to § 1608(a)(3).

### i.    Service of the D.C. District Court Final Judgment

On October 4, 2010, the Plaintiffs filed their Complaint in the United States District

Court for the District of Columbia. *See* Docket in Case No.: 1:10-cv-01689 at ECF Entry 1,

attached as Exhibit "C". On October 11, 2010, the Plaintiffs filed an Amended Complaint, for

the purpose of adding additional Plaintiffs. *Id.* at ECF Entry 8. Pursuant to the service

procedure described in 28 U.S.C. § 1608(a)(3), the Defendant, Republic of Sudan, was served by the Clerk of this Court with the Summons, Amended Complaint, and Amended Notice of Suit in this matter and with Arabic translations of said documents, on November 17, 2010. *Id.* at ECF Entry 10. Pursuant to 28 U.S.C. § 1608(d), the Defendant was required to file a response to the Plaintiffs' Amended Complaint within sixty (60) days after service had been made, or by January 17, 2011. The Defendant failed to plead, answer or otherwise respond to the Complaint and as a result, a Clerk's Default was entered by the Court on January 19, 2011. *Id.* at ECF Entry 13.

Before the Plaintiffs could be awarded any relief, the District Court was required to determine whether the Plaintiffs had established their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Taylor v. Islamic Republic of Iran*, 2011 WL 3796156, *3 (D.D.C. 2011). On September 21, 2011, an evidentiary hearing on liability and damages was held. *Id.* at ECF Entry 15. During the hearing, this Court accepted evidence in form of depositions, affidavits, expert testimony, and original documentary evidence. On March 30, 2012, the District Court entered a final judgment, awarding the Plaintiffs, in the aggregate, $314,705,896. *See* Exhibit A.

On April 20, 2012, at the Plaintiffs' request, pursuant to 28 U.S.C. § 1608(e), the Clerk of the District Court served the Defendants with a Notice of the Default Judgment and Amended Default Judgment in the same manner as the Complaint was served, pursuant to 28 U.S.C. § 1608(a)(3) and 22 C.F.R. § 93.2. *See* Exhibit C at ECF Entry 45. On April 23, 2012, the package served by the Clerk was delivered to the Judgment Debtor. *See* USPS Track and Confirm Delivery Confirmation attached as Exhibit "D".

Service of the Notice of Default Judgment by the Clerk of Court, pursuant to the procedure described in 28 U.S.C. § 1608(a), is a recognized procedure for providing notice in

compliance with 28 U.S.C. § 1610(c). *See Agudas*, 798 F. Supp. 2d at 267. Accordingly, the Court should hold that the Plaintiffs have satisfied the notice requirement of § 1610(c).

As more than a year having passed since the Notice of Default Judgment was served on the Judgment Debtor, sufficient time has passed to satisfy the second requirement of 28 U.S.C. § 1610(c).[4]  *See Ned Chartering & Trading, Inc. v. Republic of Pak.*, 130 F.Supp.2d 64, 67 (D.D.C. 2001) (collecting cases to conclude "that other courts have found periods such as two or three months sufficient to satisfy section 1610(c)'s requirements" and separately determining that six weeks was acceptable). Because the Plaintiffs have satisfied both requirements of 28 U.S.C. § 1610(c), the Court may then enter an order directing attachment and execution to issue against assets of the Judgment Debtor. *See* 28 U.S.C. § 1610(c).

### C. Because Sudan is a Terrorist Party, under the TRIA, Its Blocked Assets and those of its Agencies and Instrumentalities are Subject to Turnover in Satisfaction of the Judgment in this Case.

Following entry of the Final Judgment by the D.C. District Court, the Plaintiffs served the Office of Foreign Asset Control ("OFAC") of the U.S. Treasury Department with a subpoena seeking a list of all financial institutions holding assets in the United States that are blocked as a result of governmental sanctions against the Republic of Sudan.[5]

In its response to the Plaintiffs' subpoena, OFAC identified several entities within this jurisdiction holding assets that have been frozen under the Sudan Sanctions Regulations, 31 C.F.R. Part 358. To the extent that these frozen assets are the property of the Judgment Debtor

---

[4] Since the Notice of Default Judgment was served upon the Judgment Debtor, it has not appeared or contacted the Plaintiffs for any purpose.

[5] Prior to providing its response, OFAC through the Department of Justice requested that a protective order be entered governing the disclosure of information it provided in response to the Plaintiffs' subpoena. The Plaintiffs' agreed to OFAC's request; and a protective order was entered. (*See* Exhibit C at ECF Entry 47). Should the Court require it, the Plaintiffs would request leave to provide OFAC's response to the Plaintiffs' subpoena under seal.

or its agencies and instrumentalities the assets are blocked property subject to execution under the TRIA.

