# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
┌─────────────────────────────────┐
│ RICK HARRISON, et al.,          │
│                                 │
│               Plaintiffs,       │
│                                 │
│     v.                          │
│                                 │
│ REPUBLIC OF SUDAN,              │
│                                 │
│               Defendant.        │
└─────────────────────────────────┘
```

Civil Action 10-1689 (RCL)

## MEMORANDUM OPINION

This case arises out of the bombing of the U.S.S. Cole ("the Cole") on October 12, 2000.

The attack ripped a thirty-two-by-thirty-six-foot hole in the side of the vessel when it was berthed

in Yemen's Aden Harbor.  Seventeen servicemen and women were killed, and forty-two suffered

injuries.  The eighteen plaintiffs before this Court are fifteen former sailors who were injured

while on the Cole and three of their spouses, who, although not on the Cole during the attack,

allegedly suffered emotional distress upon learning of the incident.[1]  Plaintiffs bring this action

under the "state-sponsored terrorism" exception to the Foreign Sovereign Immunities Act

("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq*.[2]  Plaintiffs allege that defendant Republic of Sudan

("Sudan") is liable for their injuries by virtue of its support of Al Qaeda, which perpetrated the

Cole bombing.  Before the Court is [Dkt # 14] plaintiffs' motion for a default judgment against

---

[1]      Since the filing of this lawsuit, one plaintiff, Rubin Smith, has died.  After his
claim was severed, his spouse, as administrator of his estate and upon motion, rejoined the case
[Dkt. #34].

[2]      This provision which was enacted as part of the 2008 National Defense
Authorization Act ("NDAA").  Pub. L. No. 110-181, § 1083, codified at 28 U.S.C. § 1605A.  It
creates a "federal right of action against foreign state."  *Simon v. Republic of Iran*, 529 F. 3d
1187, 1190 (D.C. Cir. 2008).

Sudan.  After making pertinent findings of fact, the Court concludes that plaintiffs have provided

sufficient evidence to establish a cause of action against Sudan under FSIA's state-sponsored

terrorism exception, that Sudan is liable to the plaintiffs for the alleged harms, and that plaintiffs

are entitled to both compensatory and punitive damages.  In accordance with these findings and

conclusions, the Court awards damages to plaintiffs.

## I.  BACKGROUND

**A.     Prior and Current USS Cole Litigation**.

Two cases involving the Cole attack relate to the case at bar and speak to the question of

Sudan's liability for the Cole attack.  In *Rux v. Republic of Sudan* fifty-seven survivors of the

seventeen sailors who died in the Cole attack sued Sudan for damages.  *Rux v. Republic of*

*Sudan*, 2005 WL 2086202 (Aug. 26, 2005).  After defaulting, Sudan moved to dismiss plaintiffs'

claims on jurisdictional and immunity grounds.  The district court denied Sudan's motion,

concluding that plaintiffs had alleged sufficient jurisdictional facts to bring their case within the

FSIA state-sponsored terrorism exception.  *Id.*  Sudan appealed.  The United States Court of

Appeals for the Fourth Circuit affirmed the district court, finding that plaintiffs' allegations met

FSIA's jurisdictional pleading requirements "by describing how Sudan provided Al-Qaeda a base

of operations to plan and prepare for the bombing, and provided operational support for the

attack." *Rux v. Republic of Sudan*, 461 F.3d 461, 473–74 (4th Cir. 2006).  The district court then

proceeded to the merits of plaintiffs' claims and concluded that, even though Sudan was liable

for plaintiff's injuries,  plaintiffs were only entitled to damages under the Death on the High Seas

Act (DOHSA), 46 U.S.C. § 30302.  The Court held that "[w]hile the FSIA vests jurisdiction in

federal courts to hear cases against foreign states, it does not afford plaintiffs with a substantive

cause of action."  495 F. Supp. 2d 541, 555 (E.D. Va 2007*).  Accordingly, the district court

dismissed plaintiffs' maritime and state law claims and awarded eligible plaintiffs $ 7,956,344

under DOHSA. *Id.* at 567–69. Plaintiffs appealed the district court's judgment. While this

appeal was pending, Congress passed the 2008 NDAA amendment to the FSIA which, in

addition to creating a federal private right of action, added punitive damages and solatium as

recoverable damages in a new section of the FSIA, § 1605A. *See* 28 U.S.C. § 1605A(c). Under

this provision, the same fifty-seven *Rux* plaintiffs filed a second lawsuit in August 2010, joining

with two new plaintiffs to the case. *Kumar v. Republic of Sudan*, 2011 WL 4369122 (E.D. Va.

Sept. 19, 2011). The same district court that heard *Rux* considered and rejected the claims of the

plaintiffs to whom it had awarded judgments in the previous litigation, reasoning that both *res

judicata* and the prohibition on legislative reopening of final judgments barred them. *Id.* at

*10–11 (citing *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 241 (1995)). The court therefore

awarded damages only to the new plaintiffs who had not been party to the previous *Rux*

litigation. *Id.* at *11.[3] Plaintiffs in the case at bar were not plaintiffs in *Rux* or *Kumar*.

The Court underscores an important matter before proceeding: because plaintiffs in this

case bring their action under the new § 1605A, they are entitled to types of damages — i.e. for

pain and suffering and solatium — and punitive damages that the *Rux* plaintiffs, who initiated

their action before § 1605A was enacted, did not obtain. As the Court will explain below, these

new damages can amount to substantially larger sums than the *Rux* court awarded those

plaintiffs. The Court regrets this disparity and emphasizes that the difference primarily reflects a

_____

[3]     The Court respectfully disagrees with the *Kumar* court's application of *res
judicata* to bar plaintiffs' claims. For purposes of that doctrine, this Court is not persuaded that
there is a meaningful distinction between the procedural posture of the *Kumar* plaintiffs and that
of the plaintiffs in *In re Islamic Republic Iran Terrorism Litigation* where this Court concluded
that *res judicata* did not preclude claims filed under § 1605A even though they had been litigated
under § 1605(a)(7). *In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31,
84–85 (D.D.C. 2009).

change in the governing statute rather than this Court's assessment of the relative hardship

endured by the *Rux* plaintiffs and the plaintiffs currently before the Court.

## B.      Plaintiffs' Claims Before This Court

Plaintiffs effected service of the complaint, summons, and notice of suit on Sudan by

mail.  *See* 28 U.S.C. § 1608(a)(3).  Sudan accepted service on November 17, 2010.  Return of

Service/Affidavit, Nov. 23, 2010 [Dkt. # 11].  Under § 1608(d) of the FSIA, this service

obligated Sudan to serve and answer or other responsive pleading within 60 days after service.

28 U.S.C. § 1608(d).  It failed to do so.  On January 19, 2011 plaintiffs obtained entry of default

from this court.  Clerk's Entry of Default, Jan. 19, 2011 [Dkt. # 13].  Plaintiffs now move for a

default judgment [Dkt. # 14].  To date, Sudan has not served an answer or any other responsive

pleading.

## II. LEGAL STANDARDS

## A.      Default Judgment

The FSIA states that a court shall not enter a default judgment against a foreign state

"unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."

28 U.S.C. § 1608(e); *Roeder v. Islamic Republic of Iran*, 333 F. 3d 228, 232 (D.C. Cir. 2003).

This standard mirrors that applied to entry of default judgment against the United States in

Federal Rule of Civil Procedure 55(d).[4]  *See Hill v. Republic of Iraq*, 328 F. 3d 680, 684 (D.C.

Cir. 2003).  FED. R. CIV. PROC. 55(d).

In considering motions for default judgment, a court may accept as true the plaintiffs'

"uncontroverted evidence," *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 155

---

[4]      Rule 55(d) provides: "no default [judgment] shall be entered against the United States . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  FED. R. CIV. P. 55 (d).

(D.D.C. 2009) including proof by affidavit.  *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83–85 (D.D.C. 2010).  On September 21, 2011 an evidentiary hearing was held before the Honorable Henry H. Kennedy, Jr.[5]  During that hearing, the Court accepted evidence in form of depositions, affidavits, expert testimony, and original documentary evidence.  Reviewing these submissions, this Court will determine whether or not the evidence is sufficiently "satisfactory" to prove Sudan's liability and the damages that plaintiffs seek.  28 U.S.C. § 1608(e).[6]

## B.      Jurisdiction and Immunity

To state a viable claim, plaintiffs must first demonstrate that this Court has jurisdiction to hear the claims they assert and that Sudan is not entitled to immunity from suit.  The FSIA is the "sole basis of jurisdiction over foreign states in our courts."  *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 39 (D.D.C. 2009).  While foreign sovereigns enjoy general immunity from suit in U.S. courts, FSIA § 1605A establishes a waiver provision that is conditioned on a number of factors.  Specifically, a foreign state is not immune from suits in which the following factors are met: (1) money damages are sought (2) against that state for (3) personal injury or death that (4) was "caused by" (5) an act of torture, extrajudicial killing . . . or the provision of material support of resources for such an act if such act or provision of material support or resources is engaged in by an official, employee or agent of such foreign state while acting within the scope of his or her office, employment or agency."  28 U.S.C. § 1605(A)(a)(1);

---

[5]      Courts are not required to hold an evidentiary hearing, *see Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 78 (D.D.C. 2006), but typically do so as a matter of custom and acknowledgment of the defendants' sovereign status.

[6]      This case was reassigned to the undersigned judge on November 4, 2011 after Judge Kennedy's retirement.  I have carefully reviewed all of the evidence presented to Judge Kennedy.

*accord Owens v. Republic of Sudan*, 2011 WL 5966900, at \*17 (D.D.C. Nov. 11, 2011).[7]
Because plaintiffs in this case do not allege torture or extrajudicial killing, only the "material
support" provision is relevant to the case at bar.  With regard to § 1605A's causation
requirement, in this Circuit there must be "some reasonable connection between the act or
omission of the defendant and the damages which the plaintiff has suffered."  *Valore*, 700 F.
Supp. 2d 52, 66 (internal quotations omitted).

Furthermore, the FSIA provides that courts  "shall hear a claim" under § 1605A of the
FISA if (1) the foreign state was designated as a state sponsor of terrorism at the time the act
occurred; (2) the claimant was a United States national, a member of the armed forces, or
otherwise an employee or contractor of the Government of the United States, acting within the
scope of her employment and (3) the claimant has afforded the foreign state a reasonable
opportunity to arbitrate the claim, provided that the act occurred in the foreign state against
which the claim is brought.  28 U.S.C. § 1605(A)(a)(2).  Combined, these § 1605A(a)(1) and
(a)(2) factors determine the Court's jurisdiction over the present case and whether Sudan has
effectively waived its immunity from suit.  To resolve these threshold questions, the Court first
makes relevant findings of fact, as discussed below.

