**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**



JAMES OWENS, et al.,

    Plaintiffs,

       v.

REPUBLIC OF SUDAN, et al.,

    Defendants.

Civil Action No. 01-2244 (JDB)

## MEMORANDUM OPINION

Over thirteen years ago, on August 7, 1998, the United States embassies in Nairobi, Kenya

and Dar es Salaam, Tanzania were devastated by simultaneous suicide bombings that killed

hundreds of people and injured over a thousand.   Now, in this civil action under the Foreign

Sovereign Immunities Act ("FSIA"), plaintiffs — victims of the bombings and their families —

seek to assign liability for their injuries to the Republic of Sudan ("Sudan"), the Ministry of the

Interior of the Republic of Sudan, the Islamic Republic of Iran ("Iran"), the Iranian Revolutionary

Guards Corps ("IRGC") and the Iranian Ministry of Information and Security ("MOIS")

(collectively "defendants").

The Court will proceed in two steps.   First, it will present findings as to the causes of the

bombings — specifically, findings that defendants were indeed responsible for supporting,

funding, and otherwise carrying out this unconscionable attack.   Second, the Court will set forth

1

legal and remedial conclusions to bring this litigation to a close.[1]   Most recently, and relevant

here, the National Defense Authorization Act for Fiscal Year 2008 ("2008 NDAA" or "Act")

amended the FSIA to permit foreign national employees of the United States government killed or

injured while acting within the scope of their employment and their family members to sue a state

sponsor of terrorism for injuries and damages resulting from an act of terrorism.   Here, the

majority of plaintiffs are foreign national employees of the U.S. Government and their immediate

family members who, as the Court will explain below, lack a claim under the 2008 NDAA

amendments to FSIA but may proceed under applicable state law.

### Background

Plaintiffs bring this case pursuant to section 1083 of the National Defense Authorization

Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 341 (2008) (codified at 28 U.S.C.

§1605A (2009)).   Several cases were consolidated for purposes of the Court's October 25-28,

2010 evidentiary hearing on liability.   In each case, as described below, defendants were properly

served according to the FSIA. Defendants failed to respond, and the Clerk of Court entered

defaults against defendants in each case.   In Owens v. Republic of Sudan, No. 1:01-cv-02244

(JDB), service of process was completed upon each defendant: the Republic of Sudan on February

25, 2003 [Docket Entry 9]; the Ministry of the Interior of the Republic of Sudan on February 25,

2003 [Docket Entry 9]; the Islamic Republic of Iran on March 5, 2003 [Docket Entry 10]; and the

Iranian Ministry of Information and Security on October 14, 2002 [Docket Entry 6].   Defaults

were entered against the Iranian defendants on May 8, 2003, [Docket Entry 11], and defaults were

---

[1]   The Court enters the findings and conclusions below pursuant to 28 U.S.C. § 1608(e).   That
provision requires plaintiffs under the FSIA to "establish [their] claim or right to relief by evidence
satisfactory to the court" even where, as here, defendants have failed to appear after proper service.

2

entered against the Republic of Sudan and the Ministry of the Interior of the Republic of Sudan on March 25, 2010 [Docket Entry 173].

In Wamai v. Republic of Sudan, No. 1:08-cv-01349 (JDB), service of process was completed on each of the named defendants: the Ministry of the Interior of the Republic of Sudan was served with process on February 12, 2009, pursuant to 28 U.S.C. 1608(a)(3) [Docket Entry 15]; the Republic of Sudan was served with process on April 22, 2009 through the U.S. Department of State pursuant to 28 U.S.C.1608(a)(4) [Docket Entry 23], which was delivered under diplomatic note on November 12, 2009 [Docket Entry 28]; the Iranian Ministry of Information and Security was served with process on February 14, 2009 pursuant to 28 U.S.C. 1608(a)(3) [Docket Entry 15]; and the Islamic Republic of Iran and the Iranian Revolutionary Guards were served with process on April 22, 2009 through the U.S. Department of State pursuant to 28 U.S.C.1608(a)(4) [Docket Entry 23], which was delivered under diplomatic notes on November 18, 2009 [Docket Entry 29]. An entry of default was filed against each of these defendants on June 4, 2010 [Docket Entries 34, 35].

In Amduso v. Republic of Sudan, No. 1:08-cv-01361 (JDB), the Sudanese defendants were served with process on February 1, 2009 under 28 U.S.C. § 1608(a)(3) [Docket Entry 27], and the Iranian defendants were served on June 26, 2009 under 28 U.S.C. § 1608(a)(4) [Docket Entry 33]. Defaults were entered against the Republic of Sudan and the Ministry of the Interior of the Republic of Sudan on April 22, 2010 [Docket Entry 29] and against the Islamic Republic of Iran and the Iranian Ministry of Information and Security on October 6, 2009 [Docket Entry 40].