> **i.  As judgment holders against a terrorist party, the Plaintiffs can execute their judgment upon blocked assets of Sudan and its agencies and instrumentalities under § 201(a) of the TRIA and 28 U.S.C. § 1610(g)**

The Plaintiffs' claims were brought pursuant to the statutory cause of action for terrorism related injuries and death that is codified in 28 U.S.C. § 1605A. *See* Exhibit B. As such, the Plaintiffs can seek to execute their judgment against blocked assets of Sudan and its agencies and instrumentalities, pursuant to 28 U.S.C. § 1610(g) and § 201(a) of the TRIA. *See Gates v. Syrian Arab Republic*, 2013 WL 1337223 at *3 (N.D. Ill. 2013) ("Section 1610(g) of the FSIA and Section 201 of the TRIA each permit attachment against assets of a foreign state, or an agency or instrumentality of that foreign state, in aid of execution of a judgment obtained under 28 U.S.C. § 1605A.").

"The TRIA was … specifically intended to 'deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties.'" *Hill v. Republic of Iraq*, 2003 WL 21057173 (D.D.C. 2003) (citing 148 Cong. Rec. H8728 (Nov. 13, 2002)). The TRIA provides that:

> [I]n every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under Section 1605(a)(7) of Title 28, United States Code, **the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment** to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610 Note, TRIA § 201(a), 116 Stat. at 2337 (emphasis added).

Similarly, 28 U.S.C. § 1610(g), states in pertinent part:

[T]he property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution....

28 U.S.C. § 1610(g).

### ii.     Sudan is a "terrorist party," under the TRIA

Under the TRIA, a terrorist party is "a terrorist, terrorist organization . . ., or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961." 15 U.S.C. § 1610 Note, TRIA § 201(d)(4), 116 Stat. 2332, 2340 (citations omitted).

Sudan was designated a state sponsor of terrorism in 1993.  *See* 58 Fed.Reg. 52, 523 (Oct. 8, 1993).  Once a country has been designated as a state sponsor of terrorism, the designation cannot be rescinded unless the President submits to Congress a proper report, as described in the Export Administration Act.  *See* 50 U.S.C. app. § 2405(j)(4).  Sudan has never been removed from this list of state sponsors of terrorism.  *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 149 (D.D.C. 2011).  Accordingly, the Republic of Sudan is a terrorist party under TRIA § 201.  *See Rux v. ABN-Amro Bank, N.V.*, 08 CIV. 6588 AKH, 2009 WL 8660085 (S.D.N.Y. 2009) ("Since 1993, the U.S. Dept. of State has designated Sudan as a state sponsor of terrorism.  Sudan is therefore a terrorist party as that term is used in TRIA § 201.").

### ii.     Assets of Sudan frozen under the Sudan Sanctions Regulations are "blocked assets" under the TRIA

The TRIA defines "blocked asset" as "any asset seized or frozen by the United States under Section 5(b) of the Trading With the Enemy Act (50 U.S.C.App. § 5(b)) or under sections 202 and 203 of the International Emergency Powers Act (50 U.S.C. §§ 1701; 1702)."  15 U.S.C. § 1610 Note, TRIA § 201(d)(2), 116 Stat. at 2340.

The funds the Plaintiffs seek to attach were frozen under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq .).  *See* E.O. 13067, 62 FR 59989, 3 CFR, 1997 Comp., p. 230; *see also* E.O. 13412, 71 FR 61369, 3 CFR, 2006 Comp., p. 244.  As such, they are attachable "blocked assets" under the TRIA.

## CONCLUSION

Based on the foregoing, the Plaintiffs respectfully request that the Court enter an order holding, pursuant to the requirements of 28 U.S.C. § 1610(c), that (1) for the purposes of attachment and execution, a reasonable period of time has elapsed following the entry of judgment and the giving of notice to the Judgment Debtor, and (2) authorizing the Plaintiffs to use all procedures available under local law to attach blocked property of the Judgment Debtor located within this jurisdiction.

Respectfully submitted,

/s/ Edward H. Rosenthal
Edward H. Rosenthal, Esq.
Beth I. Goldman, Esq.
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York 10022
Tel:  (212) 980-0120
Fax: (212) 593-9175

*Attorneys for Plaintiffs Rick Harrison, et al.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the forgoing was delivered via U.S. mail on this 31st day of May, 2013 to: Republic of Sudan, Ali Ahmed Karti, Minister of Foreign Affairs, Embassy of the Republic of Sudan, 2210 Massachusetts Avenue NW, Washington, DC 20008.

/s/ Beth I. Goldman