## C.    Cause of Action and Theory of Liability

After establishing jurisdiction, plaintiffs must also advance a theory of recovery that is
supported by the evidence presented to the court.  When a state is subject to suit under an

---

[7]        "[T]he defendant bears the burden of proving that the plaintiff's allegations do not
bring its case within a statutory exception to immunity."  *Phoenix Consulting, Inc. v. Republic of
Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (citing *Transamerican S.S. Corp. v. Somali Democratic
Republic*, 767 F.2d 998, 1002 (D.C. Cir.1985) and *Princz v. Federal Republic of Germany*, 26
F.3d 1166, 1171 (D.C. Cir. 1994)); *Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 94 (D.D.C.
2006) (citing *Phoenix* and stating "sovereign immunity is in the nature of an affirmative
defense.").

exception to immunity, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 1606.

Section 1605A(c) of the FSIA creates an explicit "private right of action," which, when read in concert with §1605A(a)(1), establishes the requirements for a viable claim. *Id.* §1605A(a)(1). Courts have interpreted the FSIA-created cause of action to require plaintiffs to prove a theory of liability under which defendants cause the alleged injury or death. *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 176 (D.D.C. 2010). Plaintiffs must supply the elements of each specific claim — in this case, assault, battery, and intentional infliction of emotional distress ("IIED"). Because the statute is silent as to these elemental requirements, courts in this district apply principles of law found in the Restatement of Torts and other leading treatises. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 76; *In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d at 60 n.19; *Heiser v. Islamic Republic of Iran (Heiser II),* 659 F. Supp. 2d 20, 24 (D.D.C. 2009); *see also Bettis v. Islamic Republic of Iran* 315 F.3d 325, 333 (D.C. Cir. 2003) ("[F]ederal courts in FSIA . . . cases have accepted § 46 of the Restatement (Second) of Torts as a proxy for state common law of intentional infliction of emotional distress"). Having established the applicable law and evidentiary requirements, the Court now reviews the evidence and makes findings of fact.

### III. FINDINGS OF FACT

#### A. Judicial Notice of Facts Found in Other Courts

As a preliminary matter, the Court must determine whether or not it will take judicial notice of findings made in *Rux*, as plaintiffs request [Dkt. #26]. As discussed above, both the district court and the Fourth Circuit concluded in that litigation that plaintiffs had alleged sufficient facts as to Sudan's material support of Al Qaeda and the Cole attack and that the

country was therefore not immune from suit. *Rux,* 495 F. Supp. 2d at 554 (citing and reaffirming *Rux v. Sudan*, 461 F.3d at 467–75 (E.D. Va 2006); *Rux*, 461 F.3d at 473–74.[8]  The district court then proceeded to find that, as a matter of fact, Sudan had provided such support and was liable for plaintiffs' harm. *Rux,* 495 F. Supp. 2d at 556.

Courts in this district have taken judicial notice of related FSIA proceedings and findings of fact made therein.  *See, e.g.*, *Estate of Doe v Islamic Republic or Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011) (taking judicial notice of facts found in *Dammarell v. Islamic Republic of Iran*, 2006 WL 2583043 (D.D.C. Sept. 7, 2006) which found Iran had provided material support to Hizbollah for the attack on the U.S. Embassy in Beirut); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43 (D.D.C. 2009) (taking notice of the same for *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 132 (D.D.C. 2001)); *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1,6–7 (D.D.C. 2011) (taking notice of facts found in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003), which found Iran provided material support for the 1984 bombing of the U.S. Marine barracks)).  Indeed, "[t]he statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack," *Rimkus v. Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010). Thus, when a court has found facts relevant to a FSIA case involving  material support to terrorist groups, courts in subsequent, related cases may "rely upon the evidence presented in

---

[8]      Sudan appeared in these earlier proceedings.  It filed a motion to dismiss, which was denied on August 26, 2005.  *Rux*, 495 F. Supp. 2d at 543.  On appeal, the United States Court of Appeals for the Fourth Circuit affirmed the Eastern District of Virginia's ruling. Subsequently, counsel for Sudan notified the Eastern District that they would not defend nor participate in the proceeding on the merits.  A clerk default was entered, and the matter proceeded to trial.  *Id.*  Counsel for Sudan attended trial but did not participate other than to make a brief closing statement regarding damages.  *Id.*  Based upon the evidence submitted at trial, judgment was entered against Sudan on July 25, 2007.  *Id.* at 566–69.

earlier litigation . . . without necessitating the formality of having that evidence reproduced." *Taylor*, 811 F. Supp. 2d at 7.

At the same time, taking *notice* of another court's finding of fact does not necessarily denote *adoption* or *finding* of that fact. Indeed, just as "findings of fact made during this type of one-sided hearing should not be given a preclusive effect," *Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20 (D.D.C. 2001), they also "should not be assumed true beyond reasonable dispute." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58–59 (D.D.C. 2010). Moreover, because "default judgments under the FSIA require additional findings than in the case of ordinary default judgments," *Weinstein*, 175 F. Supp. 2d at 19–20, the Court "should endeavor to make such additional findings in each case." *Murphy*, 740 F. Supp. 2d at 59. Therefore, taking judicial notice of the facts established by the *Rux* court, does not conclusively establish the facts found in *Rux* for, or the liability of the defendants in, this case. Based on this judicial notice of evidence presented in earlier, similar cases "courts may reach their own independent findings of fact." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010). As a result, employing this FSIA-specific approach to judicial notice-taking of prior proceedings, the Court grants plaintiffs' motion to take judicial notice of the findings of fact in *Rux* [Dkt. # 26], reviews the relevant evidence, and makes its own findings of fact and conclusions of law. Turning to the facts presented and noticed, the Court finds the following:

**1.      The USS Cole Bombing**[9]

---

[9]      This section is based on a Navy report cited in *Rux*: Investigation to Inquire Into the Actions of USS Cole (DDG 67) In Preparing For And Undertaking a Brief Stop For Fuel at Bandar at Tawahi (Aden Harbor) Aden, Yemen, On Or About 12 October 2000. *See Rux,* 495 F. Supp. 2d at 544 n.12 (citing report). The report describes the attack and its aftermath, and the Court summarizes relevant portions here.

At approximately 8:30 a.m. on October 12, 2000, the Cole entered  the Port of Aden,

Yemen, to temporarily stop for refueling.  The ship began refueling at approximately 10:31 a.m.

At approximately 11:10 a.m., a small boat manned by two drivers pulled up parallel to the ship.

Seconds later, the boat exploded.

The explosion occurred between approximately 11:15 and 11:18 a.m., just as some of the

crew was sitting down for lunch.  The blast ripped a large hole in the port side of the ship, and

the main engine room, auxiliary machine room, and a storeroom were flooded.  Smoke, dust, and

fuel vapors filled the air. Several chambers were structurally destroyed.   As discussed above, the

blast and its after-effects killed seventeen navy sailors, and forty-two others were injured.


2. **Sudan's Support of the USS Cole Bombing**[10]

a. **Sudan and Al Qaeda**

Since 1993, the United States has designated Sudan as a state sponsor of terrorism.  58

Fed. Reg. 52523-01 (Oct. 8, 1993); U.S. Department of State, State Sponsors of Terrorism,

available at http://www.state.gov/j/ct/c14151.htm (last visited March 22, 2012).  During the

1990s, Hassan Abdallah Turabi, head of the Sudanese political party and leader of the Muslim

Brotherhood and the National Islamic Front ("NIF"), transformed Sudan into a centralized,

---

[10]        In determining whether Sudan provided material support and assistance to Al
Qaeda in perpetrating the attack on the Cole, the Court accepts the deposition testimony from
three experts including: Lorenzo Vidino, a Research Program Manager at the Jebsen Center for
Counter-Terrorism Studies at The Fletcher School of Tufts University, Ex. 78; James Woolsey,
the director of the Central Intelligence Agency from 1993 to 1995, Ex. 79; and Steve Emerson,
Executive Director of The Investigative Project on Terrorism and an expert on Islamic extremist
networks.  Ex. 77.  The Court accepts each as an expert witness on terrorism, the relationship
between Al Qaeda and Sudan, and the material support Sudan provided to Al Qaeda for the Cole
bombing.

Islamic state that supported movements and organizations with militant Islamic ideologies.  Exs. 80 at 12 & 81 at 18-19.

As is well-known today, Al Qaeda is a worldwide terrorist network.  Ex. 81 at 29:4-7.  Founded by Osama Bin Laden in approximately 1990, Ex. 22, it has organized, executed or inspired acts of terrorism around the world that killed or injured thousands of innocent people, including the September 11, 2001 attacks on the United States.  Exs. 28 & 74 at 70.

According to the U.S. State Department, Bin Laden relocated to Sudan from Afghanistan in 1991, where he was welcomed by Turabi.  Ex. 17.  Turabi and Bin Laden shared a common extremist ideological and religious outlook.  Bin Laden agreed to help Turabi in the regime's ongoing war against African Christian separatists in southern Sudan, and also to invest his wealth in the poor country's infrastructure.  Exs. 81 at 21–23 & 74 at 57.  In exchange, Sudan provided Bin Laden's fledgling terrorist group with a sanctuary within which it could freely meet, organize, and train militants for operations.  Ex. 80 at 13:3–14:7.  In 1996, he was expelled from the country under international pressure and returned to Afghanistan.  Exs. 23 & 74 at 57, 109.  Both before and after this departure, the effects of Sudan's support of Al Qaeda were substantial.

**b.**      **Joint Business Ventures**

Bin Laden established several joint business ventures with the Sudanese regime that began to flourish upon his arrival in the Sudanese capital of Khartoum in 1991.  Ex. 17.  Bin Laden formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf.  *Id.*  These included Al-Hijrah for Construction and Development, Ltd., which built the Tahaddi road between Khartoum and Port Sudan on the Red Sea coast, as well as a modern international airport near Port Sudan; Wadi al-Aqiq Company, Ltd., which, dealt in gum, corn, sunflower, and sesame products; and Al-Themar

al-Mubarak-ah Agriculture Company, Ltd., which acquired large tracts of land near Khartoum

and in eastern Sudan.  Exs. 17 & 32 at 239, 241.  These businesses provided income to Al Qaeda,

as well as cover for the procurement of explosives, weapons, and technical equipment, and for

the travel of Al Qaeda operatives.  Exs. 24 & 74 at 57–58.  Bin Laden continued to maintain his

substantial business interests and facilities in Sudan even after his departure to Afghanistan in

1996.  Exs. 23 & 82 at 26-27.

**c.**      **Banking Support**

Sudan allowed its banking institutions to be used by Al Qaeda to launder money.  Ex. 81

at 25.  Indeed, Bin Laden and wealthy members of the NIF capitalized Al-Shamal Islamic Bank

in Khartoum; Bin Laden personally invested $50 million in the bank.  Exs. 17 & 32 at 332.  In

the late 1980s, Sudan adopted an Islamic banking system that forbids interest and lacks the

rigorous accounting standards used by Western banking systems.  Ex. 81 at 36.  The lack of

scrutiny associated with this system was ideal for Al Qaeda because it allowed the group to move

large sums of money in support of its operations without detection.  Exs. 81 at 52 & 80 at 15.