In Mwila v. Islamic Republic of Iran, No. 1:08-cv-01377 (JDB), service of process was completed on each of the named defendants: the Ministry of the Interior of the Republic of Sudan was served with process on March 17, 2009 pursuant to 28 U.S.C. 1608(a)(3) [Docket Entry 3]; the

3

Islamic Republic of Iran and the Iranian Ministry of Information and Security were served with process on September 8, 2009 through the U.S. Department of State pursuant to 28 U.S.C.1608(a)(4) [Docket Entry 16]; and the Republic of Sudan was served with process on November 12, 2009 through the U.S. Department of State pursuant to 28 U.S.C.1608(a)(4) [Docket Entry 19]. Defaults were entered against the Islamic Republic of Iran, the Republic of Sudan, and the Ministry of the Interior of the Republic of Sudan on February 18, 2010 [Docket Entries 20, 21 and 22] and against the Iranian Ministry of Information and Security on April 21, 2010 [Docket Entry 23].

In Khaliq v. Republic of Sudan, No. 1:10-cv-00356 (JDB), the Sudanese defendants were served with process on October 13, 2010 pursuant to 28 U.S.C. 1608(a)(4) [Docket Entry 16]. The Islamic Republic of Iran was served with process on October 11, 2010 pursuant to 28 U.S.C. 1608(a)(4) [Docket Entry 20]. Defaults were entered against the Republic of Sudan on December 15, 2010 [Docket Entry 18] and against the Islamic Republic of Iran on December 22, 2010 [Docket Entry 21].

Finally, in Onsongo v. Republic of Sudan, No. 1:08-cv-01380 (JDB), the Sudanese defendants were served with process on December 17, 2009 pursuant to 28 U.S.C. 1608(a)(4) [Docket Entry 16]. The Iranian Ministry of Information and Security was served with process on February 14, 2009 pursuant to 28 U.S.C. 1608(a)(3) [Docket Entry 8], and the Islamic Republic of Iran and the Iranian Revolutionary Guards were served with process on November 18, 2009 pursuant to 28 U.S.C. 1608(a)(4) [Docket Entry 17]. Defaults were entered against each of the named defendants on June 2, 2010 [Docket Entries 21, 22, and 23].

Before plaintiffs can be awarded any relief, this Court must determine whether they have established their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e); see also

Roeder v. Islamic Republic of Iran, 333 F.3d 228, 232 (D.C. Cir. 2003).   This "satisfactory to the

court" standard is identical to the standard for entry of default judgments against the United States

in Federal Rule of Civil Procedure 55(e).   Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir.

2003). In evaluating the plaintiffs' proof, the court may "accept as true the plaintiffs'

uncontroverted evidence." Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C.

2000); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003). In FSIA

default judgment proceedings, the plaintiffs may establish proof by affidavit. Weinstein v. Islamic

Republic of Iran, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).    A three-day hearing on liability and

damages was held beginning on October 25, 2010. At this hearing, the Court received evidence in

the form of live testimony, videotaped testimony, affidavit, and original documentary and

videographic evidence. The Court applied the Federal Rules of Evidence. Based on the record

established herein, the Court makes the following findings of fact and conclusions of law.

I.      FINDINGS OF FACT

### A.      Islamic Republic of Iran's Support for Bin Laden and Al Qaeda

The government of the Islamic Republic of Iran ("Iran") has a long history of providing

material aid and support to terrorist organizations including al Qaeda, which have claimed

responsibility for the August 7, 1998 embassy bombings. See, e.g., Tr. Vol. II at 124-25.[2]  Iran had

been the preeminent state sponsor of terrorism against United States interests for decades.   See id.

at 123. Throughout the 1990s — at least — Iran regarded al Qaeda as a useful tool to destabilize

U.S. interests.   As discussed in detail below, the government of Iran aided, abetted and conspired

---

[2]  "Tr. Vol." refers to the transcript for each day of the bench trial in this case, beginning on
October 25, 2010.   Accordingly "Tr. Vol. I" refers to the transcript for the first day of testimony on
October 25, 2010, "Tr. Vol. II" refers to the transcript of day two of the bench trial, and so on.   "Ex." refers
to those exhibits admitted into evidence during the trial.

with Hezbollah, Osama Bin Laden, and al Qaeda to launch large-scale bombing attacks against the

United States by utilizing the sophisticated delivery mechanism of powerful suicide truck bombs.