Douglas Farah, former reporter for the Washington Post in West Africa and author of the book

"Blood From Stones: The Secret Financial Network of Terror," Ex. 76, asserted in a written

deposition, that Sudan "provided [Al Qaeda] fundamentally with a banking structure, Islamic

structure that's out of the norm of the banking rules that we're acquainted with in the west, and

allowed them channels to move money through that would be virtually undiscoverable to the

outside world."  Ex. 80 at 14-15, 26.  He further stated that Al Qaeda "couldn't have operated

with that degree of freedom and openness if they had not been sanctioned by the central

government to do so."  *Id.*

**d.**      **Training and Direct Finance of Terrorist Groups**

Starting in the early 1990s, Turabi and the Sudanese regime convened annual conferences in Sudan under the label Popular Arab and Islamic Conference. Ex. 80 at 26:13–27:15; Ex. 82 at 19:16-20:22. At these conferences, Bin Laden and other top leaders and operatives from the most violent Islamic terrorist organizations congregated to exchange information and plan terrorist activities. Exs. 74 at 61 & 81 at 26. Although the conference was closed down in approximately 2000, Sudan continued to be used as a safe haven by Al Qaeda and other terrorist groups. Ex. 35.

In addition, as reported by the U.S. Department of State in its annual "Patterns of Global Terrorism" reports, the Sudanese military cooperated with Bin Laden and Al Qaeda to finance at least three terrorist training camps in northern Sudan. Ex. 17. As well, each year from 1997 through 2000, Sudan served as a meeting place, safe haven, and training hub for Al Qaeda and other terrorist groups including Lebanese Hizballah, Palestinian Islamic Jihad, Abu Nidal Organization, and Hamas. *See* Exs. 22; 25; 28; 35. Most of the groups maintained offices and other forms of representation in the capital, using Sudan primarily as a secure base for organizing terrorist operations and assisting compatriots elsewhere." Exs. 25 & 28. Moreover, Ayman Al-Zawahiri, a top-ranking member of Al Qaeda, reached an agreement in 1998 with Sudan's national Islamic groups to establish budgets to finance terror operations. Ex. 81 at 43:9–44:4. Bin Laden's construction company worked directly with Sudanese military officials to transport and provision the camps, where terrorists of Egyptian, Algerian, Tunisian, and Palestinian origin received training. *Id.*

Sudan's support of Al Qaeda continued after Bin Laden's 1996 departure until at least the Cole bombing. Ex. 80 at 12:11–23. As of 1999, this assistance consisted of "paramilitary

training, money, religious indoctrination, travel, documents, safe passage, and refuge." As of

2000 support "included the provision of travel documentation, safe passage, and refuge." Ex. 28.

e.      **Diplomatic Cover**

As early as 1998, Sudan provided Al Qaeda members with Sudanese diplomatic

passports, diplomatic pouches, and regular Sudanese travel documentation that facilitated the

movement of Al Qaeda operatives in and out of the country. Exs. 22, 25, 35, 53, 81 at 31; 83 at

28. Diplomatic passports allow the holder to pass through airport security in airports and ports

around the world without her bags being checked and without the same level of scrutiny or

searches normally given to regular passport holders. Exs. 80 at 17; 81 at 32. A diplomatic

passport typically lasts between five and ten years. Ex. 81 at 33. Thus, the passports issued in

1998 would not have expired prior to 2003. *See id.* Diplomatic pouches enjoy diplomatic

immunity from search or seizure. Al Qaeda agents with these passports and pouches were

therefore able to enter and leave Sudan and cross borders in other countries carrying materials to

prepare for attacks without arousing suspicion. Exs. 82 at 19; 81 at 33; 83 at 31; 80 at 14.

Indeed, it was critical to Al Qaeda's method of training its operatives in one country and then

dispatching them with their materials to other countries to carry out operations or await

instructions. Ex. 83 at 25:5–26:5; Ex. 83 at 31:9–32:1. By providing such cover to Al Qaeda,

Sudan enabled the terrorist organization to transport weapons and munitions outside the country

and into other countries undetected by customs agents. Exs. 82 at 25; 80 at 18.

f.      **Sudan's Connection to the Cole Attack**

While receiving support from Sudan, Al Qaeda prepared the strike against the Cole. The

attack was part of a decade-long plan conceived and executed by Bin Laden and Al Qaeda to

confront U.S. interests in the Middle East. Ex. 72 at 29. Bin Laden supervised the Cole plot

directly. Ex. 74 at 190. As stated in the 9/11 Commission Report, Bin Laden "chose the target

and location of the attack, selected the suicide operatives, and provided the money needed to

purchase explosives and equipment." *Id*. Mr. Emerson and Mr. Vidino both testified that the

attack's "mastermind" was Qaed Salim Sinan al-Harethi, also known as Ali Qaed Sinan Harthi,

who was one of Bin Laden's bodyguards. Exs. 81 at 45–46; 83 at 33. They further assert that

Al-Harethi was trained by Al Qaeda in Sudan in the 1990s before being dispatched to Yemen

where, according to Mr. Vidino, he became "the chief of operation[s] of Al Qaeda in Yemen."

Ex. 81 at 46.

In addition to training, Sudan was "more likely than not" the source of the explosives

used in the Cole bombing, according to CIA Director Woolsey. Ex. 82 at 46. Mr. Emerson

testified, "I have no doubt the source [of the explosives used on the Cole] came from Al Qaeda

and was transported to Yemen from Al Qaeda or by the Sudanese government through most

probably the diplomatic pouch." Ex. 80 at 18–19. Mr. Farah testified that his "best guess" as to

the source of the explosives used in the Cole, based on his "studied opinion and having discussed

this case with intelligence officials," is Sudan, "which was the closest place to Yemen in which

they had the safe quarter in which to be able to move this type of goods across the border." Ex.

80 at 18–19. As well, according to Mr. Emerson, the explosives used in the Cole attack were

sent by Al Qaeda operatives in Sudan. Ex. 83 at 25:20–26:5. In criminal proceedings arising out

of the 1998 embassy bombings, one of Bin Laden's lieutenants in Sudan, Jamal Al-Fadl,

corroborated this fact when he testified against Bin Laden. Ex. 32, *U.S. v. Bin Laden*, 397 F.

Supp. 2d 465 (S.D.N.Y 2005), Case No. 98-cr-1023, Trial Tr. Feb. 6, 2001. Specifically, Mr.

Al-Fadl stated under oath that he worked under Bin Laden in Sudan; that he stored four crates of

weapons and explosives at a farm in Sudan owned by Bin Laden; and that he shipped the four

crates in an Al Qaeda-owned boat from a facility owned by the Sudanese military in Port Sudan

to Yemen, where they were to be used to "fight the Communists."  Ex. 32 at 262, 336–40.

  In sum, the evidence suggests that Sudan provided Al Qaeda with the support, guidance,

and resources that allowed it to transform into a sophisticated, terrorist network, and that such

support was critical to Al Qaeda developing the expertise, networks, military training, munitions,

and financial resources necessary to plan and carry out the Cole attack.  Ex. 83 at 25:5–28:14.

As Mr. Woolsey testified, "[t]he proximity of Sudan to Yemen, the need for a protected logistics

infrastructure, the confused situation in the Government of Yemen at the time . . . , the amount of

explosives that needed to be put in the boat that attacked the Cole, all that suggests to me that the

logistical support and base of operations that could have been available in Sudan could have been

of substantial assistance to an attack in Yemen, such as the one that occurred."  Ex. 82 at 29.  He

summarized: the Cole attack "might have been possible, but it would not have been as easy"

without Sudan's support.  *Id.*  In addition, Mr. Vidino stated that the bombing would have been

"close to impossible" without Sudan's assistance because "simply all they needed, starting from

the training to the explosives, to all what a terrorist cell needs, even the ideological aspect of it,

came from Sudan.  It was clearly necessary to have all these things in place to carry out an

operation such as the attack on the Cole."  Ex. 81 at 47–48.  In addition, Mr. Emerson asserted

that the Cole attack would not have occurred without Sudan.  Ex. 157 at 34.  According to

Emerson, by removing Sudan's support, "[y]ou would have deprived them of the oxygen needed

to operate."  *Id.*  Moreover, Mr. Farah testified that he did not think the bombing of the Cole

could have happened "without the active support of the Government of Sudan . . . from 1992

through the Cole bombing, Sudan provided an incredibly necessary and vital infrastructure for

Al-Qaeda to be able to prepare and move the explosives and carry out the attacks on the Cole.

And it was not clandestine or hidden presence, but rather fairly overt and knowing presence by senior members of the NIF government in Sudan." Ex. 80 at 14, 27–30.

In light of the submitted reports, testimony, and other uncontroverted evidence, the Court finds that Sudan provided material support to Al Qaeda such that the terrorist organization could attack the Cole. The conforms to the findings of the *Rux* court, discussed above. With this fact established, the Court now turns to the uncontested evidence plaintiffs have submitted on the nature and extent of their injuries.

**B**.    **Plaintiffs' Injuries**

**1**.    **Plaintiffs on the Cole During the Attack**

Plaintiffs who were on the Cole during the attack, each allege assault, battery and IIED. They claim injuries in the form of post-traumatic stress, lost physical abilities, and anguish, and they seek compensatory and punitive damages. Each individual's claim is explained in more detail below.

**Rick Harrison**

Rick Harrison was born on January 30, 1962, in Cut Bank, Montana. Ex. 92 at 6:24-7:6. On January 19, 1982, Mr. Harrison enlisted in the Navy. Ex. 92 at 7:15-17. He intended to remain in the Navy as a career. Ex. 92 at 7:23-8:17. In July 1999, he was assigned to serve on the Cole as a fire marshal. Ex. 92 at 8:20-24.

At the time of the bombing, Mr. Harrison was on the starboard side of the ship walking past the medical station. Ex. 92 at 15:10-17. He was located approximately 47 feet from the blast. Ex. 92 at 16:13-24. The blast threw him toward the overhead, causing him to strike his head and suffer a concussion. Ex. 92 at 17:14-18:1. Mr. Harrison landed directly on his knees causing severe injuries to his knees, back. The blast also damaged the membranes in his ears.