Hezbollah, a terrorist organization based principally in Lebanon, had utilized this type of bomb in

the devastating 1983 attacks on the U.S. embassy and Marine barracks in Beirut, Lebanon.   Prior

to their meetings with Iranian officials and agents, Bin Laden and al Qaeda did not possess the

technical expertise required to carry out the embassy bombings in Nairobi and Dar es Salaam.

The Iranian defendants, through Hezbollah, provided explosives training to Bin Laden and al

Qaeda and rendered direct assistance to al Qaeda operatives.   Hence, for the reasons discussed

below, the Iranian defendants provided material aid and support to al Qaeda for the 1998 embassy

bombings and are liable for damages suffered by the plaintiffs.

1.   The Iranian Government's Relationship with Hezbollah

Iranian support of Hezbollah began in the 1980s.   Id. at 123.   Iran "actively encouraged,

if not directed, the formation of Hezbollah," and the relationship was "quite close" during the

1990s.   Id.   Iran was formally declared a "state sponsor of terrorism" on January 19, 1984, by

U.S. Secretary of State George P. Schultz in accordance with section 6(j) of the Export

Administration Act of 1979, 50 App. U.S.C. § 2405(j), see 49 Fed. Reg. 2836-02 (statement of

Secretary of State George P. Schultz, Jan. 23, 1984), and remains designated as a state sponsor of

terrorism today.   The Iranian government and the Iranian intelligence service "provided

substantial financial support and lots of other services" to Hezbollah.   Tr. Vol. II at 122.

At all times relevant to this case, Iran was a state sponsor of terrorism that supported

terrorist groups that U.S. intelligence agencies believed were capable of attacking U.S. interests.

The declassified 1991 National Intelligence Estimate produced by the CIA stated that: "Iranian

support for terrorism will remain a significant issue dividing Tehran and Washington. Tehran is

unlikely to conduct terrorism directly against U.S. or Western interests during the next two years,

but it is supporting radical groups that might do so."   Ex. DD at 20.

Hezbollah possessed "extraordinary knowledge of explosives" in the mid-to-late 1990s. Tr.

Vol. II at 126.   Iran trained Hezbollah "in counterintelligence and in explosive capability" such

that Hezbollah "is often described as the A-team of terrorists."   Id. at 169.   Hezbollah operatives

were trained in Iran, and Iranian Revolutionary Guard Corp ("IRGC") trainers were present in

Lebanese Hezbollah training camps.   Id.   Indeed, as terrorism expert Evan Kohlmann testified,

"Hezbollah is a proxy force of Iran.   Its primary foreign sponsor is Iran, both financially and

otherwise.   Almost all of Hezbollah's activities are well known to the Iranian government.   In

some cases they're planned by the Iranian government."   Tr. Vol. III at 240.

### 2.   Iranian Support for Al Qaeda

In the 1990s, Iranian support for terrorist groups extended beyond Hezbollah to al Qaeda.

Dr. Matthew Levitt, an expert witness on the state sponsorship of terrorism, and specifically Iran,

Hezbollah and al Qaeda, explained how al Qaeda came into contact with the Iranian government:

"Hassan al-Turabi, the head of the National Islamic Front, which ruled Sudan at the time, was keen

not only on instituting Islamic sharia law in Sudan at home, but in making the Sudan a place from

which worldwide Islamic revolution could flow."   Tr. Vol. II at 165.   To that end, "Hassan

al-Turabi hosted numerous meetings, some large summits with radical extremist groups, including

one, for example, in April 1991.   Groups like HAMAS and Palestinian Islamic Jihad, Egyptian

Islamic Jihad, al Qaeda, Sudanese radicals, Iranians, Lebanese Hezbollah were all invited and

attended."   Id. at 165-66. Such a conglomeration of different terrorist groups and governments

such as Iran had been very unusual prior to al-Turabi's conferences.   Id. at 166.   And "it was at

these meetings where Iranian officials, Hezbollah officials, al Qaeda officials and others first

began to have some serious meetings."   Id.   Several meetings took place between

representatives of Hezbollah, al Qaeda and the governments of Sudan and Iran.   Tr. Vol. III at

8

240.  The purpose of these meetings, "in the words of a ranking al Qaeda shura council member
Abu Hajer al-Iraqi, . . . was to focus on a common enemy, that being the West, the United States."
Id.

Al-Turabi's policies therefore resulted in the exchange of ideas and sharing of resources by
groups that would not necessarily have communicated otherwise, including Hezbollah and al
Qaeda.  Ex. W-2 at 3, 6.  Bin Laden and al Qaeda relocated to Sudan in 1991.  Tr. Vol. II at 165.
The Iranian government played a "very active" role in Sudan during the time that Bin Laden
operated from Khartoum.  Id. at 124. This included playing a "prominent role" in a conference of
those resisting the Israeli-Arab peace process, which had been organized by the Sudanese
government.  Id.  Hezbollah also had a base of operations in Khartoum, Sudan.    Tr. Vol. III at
233.