17

Ex. 92 at 17:14-18:1, 18:22-20:1.  Mr. Harrison inhaled toxic smoke in a room where wiring was

burning.  Ex. 92 at 22:21-23:10.  He later developed a lung condition as a result of breathing the

toxic smoke.  *Id.*  Mr. Harrison did not cease his rescue activities for 96 hours.  Ex. 92 at

20:15-18, 23:17-24:10.

Upon returning to Naval Station in Norfolk, Virginia, Mr. Harrison's permanent injuries

were discovered when he was unable to pass a physical readiness test.  Ex. 92 at 24:17-25:15.

Mr. Harrison was subsequently diagnosed with the compression of ten lower vertebrae, flattened

arches in his feet, damage to the tympanic membrane in his right ear, a separated shoulder and

damage to his rotary cuff, and a severe concussion.  Ex. 92 at 19:9-20:1, 25:2-15, 28:13-24.

Aside from the physical injuries, he also had recurring nightmares, mood swings, and severe

headaches.  Ex. 92 at 25:16-25.  Ultimately, as a result of his physical and emotional condition,

he was medically discharged from the Navy.  Ex. 92 at 26:19-27:4.  Currently, Mr. Harrison

endures constant physical pain in his knees, shoulders, lower back, and feet.  Ex. 92 at 28:8-29:7.

 Mr. Harrison testified that the emotional impact of these injuries is still present today.  Ex. 92 at

29:8-31:16.  His symptoms include anxiety, anger, flashbacks, and nightmares.  Ex. 92 at

31:17-32:23.

Dr. Hernandez-Cardenache an expert clinical psychologist, further provided his expert

opinion that Mr. Harrison's symptoms are consistent with chronic post-traumatic stress disorder.

Ex. 106 at 36:14-39:4.

**Keith Lorensen**

Keith Lorensen was born on September 28, 1967, in St. Paul, Minnesota.  Ex. 90 at

5:13-16.  On October 7, 1985, Mr. Lorensen enlisted in the Navy.  Ex. 90 at 6:8-25.  He intended

to remain in the Navy as his career.  Ex. 90 at 12:12-18.  In 1998, Mr. Lorensen was assigned to the Cole.  Ex. 90 at 14:12-17.

At the time of the attack, Mr. Lorensen was in the chief petty officer's mess, midship on the port side very near to the point of impact, conversing with another crew member.  Ex. 90 at 14:24-16:6. The blast flung him 30 feet through the air and caused him to black out.  Ex. 90 at 16:7-18:8. When he regained consciousness, he found himself lying across the mess underneath debris from the galley equipment.  *Id.*  His right femur was broken four inches above the knee and had been completely folded behind his back so that his foot was now located near his head.  Ex. 90 at 19:6-20:14.  Mr. Lorensen also sustained multiple contusions on each of his legs, a lip laceration, and a broken wrist in the blast.  Ex. 90 at 18:15-20:25, 30:13-31:9.  After noticing bleeding from his right leg, he used his belt as a tourniquet to stop the bleeding from his femoral artery, and continued applying the pressure until, after approximately 40 minutes, he was removed from the space by other sailors.  Ex. 90 at 18:9-20:14.

After being removed from the mess hall, Mr. Lorensen was given morphine and taken to the top of the ship with other injured sailors.  Ex. 90 at 22:18-23:4.  While waiting for additional medical treatment, Mr. Lorensen witnessed a fellow sailor being declared dead.  Ex. 90 at 23:5-15. He was then taken to a hospital in Yemen for further treatment.  Ex. 90 at 27:11-18.  He blacked out again in the hospital and only regained consciousness after surgery had been performed on his broken leg.  Ex. 90 at 29:1-6.  When he awoke, his leg was in traction, with makeshift metal components affixed to open wounds in his leg held in place by a piece of concrete attached via twine as a counterweight.  Ex. 90 at 30:13-31:16.  The laceration in his lip was subsequently stitched without any anesthesia.  *Id.*

19

The next day he was flown to Germany where he received further medical treatment before ultimately returning to Virginia.  Ex. 90 at 32:13-21.  After returning to the United States, seven months passed before he could put any weight on his right leg.  Ex. 90 at 40:10-41:16.  He can no longer squat down and has lost range of motion in his right leg.  Ex. 90 at 43: 21-44:7.  In addition to physical injuries, Mr. Lorensen also sustained psychological damage as a direct result of the incident.  Ex. 90 at 46:1-4.  Specifically, he experienced increased irritability and could not sleep through the night for a number of years.  Ex. 90 at 46:5-48:17.  Mr. Lorensen also experienced flashbacks and emotional outbursts.  *Id.*  He was subsequently diagnosed with post traumatic stress disorder.  Ex. 90 at 46:1-17.  The Department of Veterans Affairs has assigned him a 40% disability rating.  Ex. 90 at 60:16-61:1.

Dr. Rene Hernandez-Cardenache provided his expert opinion that Mr. Lorensen's symptoms are consistent with chronic post-traumatic stress disorder.  Ex. 106 at 74:6-79:21.


**John Buckley III**

John Buckley III was born on August 10, 1979.  Ex. 99 at 4:18-21.  He enlisted in the Navy on May 28, 1997,  Ex. 99 at 5:7-8, intending to remain in the service for the duration of his career.  Ex. 99 at 5:15-21.  Prior to the terrorist attack, he had been serving on the Cole for approximately three years.  Ex. 99 at 6:18-21.

At the time of the bombing, Mr. Buckley was in a passageway approximately ten feet from the point of impact.  Ex. 99 at 12:25-13:3.  The explosion flung him through the air to the other end of the passageway, where he had a concussion and lost consciousness.  Ex. 99 at 13:4-18.  After coming to, Mr. Buckley moved toward the area of the blast in an effort to assist

injured sailors.  Ex. 99 at 13:22-14:17.  Mr. Buckley assisted in the medical care and evacuation

of other injured sailors for several hours, until he collapsed due to his own injuries.  *Id.*

As a result of the blast, Mr. Buckley suffered fractures to both knees, hearing loss, and

severe lower back trauma.  Ex. 99 at 8:25-10:13.  Mr. Buckley continues to suffer from his

physical injuries.  Ex. 99 at 9:25-10:3.  He cannot lift over 100 pounds, has undergone two back

surgeries, and continues to receive treatment for his knee injuries.  *Id.*; Ex. 99 at 17:16-18:7.  Mr.

Buckley has also been diagnosed with post-traumatic stress disorder.  Ex. 99 at 8:25-10:13.  He

continues to experience nightmares and headaches, is prone to aggressive behavior, and hears

voices.  Ex. 99 at 19:3-12.  On May 29, 2001, Mr. Buckley was honorably discharged from the

Navy.  Ex. 99 at 7:13-25.  Mr. Buckley was assigned a 100% disability rating by the VA.  Ex. 99

at 8:14-21.

According to Dr. Hernandez-Cardenache, Mr. Buckley's symptoms are consistent with

post-traumatic stress disorder.  Ex. 106 at 21:17-25:5.


**Margaret Lopez**

Margaret Lopez was born on December 26, 1970.  Ex. 96 at 6:14-16.  She enlisted in the

Navy.  Ex. 96 at 7:6-7.  It was Mrs. Lopez's intention to remain in the Navy as a career.  Ex. 96

at 7:10-16.  In July 1998, Mrs. Lopez was assigned to the Cole as a gas turbine systems

mechanic.  Ex. 96 at 10:23-11:8.

At the time of the bombing, Mrs. Lopez was supervising work being performed in the oil

lab.  Ex. 96 at 14:12-22.  The bomb blast impacted the ship approximately 20 feet from her

location and immediately killed one of the sailors working with her in the oil lab at that time.

Ex. 96 at 15:21-16:13.  As a direct result of the blast, Mrs. Lopez sustained burns to her face,

neck, legs, and arms; her ear drums were ruptured; and several discs in her spine were ruptured. Ex. 96 at 19:25-20:13. After the blast, the oil lab began to fill with smoke and water. Ex. 96 at 16:25-17:14, 18:8-18. In order to escape the area, she freed herself from debris and jumped into the sea through the hole created by the blast. Ex. 96 at 18:20-25. She remained in the water for over an hour before being pulled to safety. Ex. 96 at 21:8-19.

Mrs. Lopez was transferred to a hospital in Yemen before being sent to Germany for further treatment. Ex. 96 at 23:15-24:7. She remained in Germany for two weeks under the care of a burn specialist. Ex. 96 at 24:11-18. While waiting to get a skin graft, Mrs. Lopez developed pneumonia. Ex. 96 at 24:19-25:1. It took approximately two years for her burns to fully heal. Ex. 96 at 25:25-26:15. Mrs. Lopez also underwent an eardrum replacement surgery. *Id.* Since the bombing, Mrs. Lopez has experienced insomnia, mood swings and nightmares, and has been diagnosed with post-traumatic stress disorder. Ex. 96 at 34:5-20; 29:9-30:7.

As a result of her medical condition, Mrs. Lopez retired from the Navy on November 4, 2004. Ex. 96 at 27:3-28:1. At the time, she was prescribed antidepressants and pain medication for her injuries. Ex. 96 at 29:9-30:7. Based upon her injuries, she has been assigned a 100% disability rating by the Department of Veterans Affairs. Ex. 96 at 30:25-31:15.

Dr. Rene Hernandez-Cardenache testified that Mrs. Lopez's symptoms are consistent with chronic post-traumatic stress disorder. Ex. 106 at 59:6-61:25.

**Edward Love**

Edward Love was born on October 4, 1979. Ex. 94 at 5:16-19. He enlisted in the Navy on March 30, 2000, Ex. 94 at 6:4-5, intending to spend his career in the Navy. Ex. 94 at 17:22-25. His first assignment was onboard the Cole, which began in approximately August 2000. Ex. 94 at 6:8-10.

22

When the attack occurred, Mr. Love was midship on the port side. Ex. 94 at 8:12-14. As a result of the blast, he was thrown to the ground and suffered a ruptured eardrum. Ex. 94 at 8:22-9:8. Mr. Love immediately began to assist the injured crew and to repair damage to the ship to prevent further flooding. Ex. 94 at 9:17-10:25. In doing so, he witnessed many sailors who were severely injured or had died because of the attack. *Id.*

After three or four hours, Mr. Love left the ship and was transferred to the hospital in Yemen. Ex. 94 at 10-21. The next day, Mr. Love was moved to Germany where he received further treatment. Ex. 94 at 14:2-12. Since that day, Mr. Love has not been able to pass a hearing test for his right ear. Ex. 94 at 14:13-19. The VA has assigned a 10% disability rating for this injury. Ex. 94 at 14:20-24. After returning to the United States, Mr. Love was stationed at a naval base in Norfolk, Virginia. Ex. 94 at 16:16-25.