Iran's role in Sudan grew at the same time that the Sudanese government invited Bin Laden
to Khartoum. Al-Turabi invited the President of Iran, Hojatoleslam Rafsanjani, to visit Sudan in
1991 to support Al-Turabi's goal of mending the Shia and Sunni divide in Islam in order to present
a united front against the West.  Ex. V at 5.  Iran also maintained a delegation office in Khartoum
that was run by Sheik Nomani to facilitate relations between the governments and convert Sunni
Arab Muslims to the Shia sectarian view. Tr. Vol. III at 234.  The two governments shared
information and intelligence between their militaries and intelligence services.  Id.

In addition, the IRGC, an Iranian state organization that funneled assistance to terrorist
organizations abroad — such as Hezbollah in Khartoum — also maintained connections with the
Sudanese intelligence service.  Id. at 234-35.  The IRGC was founded shortly after the 1979
Iranian revolution and, along with MOIS, is one of the two major organizations through which Iran
carries out its support of terrorism.  Tr. Vol. II at 130-31.  Indeed, "Hezbollah's presence in

9

Khartoum was made possible by the relationship between the government of Sudan and the

government of Iran."  Tr. Vol. III at 240.  The Sudanese intelligence service also facilitated the

linkage between al Qaeda and Hezbollah and representatives of Iran, which was strengthened by al

Qaeda's move to Sudan.  Id. at 270.  The State Department's annual report on "Patterns of Global

Terrorism" for 1993 states:

> Sudan's ties to Iran, the leading state sponsor of terrorism, continued to cause
> concern during the past year. Sudan served as a convenient transit point, meeting
> site and safe haven for Iranian-backed extremist groups. Iranian ambassador in
> Khartoum Majid Kamal was involved in the 1979 takeover of the U.S. embassy in
> Tehran and guided Iranian efforts in developing the Lebanese Hizballah group
> while he served as Iran's top diplomat in Lebanon during the early 1980s.  His
> presence illustrated the importance Iran places on Sudan.

Ex. GG; Tr. Vol. III at 258-59.

Iran provided substantial training and assistance to al Qaeda leading up to the embassy

attacks in 1998.  For example, Ali Mohammed provided security for one prominent meeting

between Hezbollah's chief external operations officer, Imad Mughniyah, and Bin Laden in Sudan.

Tr. Vol. II at 170; Ex. A at 28.  At Ali Mohammed's plea hearing in the United States District

Court for the Southern District of New York on October 20, 2000, he was asked to describe, in his

own words, why he believed that he was guilty of the crimes charged arising out of the embassy

attack.  Ali Mohammed responded:

> I was aware of certain contacts between al Qaeda and al Jihad organization, on one
> side, and Iran and Hezbollah on the other side. I arranged security for a meeting in
> the Sudan between Mughaniya, Hezbollah's chief, and Bin Laden. Hezbollah
> provided explosives training for al Qaeda and al Jihad. Iran supplied Egyptian
> Jihad with weapons. Iran also used Hezbollah to supply explosives that were
> disguised to look like rocks.

Ex. A at 28; Tr. Vol. II at 115-19.

Iran was "helping train al Qaeda operatives and al Qaeda personnel" in Sudan in the early

1990s. Tr. Vol. II at 124-25.  Dr. Matthew Levitt explained that known al Qaeda operatives had significant relationships with Iran.  For example, "Mustafa Hamid, throughout the period we're talking about here, throughout the 1990s, was one of al Qaeda's primary points of contact specifically to Iran's Islamic Revolutionary Guard Corps."  Id. at 170.  In 2009, the Department of Treasury designated Hamid as a specially designated global terrorist, "noting specifically that he was one of al Qaeda's senior leadership living in Iran and working closely with the IRGC, the Islamic Revolutionary Guards Corps."  Id.; Ex. CC. "In the mid-1990s, Mustafa Hamid reportedly negotiated a secret relationship between Usama Bin Laden and Iran, allowing many al Qaida members safe transit through Iran to Afghanistan."  Ex. CC.

Following the meetings that took place between representatives of Hezbollah and al Qaeda in Sudan in the early to mid-1990s, Hezbollah and Iran agreed to provide advanced training to a number of al Qaeda members, including shura council members, at Hezbollah training camps in South Lebanon. Tr. Vol. III at 241.  Saif al-Adel, the head of al Qaeda security, trained in Hezbollah camps. Id.  During this time period, several other senior al Qaeda operatives trained in Iran and in Hezbollah training camps in Lebanon. Tr. Vol. II at 169.  After one of the training sessions at a Lebanese Hezbollah camp, al Qaeda operatives connected to the Nairobi bombing, including a financier and a bomb-maker, returned to Sudan with videotapes and manuals "specifically about how to blow up large buildings."  Id.