While stationed in Norfolk, Mr. Love was diagnosed with post traumatic stress disorder. Ex. 94 at 17:2-9. The lasting effects from the bombing have caused Mr. Love's personality to change, with symptoms including problems with anxiety, mood swings, lack of appetite, and trouble sleeping. Ex. 94 at 18:18-23. As a result of these continuing issues, on March 3, 2003, he was discharged from the Navy. Ex. 94 at 17:10-21. Mr. Love continues to receive treatment for his symptoms to this day. Ex. 94 at 19:14-20:25.

According to Dr. Hernandez-Cardenache, Mr. Love's symptoms are consistent with chronic post-traumatic stress disorder and co-morbid mood disorder. Ex. 106 at 62:1-65:4.

**Robert McTureous**

Robert McTureous, born on May 25, 1972, Ex. 89 at 5:13-16, enlisted in the Navy. Ex. 89 at 5:23-24. It was his intention to have a career in the Navy. Ex. 89 at 5:25-6:5. In August 2000, Mr. McTureous joined the crew of the Cole. Ex. 89 at 9:11-24.

On the day of the attack, Mr. McTureous was in the oil lab, with Margaret Lopez, preparing to relieve other sailors who were involved in the refueling process. Ex. 89 at 13:2-14. The blast occurred in close proximity to the oil lab, and the room began to fill with water. Ex. 89 at 13:20-15:8. Because the exit door of the oil lab had been damaged by the blast, Mr. McTureous escaped by climbing through the wreckage and jumping through the hole in the ship that had been caused by the explosion. *Id.*; Ex. 89 at 16:3-16.

After being rescued from the water by his shipmates, Mr. McTureous was taken to a hospital in Yemen where he remained overnight until being transferred to Germany and then Portsmouth Naval Hospital for further treatment. Ex. 89 at 18:5-19:13. After the bombing, Mr. McTureous was discharged from the Navy because he could not face "the reality of going back to sea." Ex. 89 at 23:18-24:4.

As a result of the blast, Mr. McTureous sustained severe, permanent, painful, life long injuries including two ruptured eardrums, second degree burns on his face, a fractured finger and shrapnel in his arms. Ex. 89 at 15:5-8, 20:4-13, 24:5-25:11. Currently, Mr. McTureous has significant hearing loss in both ears. Ex. 89 at 25:8-11. Due to his physical injuries, the Department of Veterans Affairs has assigned him a 70% disability rating. Ex. 89 at 25:12-15, 39:14-40:6.

In addition to severe physical injuries, Mr. McTureous was diagnosed with post-traumatic stress disorder in 2002. Ex. 89 at 26:21-29:5. The psychological effect of the blast has caused Mr. McTureous to suffer from flashbacks, nightmares, and a fear of crowds. *Id.*; Ex. 89 at 30:8-37:15. Prior to the bombing, Mr. McTureous was outgoing, but now describes himself as reserved, scared, on edge, and shy. Ex. 89 at 27:16-22.

Dr. Rene Hernandez-Cardenache testified that Mr. McTureous' symptoms are consistent with chronic post-traumatic stress disorder and reduced cognitive functioning as a result of the attack.  Ex. 106 at 25:6-28:1.

**David Morales**

David Morales was born on February 19, 1978 and enlisted in the Navy in July 1999.  Ex. 93 at 6:8-12.  It was his intention to remain in the Navy for his career.  Ex. 93 at 6:20-25.  After graduating from basic training, Mr. Morales was assigned to the Cole as a boatswain's mate.  Ex. 93 at 6:16-25.

On the day of the bombing, Mr. Morales had just finished his morning duties and had gone to his room to rest.  Ex. 93 at 14:17-15:1.  He was lying in his rack approximately 30 feet from the point of impact when he felt the explosion rock the ship.  Ex. 93 at 15:10-25.  The force of the blast caused him to impact the ceiling above his rack and then fall to the floor.  *Id.*  He immediately went to the top of the ship to assist his injured shipmates, encountering many severely injured and dead sailors on his way.  Ex. 93 at 16:3-25:21.  In the rescue efforts, Mr. Morales attempted to perform CPR on a fellow sailor who ultimately died.  *Id.*  Mr. Morales was later commanded to stand security on the deck, which he did for the next three days.  *Id.*

As a result of the blast, Mr. Morales suffered whiplash in his neck.  Ex. 93 at 26:8-27:4.  Three weeks after the incident he was diagnosed with post-traumatic stress disorder, and continues be treated for this condition to this day.  Ex. 93 at 28:6-29:18, 33:5-8.  Mr. Morales' symptoms include irritability, nervousness and anxiety, and flashbacks.  Ex. 93 at 36:8-39:5.  His condition caused Mr. Morales to be discharged from the Navy in 2002.  Ex. 93 at 10:19-22, 11:18-24.

Dr. Rene Hernandez-Cardenache provided his expert opinion that Mr. Morales's symptoms are consistent with post-traumatic stress disorder.  Ex. 106 at 33:14-36:13.

**Gina Morris**

Gina Morris was born on October 15, 1980.  Ex. 88 at 3:22-25.  She enlisted in the Navy in 1998.  Ex. 88 at 4:13-18.  She intended to remain in the Navy for her career.  Ex. 88 at 4:24-5:1.  The Cole was her first assignment.  Ex. 88 at 5:15-17.

At the time of the attack, Ms. Morris was on the inside of the ship moving towards the oil lab.  Ex. 88 at 7:22-8:2.  Immediately upon hearing the explosion, she went toward the oil lab to help her shipmates who had been injured in the blast.  Ex. 88 at 7:22-10:9.  For over five hours, Ms. Morris assisted in the medical treatment of sailors injured in the blast.  *Id.*  Ms. Morris then left the ship to escort injured sailors to a hospital in Yemen.  *Id.*

Although she did not sustain any physical injuries, Ms. Morris has suffered severe emotional distress as a direct result of the attack.  Ex. 88 at 10:10-19:22.  Upon going to the aid of her shipmates, Ms. Morris witnessed the horrific aftermath of the bombing.  Ex. 88 at 8:24-10:9.  Ms. Morris left the Navy, in August 2001, as a direct result of the attack.  Ex. 88 at 23:1-11.  She is currently undergoing treatment for her ongoing symptoms including anger, sleep issues, high anxiety, flashbacks and guilt.  Ex. 88 at 10:10-19:22.

Dr. Hernandez-Cardenache testified that Ms. Morris' symptoms are consistent with post-traumatic stress disorder.  Ex. 106 at 65:5-67:24.

**Rubin Smith**

Rubin Smith was born on July 26, 1979, in Albemarle, North Carolina.  Deposition of Tracey Smith, ("D.E. 36"), Supplemental Proposed Findings of Fact ("Supp. Ex. 1") at 6:21-7:3.  In 1997, Mr. Smith enlisted in the Navy.  D.E. 36, Supp. Ex. 1 at 7:16-18.  Mr. Smith loved his

experience in the Navy and only left the Navy because of the trauma he experienced in the

bombing of the U.S.S. Cole.  Supp. Ex.1 at 14:2-22.

In October 2000, Mr. Smith was serving onboard the U.S.S. Cole as an operations

specialist.  D.E. 36, Supp. Ex. 1 at 8:1-13.  At the time of the bombing, Mr. Smith was assigned

to work in the ship's galley, which was near the epicenter of the blast.  D.E. 36, Supp. Ex. 1 at

10:1-16.  However, a shipmate, who was a close friend, volunteered to take his shift.  *Id.*  Mr.

Smith's friend was in the galley as Mr. Smith's replacement at the time of the explosion and was

killed.  *Id.*  Mr. Smith was in his quarters at the time and was thrown from his bunk to the deck

by the force of the blast.  The fall caused him to dislocate his ankle and suffer a torn tendon and

nerve damage in his lower leg.  D.E. 36, Supp. Ex. 1 at 11:20-25.  As a result of his injuries, Mr.

Smith was evacuated from the ship to a military treatment facility.  D.E. 36, Supp. Ex. 1 at

11:3-8. Mr. Smith suffered scarring as a result of his injuries and received treatment for ongoing

pain up until the time of his death.  D.E. 36, Supp. Ex. 1 at 11:9-10 and 22; 13:19-23.

As a result of the blast, Mr. Smith suffered severe emotional distress, which caused him

to develop post-traumatic stress disorder.  D.E. 36, Supp. Ex. 1 at 12:1-13.  For the rest of his

life, Mr. Smith was plagued by feelings of guilt over the death of the shipmate who had

volunteered to take his shift in the galley and other friends who were also lost onboard.  D.E. 36,

Supp. Ex. 1 at 10:10-16.  His symptoms, which included depression and anger, resulted in

problems with maintaining personal relationships.  D.E. 36, Supp. Ex. 1 at 14:9-15; 16:10-18.  In

2003, Mr. Smith, who believed that he was no longer emotionally capable of serving, was

discharged from the Navy.  D.E. 36, Supp. Ex. 1 at 14:9-15; 7:19-21.

Mr. Smith was diagnosed with post-traumatic stress disorder and was receiving

psychological treatment at the time of his death.  D.E. 36, Supp. Ex. 1 at 14:9-15; 16:10-18.  As a

result of his physical and mental injuries, Mr. Smith was assigned a 50% disability rating by the Department of Veterans Affairs.  D.E. 36, Supplemental Ex. 2 at 2.

**Martin Songer, Jr.**

Martin Songer was born on August 3, 1970.  Ex. 102 at 4:24-5:4.  On June 11, 1991, Mr. Songer enlisted in the Navy.  Ex. 102 at 6:19-22.  In 1998, Mr. Songer was assigned to the Cole as a Second Class Boatswain Mate.  Ex. 102 at 10:7-24.  At the time of the bombing, Mr. Songer was in the boatswain workshop in the aft part of the ship on the port side, approximately 150 feet away from the area of direct impact.  Ex. 102 at 17:8-23.  The blast threw Mr. Songer against a bulkhead.  Falling equipment  bruised and lacerated him.  Ex. 102 at 19:11-19.  Mr. Songer witnessed many dead and severely injured shipmates.  Ex. 102 at 23:16-24:3, 25:20-27:9.

These events impacted Mr. Songer emotionally.  Ex. 102 at 23:16-24:3, 25:20-27:9.  As a direct result of the bombing, he now suffers from anxiety and temper control issues.  Ex. 102 at 34:7-12.  A few months after the terrorist attack, Mr. Songer decided to leave the Navy.  Ex. 102 at 34:20-35:5.

Dr. Hernandez-Cardenache further provided his expert opinion that Mr. Songer's symptoms are consistent with moderate to severe emotional distress.  Ex. 106 at 71:10-73:22.