Al Qaeda desired to replicate Hezbollah's 1983 Beirut Marine barracks suicide bombing, and Bin Laden sought Iranian expertise to teach al Qaeda operatives about how to blow up buildings.  Id. at 176. Prior to al Qaeda members' training in Iran and Lebanon, al Qaeda had not carried out any successful large scale bombings.  Id. at 177.  However, in a short time, al Qaeda acquired the capabilities to carry out the 1998 Embassy bombings, which killed hundreds and

11

injured thousands by detonation of very large and sophisticated bombs. See id.   Dr. Levitt

concluded that "it would not have been possible for al Qaeda to a reasonable degree of certainty to

have executed this type of a bombing attack, which it had never previously executed, without this

type of training it received from Iran and Hezbollah."   Id. at 181.

Hezbollah engages in international terrorist operations in close tactical and strategic

cooperation with the Iranian government.   Id. at 179.   The Supreme Leader of Iran, Ayatollah

Khameni, controls oversight of the media, the military, the Ministry of Intelligence, the IRGC, the

Basji militia, and the IRGC's Qods force; all the entities that oversee the training and support of

and cooperation with terrorist groups and that grant approval of terrorist attacks conducted with

other groups answer to Khameni.   Id.   Hezbollah's assistance to al Qaeda would not have been

possible without the authorization of the Iranian government. Id.; Ex. W-2 at 3.

Dr. Levitt testified that Iranian government authorization of Hezbollah's assistance would

be required for several reasons:

> The first is again the getting in bed with al Qaeda. After al Qaeda had issued not one
> but two fatwas, religious edicts, in '92 and '96, announcing its intent to target the
> West, it was a dangerous proposition. As I mentioned earlier, Iranian leaders have
> their own version of rationality, but they are rational actors. And that is something
> that I believe had to be approved, again, so there would be reasonable or plausible
> deniability. Overcoming this deep mistrust between the most radical Salafi jihadi
> Sunnis, who, as we saw in the context of the aftermath of the war in Iraq, are
> sometimes all too eager to kill Shia in particular, and for the Shia on the other side
> to overcome their historical animosity towards these radical Sunnis, is no small
> feat. And I think it is only because of their shared interest at that point, in the 1990s
> and the immediate — to target U.S. interests, that they were able to decide to
> overcome this animosity and mistrust. And I think it's quite clear, because it was for
> the express purpose of targeting the United States, it shouldn't surprise then that the
> type of training they received was specifically of the type used in the East Africa
> embassy bombings. They expressed interest in, we know they received at least
> videos and manuals about, blowing up large buildings.

Tr. Vol. II. at 179-80; Ex. L-2 at 14-19.   The declassified 1990 National Intelligence

12

Estimate produced by the CIA stated the following regarding President Rasfanjani's role in

the government's sponsorship of terrorism:

> The terrorist attacks carried out by Iran during the past year were probably approved in
> advance by President Rafsanjani and other senior leaders. The planning and
> implementation of these operations are, however, probably managed by other senior
> officials, most of whom are Rafsanjani's appointees or allies. Nonetheless, we believe
> Rafsanjani and Khomeini would closely monitor and approve the planning for an attack
> against U.S. or Western interests.

Ex. EE at 7; Tr. Vol. III at 238-40.

Support from Iran and Hezbollah was critical to al Qaeda's execution of the 1998 embassy

bombings.  See Tr. Vol. II at 181.  Prior to its meetings with Iranian officials and agents, al

Qaeda did not possess the technical expertise required to carry out the embassy bombings.  In the

1990s, al Qaeda received training in Iran and Lebanon on how to destroy large buildings with

sophisticated and powerful explosives.  Id. at 188; Tr. Vol. III at 314-15.  The government of

Iran was aware of and authorized this training and assistance.  Hence, for the reasons described

above, the Court finds that the Iranian defendants provided material aid and support to al Qaeda for

the 1990 embassy bombings and are liable for plaintiffs' damages.