**Jeremy Stewart**

Jeremy Stewart was born on March 5, 1981.  Ex. 95 at 5:7-10.  He enlisted in the Navy on February 9, 2000.  Ex. 95 at 7:21-23.  It was Mr. Stewart's intention to remain in the Navy for the full duration of his career.  Ex. 95 at 5:25-6:4.  Two weeks after he completed basic training, Mr. Stewart was assigned to the Cole as a Hull Maintenance Technician Fireman.  Ex. 95 at 7:4-20.

When the bomb exploded, Mr. Stewart was thrown to the ground and suffered a concussion, losing consciousness for five to fifteen minutes. Ex. 95 at 9:12-10:18. He was removed from the debris by other sailors, taken to the flight deck on the top of the ship, and evacuated to a hospital in Yemen. Ex. 95 at 10:25-11:2. He again lost consciousness and did not come to until approximately one week later, after having been transported to Germany. Ex. 95 at 11:3-7.

As a result of the blast, Mr. Stewart suffered multiple fractures and shattered bones in his arms and legs, a gastric rupture, internal bleeding, and shrapnel wounds. Ex. 95 at 10:19-24. His injuries caused permanent scarring on his forearms, knees, legs, and stomach. Ex. 95 at 11:8-14. He is no longer able to run and has lost range of motion in his right shoulder, and endures constant pain on a daily basis. Ex. 95 at 11:15-20, 13:5-11. As a result of the attack, Mr. Stewart also exhibits a variety of emotional symptoms, including sadness, flashbacks, nightmares, irritability, and high anxiety. Ex. 95 at 15:13-16:12, 17:21-23:8. In December 2003, the Navy discharged Mr. Stewart was discharged due to his injuries. Ex. 95 at 13:14-14:4. The Department of Veterans Affairs assigned Mr. Stewart a 60% disability rating. Ex. 95 at 11:21-24.

According to Dr. Hernandez-Cardenache, Mr. Stewart's symptoms are consistent with post-traumatic stress disorder and a traumatic brain injury. Ex. 106 at 39:7-41:25.

**Kesha Stidham**

Kesha Stidham was born on June 12, 1981. Ex. 100 at 4:2-5. She enlisted in the Navy in July 1999, Ex. 100 at 4:18-21, and intended to remain in the Navy for her career. Ex. 100 at 6:22-24. Ms. Stidham was assigned to the Cole on October 30, 1999. Ex. 100 at 5:20-22.

Case 1:10-cv-01689-RCL   Document 41   Filed 03/30/12   Page 30 of 46

The center of the explosion was approximately 50 or 60 feet away from her location.  Ex. 100 at 8:23-9:5.  Several sailors standing within only a few feet of her were killed by the blast. Id.  The explosion caused Ms. Stidham to be thrown back ten feet through the air.  Ex. 100 at 9:6-10:3.  She suffered large thigh and leg bruises, fractured ribs, burns to her neck, and deep lacerations to her cheek, jawline, chin, and right ear.  *Id.*  She was initially treated for her injuries on the vessel.  Ex. 100 at 11:24-12:19.  She saw other sailors injured and lying on the deck, some covered in soot, and others screaming in pain.  *Id.*

After being transported off the Cole, Ms. Stidham was taken to a hospital in Yemen.  Ex. 100 at 15:8-18.  Ms. Stidham received 15 stitches in her face without anesthesia.  Ex. 100 at 15:19-16:24.  She described the pain of the stitching as tremendous.  Ex. 100 at 16:4-10.  Ms. Stidham had to undergo re-stitching of the wounds on her face in Germany.  Ex. 100 at 17:12-15, 18:6-19:1.

Upon returning to the U.S., Ms. Stidham was placed on leave for 30 days, then returned to service on the U.S.S. Whitney.  Ex. 100 at 23:9-12, 25:23-26:5.  While onboard, she suffered an anxiety attack.  Ex. 100 at 26:17-27:23.  She was ultimately removed from the ship, placed on limited duty and discharged from the Navy.  Ex. 100 at 31:6-12, 32:24-33:24.  The Department of Veterans Affairs has given her a 40% disability rating due to her injuries.  Ex. 100 at 54:18-22.

Ms. Stidham received psychological treatment for her emotional distress caused by the attack and was diagnosed with post-traumatic stress disorder.  Ex. 100 at 28:4-22.  Her symptoms, such as anger and anxiety, have resulted in problems with maintaining personal relationships and employment.  Ex. 100 at 33:20-35:1, 37:5-38:2.  Ms. Stidham still experiences panic attacks on a daily basis.  Ex. 100 at 42:23-43:9.

Dr. Rene Hernandez-Cardenache provided his expert opinion that Stidham's symptoms are consistent with chronic post-traumatic stress disorder and panic disorder as a result of the attack.  Ex. 106 at 28:2-33:13.

**Aaron Toney**

Aaron Toney was born on March 21, 1979 and enlisted in the Navy on December 23, 1997.  Ex. 105 at 7:8-10.  It was Mr. Toney's intention to remain in the Navy as his career.  Ex. 105 at 7:17-22. In April 1998, Mr. Toney was assigned to the Cole as a fireman recruit.  Ex. 105 at 9:1-13.

At the time of the bombing, Mr. Toney had just been relieved from his post in the engine room when he heard a loud explosion.  Ex. 105 at 13:2-10.  Mr. Toney immediately changed into his firefighting ensemble.  Ex. 105 at 13:11-14:15.  As he moved around the ship, he witnessed severely injured and dead sailors.  *Id.*  For 72 hours, Mr. Toney was involved in the medical care of his fellow shipmates.  Ex. 105 at 17:22-20:8.  Mr. Toney also assisted in repairing the damage to the ship for three weeks after the incident, and was among the last of the crewmembers to leave the vessel.  Ex. 105 at 20:20-21:9.

Although Mr. Toney was not physically injured in the bombing, he has been diagnosed with post traumatic stress disorder.  Ex. 105 at 23:18-24:23.  His symptoms include difficulty sleeping, nightmares, memory problems, anxiety, and feelings of emptiness and distrust.  Ex. 105 at 30:4-22, 36:16-37:21, 40:2-41:21, 44:11-48:17, 49:21-58:25.  These symptoms ultimately caused him to leave the Navy.  Ex. 105 at 28:18-29:14.  He has been assigned a 30% disability rating by the Department of Veterans Affairs.  Ex. 105 at 61:19-62:12.

**Eric Williams**

31

Eric Williams was born on November 12, 1980.  Ex. 98 at 4:13-15.  On June 16, 1999, he enlisted in the Navy.  Ex. 98 at 5:3-6.  It was Mr. Williams' intention to remain in the Navy as his career.  Ex. 98 at 7:14-22.  In 2000, Mr. Williams was assigned to the Cole as a Tomahawk technician.  Ex. 98 at 8:13-9:13.  His duties included maintenance and operation of the Tomahawk missile system.  *Id.*

At the time of the bombing, Mr. Williams was eating in the mess hall, in the center of the ship.  Ex. 98 at 9:25-11:13.  The explosion occurred directly adjacent to his location.  *Id.* Shrapnel from the explosion lacerated the top of his head, which caused him to suffer a concussion and drift in and out of consciousness.  *Id.*  After the explosion, he witnessed sailors die from their injuries and others who had been severely injured.  Ex. 98 at 18:3-23.  Mr. Williams was able to move to the top of the ship, and assisted in the treatment and evacuation of other injured sailors until he again fell unconscious.  Ex. 98 at 21:7-22:6.  Mr. Williams was then removed to a hospital in Yemen where he received stitches for the wound to his head.  Ex. 98 at 23:3-12.  In the U.S., he was diagnosed with a severe concussion.  Ex. 98 at 29:20-24, 33:4-9.  To this day, Mr. Williams has trouble remembering events from his childhood.  Ex. 98 at 33:10-23.  The bombing continues to have a profound effect on Mr. Williams.  Mr. Williams has been diagnosed with severe post-traumatic stress disorder and has experienced nightmares, extreme anger, and issues maintaining relationships, symptoms which he did not experience prior to the bombing.  Ex. 98 at 69:13-75:21.  For several years, he struggled with alcohol abuse.  Ex. 98 at 35:13-36:13, 40:15-44:4, 46:2-48:2, 50:1-51:16, 54:13-56:19, 67:1-24.

Dr. Hernandez-Cardenache provided expert opinion that Mr. Williams' symptoms are consistent with chronic post-traumatic stress disorder and anxiety disorder.  Ex. 106 at 42:5-50:7.

**Carl Wingate**

Carl Wingate was born on April 15, 1979.  He enlisted in the Navy in August 31, 1998, Ex. 101 at 7:7-9, 8:20-24, intending to stay in the Navy for the remainder of his career.  Ex. 101 at 7:10-17.

At the time of the bombing, Mr. Wingate was in his rack.  Ex. 101 at 10:16-23.  The impact of the blast caused him to be thrown from his rack and land on his head and shoulder.  *Id.* Shortly thereafter, he made his way to the top of the ship and began assisting in the medical treatment of sailors injured in the blast and the transport of injured sailors from the ship to mainland.  Ex. 101 at 10:24-12:13.  Mr. Wingate provided medical attention to eleven injured sailors, two of which died.  *Id.*  One of the sailors who died was his bunkmate.  *Id.*

As a result of the bombing, Mr. Wingate suffered impingement of both shoulders, herniated discs in his back, hearing loss, memory loss, and post-traumatic stress disorder.  Ex. 101 at 13:8-21.  Since the bombing, the physical effects of Mr. Wingate's injuries have become progressively more severe.  Ex. 101 at 14:1-16:16.  He continues to experience significant pain in his shoulders, neck, and back, and his range of motion is limited.  *Id.*  Post-traumatic stress disorder symptoms include irritability, anxiety, flashbacks, and nightmares.  Ex. 101 at 30:11-33:1, 33:19-37:6.  The emotional damage from the bombing has caused his personal relationships to suffer and led to a divorce from his wife.  Ex. 101 at 21:7-22:3.  In 2007, Mr. Wingate was discharged from the Navy as a result of the injuries he sustained from the bombing.  Ex. 101 at 19:16-25, 20:21-21:6.  The Department of Veterans Affairs assigned him a 60% disability rating.  Ex. 101 at 19:2-5.

According to Dr. Hernandez-Cardenache, Mr. Wingate's symptoms are consistent with post-traumatic stress disorder.  Ex. 106 at 50:8-55:5.

**2.      Plaintiffs Who are Spouses of Plaintiffs on the Cole During the Attack**

Spouses of the injured sailors allege IIED and injury in the form of mental anguish and loss of consortium.  They seek punitive and compensatory damages, including loss of solatium. Their claims include the following individualized injuries.

**Andy Lopez**

Andy Lopez is the spouse of Margaret Lopez, Ex. 97 at 5:2-6, and a former Navy master chief.  Ex. 97 at 5:7-11.  He married Margaret Lopez on November 8, 1996.  Ex. 97 at 6:19-20. Mr. and Mrs. Lopez have two children together.  Ex. 97 at 7:9-14.