## B.    The Republic of Sudan's Support for Bin Laden and al Qaeda

Sudanese government support for Bin Laden and al Qaeda was also important to the

execution of the two 1998 embassy bombings.  Critically, Sudan provided safe haven in a country

near the two U.S. embassies. The Sudanese defendants ("Sudan") gave material aid and support to

Bin Laden and al Qaeda in several ways.  Sudan harbored and provided sanctuary to terrorists and

their operational and logistical supply network.  Bin Laden and al Qaeda received the support and

protection of the Sudanese intelligence and military from foreign intelligence services and rival

militants.  Sudan provided Bin Laden and al Qaeda hundreds of Sudanese passports.  The

13

Sudanese intelligence service allowed al Qaeda to travel over the Sudan-Kenya border without

restriction, permitting the passage of weapons and money to supply the Nairobi terrorist cell.

Finally, Sudan's support of al Qaeda was official Sudanese government policy.

        1.     Safe Harbor

Osama Bin Laden and a small group of supporters founded al Qaeda in Afghanistan in

September 1988. Tr. Vol. III at 225.   Al Qaeda is Arabic for "the solid foundation" or "base."   Id.

at 224. Bin Laden was "the primary financier" and the "primary creative genius behind al Qaeda,"

a group that sought to "create a worldwide network of individuals who would defend the Muslim

community by waging . . . a low-intensity war against any of its enemies, including . . . the United

States and other Western countries."   Id. at 225.   When al Qaeda was formed, it was a very small,

compartmentalized group with centralized leadership composed of a shura council, and each

member was head of a subcommittee.   Id. at 226.   Around 1990, as the war in Afghanistan

neared its end, al Qaeda faced dangers arising from the eruption of a civil war among the Afghan

mujahedeen that had previously fought and defeated the Soviet Union.   Id. at 228-29.   The

multi-dimensional civil war involved several factions and was extremely violent, with shifting

front lines, which made it a difficult place for al Qaeda to maintain a secure base.   Id. at 332-33.

The Pakistani government also began to pressure the foreign mujahedeen fighters to leave

Pakistan.   Id. at 229.   Hence, al Qaeda needed to find a new base of operations, and Sudan was an

eager host.

In 1989, the Sudanese government was overthrown by a military coup led by General

Omar al-Bashir and Hassan al-Turabi, the head of the National Islamic Front ("NIF").   See Ex. W-2

at 1.   Al-Turabi, as the head of the NIF, and al-Bashir, as the head of the military who became the

President, joined forces to rule Sudan.   Ex. W-2 at 2.   Under their leadership, the Sudanese

government courted Bin Laden and al Qaeda to convince them to relocate to Sudan.   Tr. Vol. III at 242-43.   Al-Bashir even sent a letter of invitation to Bin Laden. Id. at 243, 333-34; Ex. V at 7.

Al-Turabi and the NIF sought to implement Sharia law throughout Sudan, and then in Muslim majority countries.   Id. at 334-35.   The NIF felt the Muslim world was endangered, primarily by Western encroachment, which had to be resisted.   Id. at 335.   This resulted in the Sudanese government's welcoming of a number of terrorist organizations into Sudan.   Id. at 335; Ex. V at 5.   The NIF also believed in ending the split between the Sunni and Shi'ite branches of Islam.   Tr. Vol. III at 335; Ex. V at 5.

Al Qaeda accepted Sudan's invitation and in late 1991 began to move to Sudan. Tr. Vol. III at 242-44. Al Qaeda respected and supported the ideological program of the new government of Sudan. Tr. Vol. III at 333; Ex. V at 5-6.   The leadership of Sudan guaranteed al Qaeda a base from which it could operate with impunity, with a minimum risk of foreign interference.   In turn, al Qaeda agreed to support the war in south Sudan against the Christians and animists, and to invest in the Sudanese economy.   Tr. Vol. III at 333; Ex. V at 5-15.

One of the members of al Qaeda who played an important role in the move was Jamal al-Fadl, who later worked directly with the Sudanese intelligence service under the approval of Bin Laden. Tr. Vol. III at 244.   Al-Fadl was Sudanese, and he served as an intermediary between al Qaeda and the Sudanese intelligence service.   Id. at 244-45.   Al-Fadl later defected to the United States and became an official source for the Federal Bureau of Investigation and the U.S. Justice Department.   Id. at 244.

Al-Fadl provided testimony for the United States government during the criminal trial of Bin Laden.   He recalled that when al Qaeda considered moving from Afghanistan to Sudan initially, questions were raised among the al Qaeda leadership over whether Hassan al-Turabi's

15

ruling National Islamic Front party in Sudan would make a suitable and appropriate ally.