On the day of the bombing, Mr. Lopez learned of the attack on the Cole from the morning news.  Ex. 97 at 8:6-15.  At noon that day, the Navy officially informed him of the incident and asked him to proceed to a local naval base for further information.  Ex. 97 at 8:16-18.  Mr. Lopez did not learn that his wife survived the blast until the next day when he spoke with her on the telephone.  Ex. 97 at 9:3-19.  Mr. Lopez immediately flew to meet her in Germany, where she was being treated under the care of a burn specialist.  Ex. 97 at 9:23-10:4.  When he arrived, Mrs. Lopez was in a medically–induced coma. He stayed there with her until her return to the United States.  Ex. 97 at 10:13-11:8, 12:4-21.

The bombing and resultant injuries to his wife have affected Mr. Lopez psychologically. Ex. 97 at 17:14-18:22.  Indeed, he has been diagnosed with post-traumatic stress disorder and has entered into counseling.  Ex. 97 at 18:23-19:19.  Dr. Hernandez-Cardenache, testifies that Mr. Lopez's symptoms are consistent with chronic post-traumatic stress disorder.  Ex. 106 at 55:15-59:5.

**Lisa Lorensen**

Lisa Lorensen is the spouse of Keith Lorensen, a sailor who was injured during the bombing of the Cole.  Ex. 91 at 6:12-13.  She was married to Mr. Lorensen on October 23, 1993.

34

Ex. 91 at 6:14-15.  The Lorensens have two children together.  Ex. 91 at 6:16-20.  Although Mrs. Lorensen was not enlisted in the Navy, she served as the Ombudsman of the Cole, serving as a liaison between the families and the commanding officer of a ship.  Ex. 91 at 6:21-23.

On the day of the bombing, Mrs. Lorensen received a phone call advising her that something significant had occurred on the ship.  Ex. 91 at 11:3-12:11.  However, no specific details were provided.  *Id.*  She was advised to proceed to a naval facility in order to obtain more information.  *Id.*  While on her way to the location, Ms. Lorensen received a phone call from her mother advising her that the Cole had been attacked.  *Id.*  While waiting at the facility, Ms. Lorensen witnessed the Naval officers present at the location advising sailors' family members of the death or injuries suffered by their relatives.  *Id.*  After approximately twelve hours, she was advised that Keith Lorensen was alive, but injured.  Ex. 91 at 13:19-14:15:5.

Approximately 24 hours later, Mrs. Lorensen had the opportunity to speak with her husband.  Ex. 91 at 15:6-21. Mr. Lorensen told her that he did not know whether he would be able to walk again, but would be coming home.  Ex. 91 at 15:19-16:4. Mrs. Lorensen then flew to Germany to see her husband.  Ex. 91 at 16:5-14.  When they returned to Virginia, Mrs. Lorensen had tremendous feelings of guilt and sadness as a result of her husband's injuries and the death and injury of the other sailors on the vessel.  *Id.*  The emotional impact of the events caused a strain in their marriage.  Ex. 91 at 20:9-21:15.

Dr. Rene Hernandez-Cardenache, an expert clinical psychologist, further provided his expert opinion that Mrs. Lorensen suffered from acute emotional distress as a direct result of the bombing.  Ex. 106 at 79:22-82:3.

**Shelly Songer**

35

Shelly Songer is the spouse of plaintiff Martin Songer, who was injured during the bombing of the Cole.  Ex. 103 at 5:7-9.  Mrs. Songer learned of the bombing through a telephone call from her mother-in-law.  Ex. 103 at 8:23-9:2.  Twelve hours later, she learned that her husband survived the bombing.  Ex. 103 at 9:6-15.  Upon returning home, the continuing emotional effect of the terrorist attack on Mr. Songer has adversely affected their marriage.  Ex. 103 at 13:4-15:16.

Dr. Hernandez-Cardenache testifies that Ms. Songer's symptoms are consistent with severe emotional distress.  Ex. 106 at 67:25-71:9.

### IV.  CONCLUSIONS OF LAW

**A.      Jurisdiction is Proper and Sudan Is Not Immune from Suit**

The Court finds that the plaintiffs have met FSIA's multi-factor test for jurisdiction and waiver of immunity discussed above, as set forth above.  *See* 28 U.S.C. § 1605(A)(a)(1); *Owens*, 2011 WL 5966900, at *17.  First, the sole remedy plaintiffs seeks is "money damages."  28 U.S.C. § 1605(A)(a)(1).  Second, Sudan is a foreign state.  *Id.*  Third, the evidence presented to the Court establishes that plaintiffs suffered physical injury form the attack.  *Id.*  Fourth, the evidence presented shows that Sudan aided Al Qaeda in executing the bombing, and this harm was a direct result of Sudan's of provision of material support.  *Id.*  On the evidence presented, there is "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered."  *Valore*, 700 F. Supp. 2d at 66 (internal quotations omitted).

As well, FSIA section 1605A(a)(2) requirements have been met.  Sudan has been designated a state sponsor of terrorism since 1993, and claimants are all U.S. nationals, both

statutory requirements.  28 U.S.C. § 1605A(a)(2).[11]  Thus, for purposes of this action, FSIA does

not protect Sudan with immunity from suit, and this Court has jurisdiction over plaintiffs' claims.

**B.      Plaintiffs Have Established a Cause of Action and Theory of Liability**

The same facts as to material support and causation support plaintiffs' cause of action and

theory of liability.  Plaintiffs have shown that Sudan's support of Al Qaeda has a "reasonable

connection" to the damages they suffered.  *Id.*  As described in detail below, they also

demonstrate the other elements of the torts they allege.  *See Murphy*, 740 F. Supp. 2d at 72.  In

keeping with the prevailing approach in this Circuit, *see id.*; *Bettis*, 315 F.3d at 333, the Court

apply the generally accepted principles of tort law.  The Court addresses first the claims of the

sailors who were on the Cole at the time of the attack and then the claims of their spouses who

were not present during the attack.

**1.      Harm to Plaintiffs Injured on the Cole**

**a.      Assault**

Sudan is liable to plaintiffs for the assault they allege if, when it provided material

support to Al Qaeda, (1) it acted "intending to cause a harmful contact with . . . , or an imminent

apprehension of such a contact" by, those attacked and (2) those attacked were "thereby put in

such imminent apprehension."  RESTATEMENT (SECOND) OF TORTS § 21(1); *accord Murphy*, 740

F. Supp. 2d at 73 (citing *Valore*, 700 F. Supp. 2d at 76).  Here, the record shows that Sudan acted

with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism

are, by their very nature, intended to harm and to terrify by instilling fear of further harm.

---

[11]      As for the § 1605A(a)(2)(A)(iii) arbitration requirement, plaintiffs were not
required to extend an offer to arbitrate because the FSIA only requires as much when the alleged
terrorist act occurred in the foreign state against which the claim is brought.  *Id.*  Even though the
attack did not take place in Sudan, the plaintiffs sent Sudan an offer, to which it did not respond.
*See* Notice of Amended Offer to Arbitrate, Oct. 11, 2010 [Dkt. # 6].

Accepting these plaintiffs' uncontroverted assertions that they did, in fact, fear such harm because of the attack, the Court concludes that Sudan is liable for assault.

### b.      Battery

Likewise, Sudan is liable for battery.  It acted "intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact" by, those attacked and (2) "a harmful contact with" those attacked "directly or indirectly result[ed]."  RESTATEMENT (SECOND) OF TORTS § 13; *accord Murphy*, 740 F. Supp. 2d at 74 (citing *Valore*, 700 F. Supp. 2d at 76). Harmful contact is that which results in "any physical impairment of the condition of another's body, or physical pain or illness."  RESTATEMENT (SECOND) OF TORTS § 15.  Accepting plaintiffs' uncontroverted assertions that they did, in fact, suffer physical injury from the attack on the Cole, the Court concludes Sudan is liable to certain plaintiffs for battery.

### c.      Intentional Infliction of Emotional Distress

Sudan is liable for IIED if it (1) "by extreme and outrageous conduct" (2) "intentionally or recklessly" (3) "causes severe emotional distress to another."  RESTATEMENT (SECOND) OF TORTS § 46(1).  Further, "if bodily harm to the other results from it, for such bodily harm."  *Id.* Here, plaintiff-sailors have proven each element.  In the FSIA-terrorism context, courts have held that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  Based on the evidence presented, the Court concludes that Sudan's support of the Cole bombing was both intentional and reckless and caused plaintiffs emotional distress.  It is therefore liable to plaintiffs for IIED.

### 2.      Harm to Spouses of Sailors

Spouses of injured sailors have brought IIED claims, alleging that extreme and outrageous conduct directed at their spouses caused these plaintiffs severe emotional distress. According to the second Restatement of Torts, Sudan is liable in these cases under such claims if it (1) engaged in extreme and outrageous conduct (2) which was directed at persons other than plaintiffs (3) which intentionally or recklessly caused severe emotional distress, but not necessarily bodily harm, (4) to such persons' immediate family members — the immediate-family requirement — who were present at the time such conduct occurred-the presence requirement. *Valore*, 700 F. Supp. 2d at 78 (citing RESTATEMENT (SECOND) OF TORTS § 46(1)–(2)(a)). As the record shows, plaintiff-spouses have proven the first three elements. Although the fourth element appears to prohibit recovery for emotional injury by those not present at the time such conduct occurs, the drafters of the Restatement include a caveat that this Court has interpreted liberally: "'[i]f the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability.'" *Heiser II*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834 (2000)). As the Court noted in *Heisler II*, "[t]errorism, unique among the types of tortious activities in both its extreme methods and aims, passes this test easily." *Id.*; *accord Brewer*, 664 F. Supp. 2d at 47. Therefore, plaintiff-spouses need not have been present at the time of a terrorist attack to recover for severe emotional injuries suffered as a result. Here, accepting the uncontroverted evidence that the plaintiffs named above suffered severe emotional and physical injury as a result of the injuries suffered by their spouses, the Court concludes that Sudan is liable to them for IIED.[12]

---

[12]     Plaintiffs' also alleged "loss of solatium." Such a claim under the FSIA-terrorism exception is indistinguishable from an IIED claim. *Valore*, 700 F. Supp. 2d at 85 (citing *Heiser II*, 659 F. Supp. 2d at 27 n. 4); *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d. 1, 13 (D.D.C. 2008). Therefore the Court only considers the IIED claim and awards appropriate damages (also

D.      **Damages**

Plaintiffs have stated claims and seek recovery for assault, battery, IIED, and loss of

solatium.  Section 1605A(c)(4) of the FSIA provides that damages available under the

FSIA-created cause of action may "include economic damages, solatium, pain and suffering, and

punitive damages."  Accordingly, those who survived the Cole attack can recover damages for

their pain and suffering, as well as any other economic losses caused by their injuries; family

members can recover solatium damages for their emotional injury; and all plaintiffs can recover

punitive damages.