According to al-Fadl: "The people, they say we have to be careful with that and we have to know

more about Islamic Front . . . I remember Abu Abdallah [Usama Bin Laden] … he decide to send

some people to Sudan at that time, to discover, to see what going on over there, and they bring

good answer or clean answer." United States v. Usama Bin Laden, No. 98-1023, Tr. Trans. at

216-17 (S.D.N.Y. Feb. 6, 2001). Al-Fadl indicated that Bin Laden had dispatched several senior al

Qaeda members on this mission, including "Abu Hammam al Saudi, Abu Hajer al Iraqi, and Abu

Hassan Al Sudani. And Abu Rida al Suri." Id. at 217.  Afterwards, "we got lecture by Abu Hajer

al Iraqi, and he ask about what in the Sudan and what this relationship… He said he went over

there and I met some of the Islamic National Front in Sudan and they are very good people and

they very happy to make this relationship with al Qaeda, and they very happy to have al Qaeda if al

Qaeda come over there."  Id. at 217-18.

Al-Fadl personally interviewed and vetted those who sought to travel with al Qaeda to

Sudan.  Tr. Vol. III at 244.  During testimony on February 6, 2001, al-Fadl described his role in

facilitating al Qaeda's subsequent move to Sudan at the end of 1990: "I went with some members

and we start rent houses and farms over there . . . . In Khartoum, because they going to bring the

members in Sudan, so I went with other members to rent guesthouses and we established to rent

houses for the single people and some houses for the people married that got family. And also we

bought farms for the training and refresh training." Usama Bin Laden, Tr. Trans. at 219-20.

Al-Fadl further testified that he spent approximately $250,000 of al Qaeda's own finances on

acquiring various properties in the Sudan. On the direct orders of Bin Laden and other al Qaeda

commanders, al-Fadl purchased large farms in Damazine, Port Sudan, and Soba.  Id. at 221.

Later, al-Fadl testified that he personally witnessed senior al Qaeda commanders — including

16

Salem al-Masri, Saif al-Islam al-Masri, Saif al-Adel, and Abu Talha al-Sudani — supervising

training courses in explosives being offered at the farm in Damazine. Id. at 243-45.

Terrorism expert Evan Kohlmann explained that the government of Sudan had encouraged

al Qaeda to move for several reasons.   The government envisioned that Sudan "would become the

new haven for Islamic revolutionary thought and would serve as a base not just for al Qaeda but for

Islamic revolutionaries of every stripe and size."   Tr. Vol. III at 231.   Also, al Qaeda's presence

allowed Sudan to gain leverage against its antagonistic neighbor Egypt through the use of these

groups that were opposed to the Egyptian government and to gain resources from its partnership

with the groups, especially Bin Laden who was rumored to be very wealthy. Id. Sudan invited

"Palestinian HAMAS movement, the Palestinian Islamic Jihad, Hezbollah from south Lebanon,

which is an Iranian sponsored Shi'ite movement, al Qaeda, the Egyptian Islamic Jihad, the Libyan

Islamic Fighting Group, dissident groups from Algeria, Morocco, the Eritrean Islamic Jihad

movement, literally every single jihadist style group, regardless of what sectarian perspective they

had, was invited to take a base in Khartoum" to further the goal of organizing and launching a

worldwide Islamic revolution. Id. at 232.

Sudan's open door policy for militant Islamic revolutionary groups and goal of fostering

worldwide Islamic revolution resulted in an unprecedented meeting held in Khartoum known as

the Popular Arab and Islamic Congress ("PAIC"). Ex. V at 5.   As Dr. Lorenzo Vidino testified,

"[t]he creation of the PAIC was 'the culmination of a quarter-century of study, political activity,

and international travel by Turabi,' and was described by Turabi himself in grandiose terms as 'the

most significant event since the collapse of the Caliphate.'"   Id. (quoting J. Millard Burr and

Robert O. Collins, Revolutionary Sudan: Hasan al-Turabi and the Islamist State, 1989-2000, at

56-7 (2003)).   Indeed, "[t]he list of participants to the PAIC's first assembly, which was held in

17

Khartoum in April of 1991, reads like a who's who of modern terrorism' . . . encompass[ing] groups such as the Philippines' Abu Sayaf, the Algerian FIS, the Egyptian Islamic Jihad, and the Palestinian Hamas [who] voted a resolution pledging to work together to 'challenge and defy the tyrannical West.'"  Id.

Al Qaeda thrived "[f]rom 1991 to 1996 [when] bin Laden operated without any limitation inside Sudan, while under the protection of the Sudanese security forces. This freedom of action gave bin Laden and the members of his organization a useful extra-legal status in the Sudan."  Ex. W-2 at 2.  Al Qaeda has released official audio and video recordings and books through its media wing, As-Sahab, which explain the organization's tactical decision to move to Sudan.  See Tr. Vol. III at 246-47. In one official As-Sahab video, an al Qaeda member explains that "[t]he migration to the Sudan isn't just to build that impoverished country, but also for the Sudan to be a launching ground for the management of the Jihad against the forces of tyranny in a number of corners of the world, especially after the House of Saud colludes with the Americans in their entrance to the land of the Two Sanctuaries, in a blatant contradiction of the command of the Prophet (peace be upon him)."  Ex. FF. The al Qaeda narrator continues, "[t]he Shaykh was keen to build the Sudan, which is a sound objective, but [also], the Sudan was a factory and production cell for a generation of Mujahideen who would spread to other countries."  Id. (second alteration in original); see also Tr. Vol. III at 249-51.