"To obtain damages against defendants in an FSIA action, the plaintiff must prove that

the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not)

to occur, and must prove the amount of the damages by a reasonable estimate consistent with this

[Circuit's] application of the American rule on damages.'" *Valore*, 700 F. Supp. 2d at 84(citing,

*Salazar*, 370 F. Supp. 2d at 115-16); *accord Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir

2003).  As discussed above, plaintiffs have demonstrated that Sudan's provision of material

support to Al Qaeda was reasonably certain to — and indeed intended to — cause injury to

plaintiffs.  The Court now estimates the differing amounts of damages sought under the

FSIA-created cause of action, based in part on the expert report that plaintiffs submitted as well

the framework established by this Court in similar FSIA terrorism cases.

1.      **Economic Damages**

The plaintiffs presented evidence of their lost earning capacity through the testimony and

expert reports of Dana Kaufman, JD, CPA, CFE, a forensic accounting expert accepted by the

Court.  *See* Ex. 107.  Mr. Kaufman's reports provide calculations for the lost earnings of each of

_____

known at "solatium damages") below.

the plaintiff-sailors injured in the terrorist attack on the Cole.  *Id.*  Mr. Kaufman's methodology

assumed that each sailor would complete a twenty-year career in the Navy and then retire.  Ex.

107 at 29:25-30:22.  He did not add any additional lost wages that may have occurred after

retirement from the Navy. Ex. 107 at 19:11-20:13.  After calculating what each sailor would

have earned in the Navy, he subtracted their prospective retirement benefits to reach his

conclusion.  *Id.*  The Court finds that this conservative approach is acceptable.  Based upon his

calculations, two of the sailors injured in the bombing, Keith Lorensen and John Buckley III, did

not suffer any lost earning capacity.  Ex. 107 at 26:21-27:11, 25:5-16.  Having reviewed Dr.

Kaufmans' testimony and reports, the Court finds that the plaintiffs are entitled to receive

compensatory damages for the total economic damages.  The precise amounts are set forth in the

judgment accompanying this opinion.

### 2.      Sailor-Plaintiffs' Pain and Suffering

In addition to economic damages, plaintiffs may be entitled to compensation for the pain

and suffering they experienced as a direct result of the Cole bombing.  "Damages for surviving

victims [of a terrorist attack] are determined based upon an assessment of such factors as 'the

severity of the pain immediately following the injury, the length of hospitalization, and the extent

of the impairment that will remain with the victim for the rest of his or her life.'"  *Valore*, 700 F.

Supp. 2d at 83–84 (citing *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 51 (D.D.C.

2007)).  "'In awarding pain and suffering damages, the Court must take pains to ensure that

individuals with similar injuries receive similar awards.'"  *Id.*  "Thus in *Peterson*, the Court

granted a baseline award of $5 million to individuals suffering such physical injuries as

compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as

'lasting and severe psychological pain.'"  *Id.*  "The Court was willing to depart upward from this

baseline to $7.5–$12 million in more severe instances of physical and psychological pain, such as

where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic,

partially lost vision and hearing, or were mistaken for dead, as was one soldier who 'was placed

in a body bag [and] buried alive in a morgue for four days until someone heard him moaning in

pain.'" *Id*; *see also Estate of Bland v. Islamic Republic of Iran*, 2011 WL 6396527 (D.D.C. Dec.

21, 2011).  Conversely, the Court will depart downward from the $5 million baseline, by an

amount of $2-3 million, where victims suffered "minor shrapnel injuries or minor injury from

small-arms fire," *Valore*, 700 F. Supp. 2d at 84.  As well, when a serviceman suffers severe

emotional injury without physical injury, this Court has typically awarded the victim $1.5

million. *See Valore*, 700 F. Supp. 2d at 85; *Bland*, 2011 WL 6396527 at *3.  This Court finds

that the baseline set forth in *Valore* is appropriate in this case and applies the upward and

downward departures below.

Based upon the severity of certain injuries described above, the Court awards the baseline

amount of $5 million to the following plaintiffs for their pain and suffering: Rick Harrison, Carl

Wingate, Keith Lorenson, Robert McTureous, David Morales, and Rubin Smith.  Following the

rule on upward departure, the Court awards the following plaintiffs an upward departure to $7.5

million in damages: John Buckley, Margaret Lopez, and Jeremy Stewart.  Finally, the Court

departs downward for plaintiffs whose physical injuries were not as severe.  Accordingly, Eric

Williams is awarded $3 million, and Edward Love and Martin Songer, whose physical injuries

were relatively minor, are each awarded $2 million. *See Peterson*, 515 F. Supp. 2d at 54

(departing downward to $2 million where victim "was minimally injured" but "suffered lasting

and severe psychological problems.").

Although the remaining plaintiffs, Martin Songer and Gina Morris, did not suffer direct physical injuries as a result of the bombing, they have suffered psychological harm. A downward departure from the baseline of $5 million is also appropriate for these plaintiffs. In accordance with this Court's awards in other cases where plaintiffs on the scene of the attack did not suffer physical harm, Ms. Morris and Mr. Toney are awarded $1.5 million each.

3.       **Intentional Infliction of Emotional Distress/Solatium to Spouses**

In similar actions, this Court held that spouses of surviving servicemembers may be entitled to $4 million in solatium damages (or harm from IIED). *Valore*, 700 F. Supp. 2d at 85 (citing *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D. C. 2006) and referring to the amounts it establishes for solatium damages as a "framework"); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52; *cf. Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008) ("In determining the appropriate award of damages for solatium, the Court may look to prior decisions awarding damages for intentional infliction of emotional distress as well as to decisions regarding solatium."). This amount is "not set in stone," however, *see Valore*, 700 F. Supp. 2d at 86, and the Court may adjust it as it sees fit. In *Bland*, for example, this Court held that it is inappropriate for the solatium awards of family members to exceed the pain and suffering awards of the surviving servicemen. *Bland*, 2011 WL 6396527 at *5 ("[T]he Court does not think it appropriate for the . . . spouse to recover more than the victim"). In light of these holdings, the Court applies the baseline amount to the claims of Lisa Lorenson and Andy Lopez (whose spouses are awarded $5 and 7.5 million, respecitvely, for their pain and suffering) and awards them $4 million for the harm they suffered upon learning of the Cole attack and the injuries of their spouses and for the psychological harm they continue to experience as a result of the incident. The Court further finds that downward adjustment is warranted for the solatium

43

damages of Shelly Songer because her spouse, Martin Songer, was awarded $2 million for his

pain and suffering.  Following *Bland*, the Court awards Mrs. Songer $1 million.

### 4.    Punitive Damages

Having established the compensatory damage awards, the Court now determines whether,

and to what extent, it should levy punitive damages against Sudan.  Under 28 U.S.C. § 1605A,

foreign state sponsors of terrorism may be liable for such damages*.  See* 28 U.S.C. § 1605A(c).

According to the Second Restatement of Torts, punitive damages are designed to both "punish [a

defendant] for his outrageous conduct and to deter him and others like him from similar conduct

in the future."  RESTATEMENT (SECOND) OF TORTS § 908(1) (1977).  Further, they "may be

awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless

indifference to the rights of others."  *Id.*  Here, the Court finds Sudan's acts sufficiently

outrageous to justify punitive damages.  While Sudan's support of Al Qaeda does not rise to level

of direct involvement in the attacks, it was nonetheless intentional, material and, as a result,

reprehensible.  *See Baker*, 775 F. Supp. 2d at 85 (finding that the character of defendant's actions

in providing material support and sponsorship to terrorist organization merited award of punitive

damages).

In determining the proper punitive award, courts typically consider four factors: "(1) the

character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the

defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the

defendants."  *Flatow*, 999 F. Supp. at 32 (citing RESTATEMENT (SECOND) OF TORTS § 908(1)–(2)

(1965)).  Synthesizing these factors, courts in similar cases have generated two numbers that,

together, determine the punitive damages award: (1) the multiplicand and (2) the multiplier (the

factor by which the multiplicand should be multiplied to yield the desired deterrent effect).

44

Depending on the evidence available, the multiplicand is either the magnitude of defendant's annual expenditures on terrorist activities, *see Valore*, 700 F. Supp. 2d at 87–88, or the amount of compensatory damages already awarded, *see Bland*, 2011 WL 6396527, at *6 (using compensatory damages as the multiplicand and 3.44 as the multiplier, based on a ratio set forth in earlier cases).  Here, plaintiffs have not presented evidence relating to Sudan's actual expenditures on terrorist activities.[13]  The Court will thus use the compensatory damages value as the multiplicand.

The multiplier has ranged between three and, in exceptional cases, five.  *See Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 13 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 88–89. The Court finds no exceptional circumstances here.  Contrary to plaintiffs' assertion, Sudan's brief and cursory participation in the *Rux* litigation does not suggest that, at this point in time, its government is more amenable to a deterrent signal from this Court.  Therefore, the Court awards plaintiffs three times the compensatory damages in punitive damages, to be distributed in proportion to each plaintiff's share of the compensatory award.

## 5.    Prejudgment Interest

Plaintiffs also request pre-judgment interest.  Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations.  *See Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263 (D.D.C. 2008).  "Courts in this Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries — including, specifically, where such injuries were the result of

---

[13]        Citing various publicly availably courses, plaintiffs argue that Sudan benefitted from Bin Laden and Al Qaeda's capital and infrastructure investments, submitting figures on Sudan's gross domestic product, the growth thereof, and annual revenue from oil.  After reviewing these figures, the Court concludes that these figures do not indicate what level of punitive damages that would that would punish or deter Sudan from providing future support to terrorist entities.  The Court therefore does not consider them in its damages calculation.

targeted attacks perpetrated by foreign defendants." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). The Court finds no delay here. Plaintiffs filed their claim in October 2010. As well, Sudan, having never even appeared in this case, has not prolonged the litigation. Thus, the Court does not find any equitable grounds for awarding pre-judgment interest. Moreover, because the Court has applied the framework in *Heiser*, to its calculation of solatium damages (as explicitly proposed by plaintiffs), prejudgment interest is not appropriate for these awards. *See Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011) (concluding that pre-judgment interest was not warranted for solatium damages because the values set by the *Heiser* scale "represent the appropriate level of compensation, regardless of the timing of the attack.").

## V.  CONCLUSION

For the foregoing reasons, this Court finds Sudan liable for the injuries that plaintiffs suffered and awards damages accordingly. A separate Order and Judgment consistent with these findings shall issue this date.


Signed by Royce C. Lamberth, Chief Judge, on March 30, 2012.