Bin Laden's presence in Sudan and partnership with Sudan was openly touted by the Sudanese government, including television broadcasts of Bin Laden in the company of both al-Turabi and President al-Bashir. Tr. Vol. III at 255.  The United States monitored this alliance throughout the 1990s.  The State Department's 1991 Patterns of Global Terrorism report detailed Sudan's growing connection with terrorist organizations:

18

In the past year Sudan has enhanced its relations with international terrorist groups, including the Abu Nidal Organization, ANO. Sudan has maintained ties with state sponsors of terrorism such as Libya and Iraq and has improved its relations with Iran. The National Islamic Front (NIF), under the leadership of Hassan al-Turabi, has intensified its domination of the government of Sudanese president General Bashir and has been the main advocate of closer relations with radical groups and their sponsors.

Ex. KK-1; Tr. Vol. III at 307-08.   The 1993 Report explained that Sudan had been placed on the

list of state sponsors of terrorism.   Ex. GG.   The report continued:

Despite several warnings to cease supporting radical extremists, the Sudanese government continued to harbor international terrorist groups in Sudan. Through the National Islamic Front (NIF), which dominates the Sudanese government, Sudan maintained a disturbing relationship with a wide range of Islamic extremists. The list includes the ANO, the Palestinian HAMAS, the [Palestinian Islamic Jihad], Lebanese Hizballah, and Egypt's al-Gama'at al-Islamiyya.

Id.; see also Tr. Vol. III at 257-59.

Even after Sudan expelled Bin laden in 1996, al Qaeda operatives remained in

Sudan.   Ex. AA; see also Tr. Vol. II at 173-75; Tr. Vol. III at 305.   A declassified CIA

report dated May 12, 1997 indicated that Sudan's support for terrorist groups such as al

Qaeda continued, despite the considerable international pressure prompting the expulsion

of Bin Laden: "[d]espite some positive steps over the past year, Khartoum has sent mixed

signals about cutting its terrorist ties and has taken only tactical steps."   Ex. BB; see also

Tr. Vol. II 175-76.

The State Department's 1997 Patterns of Global Terrorism report detailed Sudan's

continued support for terrorist organizations: "Sudan in 1997 continued to serve as a haven,

meeting place, and training hub for a number of international terrorist organizations,

primarily of Middle East origin. The Sudanese Government also condoned many of the

19

objectionable activities of Iran, such as funneling assistance to terrorists and radical

Islamic groups operating in and transiting through Sudan." Ex. KK-2; see also Ex. KK-3

(stating that Sudan continued to serve as a haven of international terrorist organizations in

1998 and noting "[in] particular[] Usama Bin Ladin's al-Qaida organization"); Tr. Vol. III

at 308-09. Hence, the evidence strongly supports the conclusion that Sudan harbored and

provided sanctuary to terrorists and their operational and logistical supply network leading

up to the 1998 terrorist attacks on U.S. embassies in East Africa.

    2.    Financial, Military and Intelligence Services

As explained in more detail below, Sudan also provided critical financial, military,

and intelligence services that facilitated and enabled al Qaeda to strengthen its terrorist

network and infiltrate nearby countries. Al Qaeda set up a number of businesses and

charities in Khartoum, Sudan to finance its terrorist activities and provide employment and

cover for its operatives.   The government of Sudan also provided passports and Sudanese

citizenship for al Qaeda operatives. Additionally, the Sudanese military and intelligence

service coordinated with al Qaeda operatives frequently, providing protection for al Qaeda

and sharing resources and information to coordinate attacks on their mutual enemies.

    **i.  Financial Support**

Al Qaeda set up several businesses and charities in Sudan as its financial and

operative base for terrorist activities. Tr. Vol. III at 253-55.   Once al Qaeda settled in

Khartoum, it opened business offices and bought a guesthouse designed to house al Qaeda

operatives in transit.   Id. at 252. Al Qaeda's businesses included companies that imported

and exported containers, farm products, and construction materials.   See Ex. HH; Tr. Vol.

III at 278-80; Ex. V at 8-9.   Al Qaeda's farms provided income and offered space for

20