terrorist training camps. Tr. Vol. III at 252-53. The expansive space allowed for testing explosives, producing mock-ups and planning attacks and assassinations. Id.; Ex. V at 15-16.

These businesses produced some commercial profit but, more critically, provided employment for al Qaeda operatives and cover for terrorist activities. Tr. Vol. III at 253-55. The commercial operations also provided an avenue for exchanging currency and purchasing imported goods without raising international suspicion. Usama bin Laden, Tr. Trans. at 239-46 (testimony of al-Fadl). As Mr. Kohlmann explained:

> Al Qaeda was looking for a way of self-sustaining, providing a means of income for its membership, its leadership, and also to provide an excuse for why al Qaeda operatives would be traveling to different countries. It makes a good excuse if you show up at a foreign country at an immigration desk and someone asks you, why are you here, I'm here to help sell peanuts. I'm here to provide humanitarian relief. It sounded a lot better than saying I'm here to foment Islamic revolution.

Tr. Vol. III at 255.

Al Qaeda also opened and operated a number of purported charities to provide income for jihad, launder such funds and otherwise operate as a front for terrorist operations. Ex. II; Tr. Vol. III at 285-86. Most of the charities had offices in Khartoum and were active across West and Central Africa, including in Somalia and Kenya. Tr. Vol. III at 286. As fronts for al Qaeda activity, these charities served as depots for al Qaeda communications and records and as safe meeting houses for operatives. Id. For example, al Qaeda used the office of Mercy International in Nairobi, Kenya to hide documents, plan operations, and house members of al Qaeda. Id. at 287. Al Qaeda members used Mercy International ID cards to pose as relief workers. Id. Another charity in Nairobi, Help Africa People, did not engage in any relief work and was utilized

21

similarly as a cover organization for al Qaeda members.  Id. at 288-89.

Bin Laden and al Qaeda also invested in Sudanese banks.  Id. at 337.  This access to the formal banking system was useful for "laundering money and facilitating other financial transactions that stabilized and ultimately enlarged bin Laden's presence in the Sudan."  Id.  For example, Bin Laden invested $50 million in the Sudan's Al Shamal Islamic Bank, and these funds were used to finance al Qaeda operations. Ex. V at 11-14.  Al Shamal Islamic Bank was known for financing terrorist operations, and bin Laden remained a leading investor of the bank long after he was expelled from the Sudan.  Id.

The commercial enterprises served al Qaeda's ultimate goal of organizing jihad against the United States and the West.  As Dr. Vidino testified:

> During its time in Sudan, al Qaeda grew into a sophisticated organization. Several key figures in the organization portrayed al Qaeda at the time as a multinational corporation complete with a finance committee, investments, worldwide operations, and well-organized, concealed accounts. These activities were clearly facilitated by the Sudanese government. Complacent banks, customs exemptions, tax privileges, and, more generally, full support by the Sudanese government, allowed Bin Laden's commercial activities to flourish. But money has never been Bin Laden's highest aspiration. He used his newfound advantageous position to solidify his nascent organization, al Qaeda. . . . . Al Qaeda's commercial activities were to be used simply as a tool for the more important goal of building a stronger al Qaeda, not to generate profits. If profits were made, they were reinvested in the organization.

Ex. V at 15.

          ii.    Governmental/Military Support

The Sudanese government, through al-Turabi and al-Bashir, invited al Qaeda members to leave Afghanistan and come to Sudan in the early 1990s.  Tr. Vol. III at 242-43.  President al-Bashir followed up on this general invitation with a letter specifically inviting several al Qaeda members to come to Sudan.  Id. at 243.  Al Qaeda

members used the letter to "avoid having to go through normal immigration and customs controls" and resolve any "problems with the local police or authorities." Id. This letter served as a "free pass" throughout the Sudan: "Upon viewing this letter, whether it was customs or immigration or Sudanese police officers, they backed off. They understood that these individuals were here in an official quote-unquote diplomatic role." Id.

During the 2001 trial of Bin Laden, Jamal al-Fadl, the former high-ranking al Qaeda member from Sudan, testified that the letter served to publicly verify al Qaeda's extra-judicial status in the Sudan: "Like when we go to Port of Sudan and we bring some stuff that comes — when we have some guys from outside Sudan to go inside Sudan, that letter, we don't have to pay tax or custom, or sometime the Customs, you don't have to open our containers." Usama Bin Laden, Tr. Trans. at 238. The letter and governmental support provided al Qaeda unchecked access throughout Sudan. Tr. Vol. III at 243. Al-Fadl also testified that the Sudanese government provided al Qaeda members — including those who were not Sudanese — with "a couple hundred . . . real passports . . . and Sudanese citizenships" to facilitate travel outside of the Sudan. Usama bin Laden, Tr. Trans. at 441-42.

Al Qaeda and the Sudanese government jointly attempted to acquire nuclear materials and develop chemical weapons. Tr. Vol. III at 284-85. The Sudanese military "was directly engaged in trying to develop regular conventional weapons into nonconventional chemical weapons with al Qaeda's assistance." Id. at 285. Al Qaeda also had the support of Sudanese soldiers to facilitate the transport of weapons. Essam al-Ridi, an al Qaeda member and pilot, testified as to his knowledge of the use of Sudanese soldiers to protect Bin Laden and al Qaeda members. Ex. H at 25; see also Usama bin

23

Laden, Tr. Trans. at 569-70. Al-Ridi explained that members of the Sudanese military acted as personal guards for Bin Laden at his guest house in Khartoum. Ex. H at 25-27.

Although Sudan eventually expelled Bin Laden in 1996, the government strongly resisted foreign pressure to turn him over to the United States or grant access to the al Qaeda training camps. Ex. W-2 at 4-5. Steven Simon, an expert on the state sponsorship of terrorism, concluded that the Sudanese government's negotiation with the United States regarding Bin Laden as a terrorist threat "was a charade," with Sudan not providing "useful information on bin Laden's finances or the terrorist training camps." Id. at 5. Furthermore, "[t]he Sudanese government never offered intelligence regarding al Qaeda cells that might have helped the U.S. unravel the plots to attack the two East African U.S. embassies." Id.

        iii.    Support from Sudan's Intelligence Services

The Sudanese intelligence service had a delegation office that provided services to Bin Laden and al Qaeda. Tr. Vol. III at 271; Ex. V at 19. As described by Mr. Simon:

> The Sudanese intelligence service coordinated with al Qaeda operatives to vet the large numbers of Islamic militants entering the country to ensure that they were not seeking to infiltrate bin Laden's organization on behalf of a foreign intelligence service.

Ex. W-2 at 4. Bin Laden himself was closely involved with the Sudanese intelligence service and aware of its operations. Tr. Vol. III at 271. When al Qaeda members or operatives arrived at the Khartoum airport, Sudanese intelligence would greet them and escort them around customs and immigration to prevent their bags from being searched and their passports from being stamped. Id. Al Qaeda operatives tried to avoid passport stamps from Sudanese customs, because of Khartoum's reputation for terrorist activity and

the concern that a member with a stamped passport could come under suspicion of being involved in international terrorism. Id. at 271-73.

The Sudanese intelligence service facilitated the transport of al Qaeda operatives and funds from Sudan to the Nairobi cell. Id. at 294. For example, in violation of Kenyan customs regulations, the Sudanese intelligence service enabled al Qaeda operative L'Houssaine Kherchtou to smuggle $10,000 from Sudan to Kenya. Id. The intelligence service also provided security for al Qaeda, which included protecting Bin Laden from an assassination attempt in Khartoum in 1994. Id. at 274. Additionally, the Sudanese intelligence service provided al Qaeda with weapons and explosives. Id. at 270.

The relationship between al Qaeda and the Sudanese intelligence was close and mutually beneficial. See id. at 268-270. Indeed, "[t]he Sudanese intelligence service viewed al Qaeda as a proxy, much the way that Iran views Hezbollah as a proxy." Id. at 268-69. As a means of increasing their influence, the Sudanese intelligence service considered that "by sharing resources, information, [and] by assisting al Qaeda, the Sudanese could use al Qaeda to attack their mutual enemies." Id. at 269.

3. Sudan's Support Essential to 1998 Embassy Bombings

Sudanese government support was critical to the success of the 1998 embassy bombings: "The presence, the safe haven that Al Qaeda had in the Sudan was absolutely integral for its capability of launching operations not just in Kenya, but in Somalia, in Eritrea, in Libya. Without this base of operations, none of this would have happened." Id. at 317. The support of Sudanese intelligence, the safe haven provided by the Sudanese government to house al Qaeda's leadership and train its operatives, and the provision of passports allowing al Qaeda to open businesses and charities enabled al Qaeda to build its terrorist cells in Kenya, Somalia and Tanzania. Id. at

316-19. Indeed, Mr. Simon asserted:

> The Republic of Sudan supplied al Qaeda with important resources and support during the 1990s knowing that al Qaeda intended to attack the citizens, or interests of the United States. This support encompassed the safe haven of the entire country for bin Laden and the top al Qaeda leadership. This enabled bin Laden and his followers to plot against the U.S. and build their organization free from U.S. interference. Sudanese shelter enabled Bin Laden to create training camps, invest in – and use – banking facilities, create business firms to provide cover for operatives, generate funds for an array of terrorist groups, provide official documents to facilitate clandestine travel, and enjoy the protection of Sudan's security service against infiltration, surveillance and sabotage.

Ex. W-2 at 5-6.  Sudan's support thus facilitated and enabled the 1998 terrorist bombings on the two U.S. embassies in East Africa.

With the support of Sudan and Iran, al Qaeda killed and attempted to kill thousands of individuals on site in the 1998 U.S. embassy attacks in Nairobi, Kenya and Dar es Salaam, Tanzania.  The evidence overwhelmingly supports the conclusion that al Qaeda carried out the two bombing attacks, and Bin Laden himself claimed responsibility for them during an al Qaeda documentary history released by the al Qaeda media wing.  See Exs. LL, MM, NN, OO; Tr. Vol. III at 313-16.

II.    CONCLUSIONS OF LAW

The "terrorism exception" to the FSIA was first enacted as part of the Mandatory Victim's Restitution Act of 1996, which was itself part of the larger Antiterrorism and Effective Death Penalty Act of 1996.  See Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1241, 1241 (formerly codified at 28 U.S.C. §1605(a)(7)).  The exception permitted claims against foreign state sponsors of terrorism that resulted in personal injury or death, where either the claimant or the victim was a United States citizen at the time of the terrorist act.  See 28 U.S.C. § 1605(a)(7) (2007).  Shortly thereafter, Congress passed the so-called "Flatlow Amendment" in the Omnibus

Consolidated Appropriations Act of 1996. See Pub. L. No. 104-208, § 589, 110 Stat. 3009-1, 3009-172 (codified at 28 U.S.C. §1605 note). Initially, some courts construed § 1605(a)(7) and the Flatlow Amendment, read in tandem, as creating a federal cause of action against the foreign state sponsor of terrorism. See, e.g., Flatlow v. Islamic Republic of Iran, 999 F. Supp. 1, 27 (D.D.C. 1998).

In Cicippio-Puleo v. Islamic Republic of Iran, the D.C. Circuit concluded that neither § 1605(a)(7) nor the Flatlow Amendment itself created a cause of action against the foreign state. 353 F.3d 1024, 1027 (D.C. Cir 2004). Instead of a federal cause of action, the D.C. Circuit directed plaintiffs to assert causes of action using "some other source of law, including state law." Id. at 1036; see, e.g., Dammarell v. Islamic Republic of Iran, 2005 WL 756090, at *33 (D.D.C. Mar. 25, 2005) (requiring plaintiffs post-Cicippio-Puleo to amend their complaint to state causes of action under the law of the state in which they were domiciled at the time of their injuries). Hence, following Cicippio-Puleo, the FSIA "terrorism exception" began to serve as "a 'pass-through' to substantive causes of action against private individuals that may exist in federal, state or international law." Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 83 (D.D.C. 2006).

In some cases, applying relevant state law created practical problems for litigants and the courts. Under applicable choice of law principles, district courts applied the state tort law of each individual plaintiff's domicile, which in many cases involved several different states for the same terrorism incident. See, e.g., Dammarell v. Islamic Republic of Iran, 404 F. Supp. 2d 261, 275-324 (D.D.C. 2005) (applying the law of six states and the District of Columbia). This analysis resulted in different awards for similarly-situated plaintiffs, based on the substantive tort law distinctions among states for intentional infliction of emotional distress claims. See, e.g.,

27

Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 44-45 (D.D.C. 2007) (dismissing intentional infliction of emotional distress claims of those family members domiciled in Pennsylvania and Louisiana, whose laws required the claimant to be present at the site of the event causing emotional distress).

To address these issues, Congress enacted section 1083 of the 2008 NDAA, which amended the "terrorism exception" and other related FSIA provisions. The Act repealed §1605(a)(7) of Title 28 and replaced it with a separate section, §1605A, which, among other things: (1) broadened the jurisdiction of federal courts to include claims by members of the U.S. armed forces and employees or contractors of the U.S. government injured while performing their duties on behalf of the U.S. Government; and (2) created a federal statutory cause of action for those victims and their legal representatives against state sponsors of terrorism for terrorist acts committed by the State, its agents, or employees, thereby abrogating Cicippio-Puleo. See Simon v. Republic of Iraq, 529 F.3d 1187, 1190 (D.C. Cir. 2008), rev'd on other grounds, 129 S. Ct. 2183 (2009).

This case is the second to apply §1605A to non-U.S. national plaintiffs who worked for the U.S. government (and their non-U.S. national family members), who are now entitled to compensation for personal injury and wrongful death suffered as a result of the terrorist attacks on the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. The first was this Court's recent decision in Estate of Doe v. Islamic Republic of Iran, 2011 WL 3585963 (D.D.C. Aug. 16, 2011), dealing with claims arising out of the 1983 and 1984 bombings of the U.S. embassy in Lebanon.

### A. Jurisdiction Under The FSIA

The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, is the sole basis for

obtaining jurisdiction over a foreign state in the United States. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989); Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43, 50 (D.D.C. 2009). Although the FSIA provides that foreign states are generally immune from jurisdiction in U.S. courts, see 28 U.S.C. § 1604, a federal district court can obtain personal and subject matter jurisdiction over a foreign entity in certain circumstances. A court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608. See 28 U.S.C. § 1330(b). Moreover, subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity. See 28 U.S.C. §§ 1330(a) & 1604. Here, this Court has jurisdiction because service was proper and defendants' conduct falls within the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A.

1. Service of Process

Courts may exercise personal jurisdiction over a foreign state where the defendant is properly served in accordance with 28 U.S.C. § 1608. See 28 U.S.C. § 1330(b); TMR Energy Ltd. v. State Prop. Fund of Ukr., 411 F.3d 196, 199 (D.C. Cir. 2005). "A foreign state or its political subdivision, agency or instrumentality must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). "The FSIA prescribes four methods of service, in descending order of preference. Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." Ben-Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 52 (D.D.C. 2008); see also 28 U.S.C. § 1608. As described above, plaintiffs in each case here properly effected service on all defendants. See supra at 2-4. And in each case, defendants did not respond or make an appearance within 60 days, and thus, pursuant to § 1608(d), the Clerk entered default against defendants. Hence, as defendants were

properly served in accordance with § 1608, this Court has personal jurisdiction over them.

    2. <u>Subject Matter Jurisdiction</u>

The provisions relating to the waiver of immunity for claims alleging state-sponsored terrorism, as amended, are set forth at 28 U.S.C. § 1605A(a).  Section 1605A(a)(1) provides that a foreign state shall not be immune from the jurisdiction of U.S. courts in a case where

> money damages are sought against [it] for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

§ 1605A(a)(1).  For a claim to be heard in such a case, the foreign state defendant must have been designated by the U.S. Department of State as a "state sponsor of terrorism" at the time the act complained of occurred.  <u>Id.</u>  Finally, subsection (a)(2)(A)(ii) requires that the "<u>claimant or the victim</u> was, at the time the act . . . occurred

> (I) a national of the United States;
>
> (II) a member of the armed forces; or
>
> (III) otherwise an employee of the Government of the United States . . . acting within the scope of the employee's employment . . . .

28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III)(emphasis added).

As explained in more detail below, plaintiffs satisfy each of the requirements for subject matter jurisdiction.  First, Iran and Sudan were designated as state sponsors of terrorism at the time all of the related actions in this case were filed.  Second, plaintiffs' injuries were caused by the defendants' acts of "extrajudicial killing" and provision of "material support" for such acts to their agents.  Third, plaintiffs presented evidence that they were either themselves nationals of the

United States or U.S. Government employees at the time of the attacks, or their claims are derived from claims where the victims were either U.S. nationals or U.S. Government employees at the time of the attacks, as required by section 1605A(a)(2)(A)(ii). As the case progresses to the damages phase, individual plaintiffs will be required to produce evidence of their employment or familial relationship to establish their standing under the statute.

### i. Iran and Sudan Designated As State Sponsors of Terrorism

A foreign state defendant must have been designated as a state sponsor of terrorism at the time the act complained of occurred. 28 U.S.C. § 1605A(a)(2)(A)(I). The statute defines "state sponsor of terrorism" as "a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism . . . ." 28 U.S.C. § 1605A(h)(6).

Iran and Sudan were designated by the U.S. Department of State as state sponsors of terrorism on January 19, 1984 and August 12, 1993, respectively. Iran was formally declared a state sponsor of terrorism by Secretary of State Schultz, see 49 Fed. Reg. 2836 (Jan. 23, 1984), and today remains designated as a state sponsor of terrorism. Sudan was originally designated a state sponsor of terrorism in 1993. See 58 Fed. Reg. 52,523 (Oct. 8, 1993). Once a country has been designated as a state sponsor of terrorism, the designation cannot be rescinded unless the President submits to Congress a proper report, as described in the Export Administration Act. See 50 U.S.C. app. § 2405(j)(4). Iran and Sudan have never been removed from this list of state sponsors of terrorism. Hence, the requirements set forth in section 1605A(a)(2)(A)(i) are satisfied.

### ii. Extrajudicial Killing and Provision of Material Support

31

The FSIA, as amended, strips immunity "in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act if such an act or provision of material support or resources is engaged in by an official, employee, or agent or such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). The FSIA refers to the Torture Victim Protection Act of 1991 ("TVPA") for the definition of "extrajudicial killing." See 28 U.S.C. § 1605A(h)(7). The TVPA provides that

> the term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all of the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note; see also Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 74 (D.D.C. 2010) (adopting the TVPA definition of "extrajudicial killing" in bombing of U.S. Marine barracks in Beirut, Lebanon).

Plaintiffs have satisfied their burden under 28 U.S.C. § 1608(e) to show that the governments of Sudan and Iran provided material support and resources to Bin Laden and al Qaeda for acts of terrorism, including extrajudicial killings. Targeted, large-scale bombings of U.S. embassies or official U.S. government buildings constitute acts of extrajudicial killings. Estate of Doe, 2011 WL 3585963, at *10 ("[T]he 1983 and 1984 Embassy bombings both qualify as an 'extrajudicial killing.'"); Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 192 (D.D.C. 2003)("[T]he evidence is conclusive that [the victims of the 1983 embassy bombing in Lebanon] were deliberately targeted for death and injury without authorization by a previous court judgment . . . and [the 1983 bombing] constitutes an act of 'extrajudicial killing.'"); Wagner v.

Islamic Republic of Iran, 172 F. Supp. 2d 128, 134 (D.D.C. 2001) (finding the September 1984 bombing of the U.S. embassy annex in Lebanon was a "deliberate and premeditated act" that killed 14 people and "[t]here is no evidence that it was judicially sanctioned by any lawfully constituted tribunal"); Brewer, 664 F. Supp. 2d at 52-53 (same); Welch v. Islamic Republic of Iran, 2007 U.S. Dist. LEXIS 99191, at *26 (D.D.C. Sept. 20, 2007) (finding that an embassy attack "clearly qualifies as an extrajudicial killing").

With the support of Sudan and Iran, al Qaeda killed hundreds of individuals — and attempted to kill thousands more — on site in the 1998 U.S. embassy attacks in Nairobi and Dar es Salaam. No one questions that al Qaeda carried out the two bombing attacks, and Bin Laden himself claimed responsibility for them during an al Qaeda documentary history released by the al Qaeda media wing. See Exs. LL, MM, NN, OO; Tr. Vol. III at 313-16. Such acts of terrorism are contrary to the guarantees "recognized as indispensable by civilized persons." Hence, the 1998 embassy attacks in Kenya and Tanzania, and the resulting deaths and injuries, qualify as an "extrajudicial killing."

The statute defines "material support or resources" to include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, [and] personnel." 18 U.S.C. § 2339A(b). As described in detail above, defendants provided several kinds of material support to al Qaeda without which it could not have carried out the 1998 bombings. Sudan provided — at least — safe haven for Bin Laden and al Qaeda, and functioned as its training, organizational and logistical hub, from 1991 to 1996. When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of

"safehouse" under 18 U.S.C. § 2339A(b):

> Insofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al Qaeda and Hizbollah to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks — as the complaint unambiguously alleges — Sudan provided a "safehouse" within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7).

Owens v. Republic of Sudan, 412 F. Supp. 2d 99, 108 (D.D.C. 2006). The Sudanese government also provided inauthentic passports, which qualify as "false documentation or identification" under 18 U.S.C. § 2339A(b). Plaintiffs also established that the Iranian government both trained al Qaeda members and authorized the provision of training by Hezbollah in explosives, and specifically in how to destroy large buildings. This support qualifies as "training, expert advice or assistance" under 18 U.S.C. § 2339A(b). See id. § 2339A(b)(2) and (3) (defining "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge" and "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge").

The statute also requires that the extrajudicial killings be "caused by" the provision of material support. The causation requirement under the FSIA is satisfied by a showing of proximate cause. See 28 U.S.C. § 1605A(a)(1); Estate of Doe, 2011 WL 3585963, at *11; Valore, 700 F. Supp. at 66; Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (weighing the import of the phrase "caused by" from 28 U.S.C. § 1605(a)(7), the predecessor statute to 28 U.S.C. § 1605A). Proximate causation may be established by a showing of a "reasonable connection" between the material support provided and the ultimate act of terrorism. Valore, 700 F. Supp. 2d at 66. "Proximate cause exists so long as there is 'some reasonable connection between the act or omission of the defendant and the damages

34

which the plaintiff has suffered.'" Id. (quoting Brewer, 664 F. Supp. 2d at 54 (construing causation element in 28 U.S.C. § 1605A by reference to cases decided under 28 U.S.C. § 1605(a)(7)). Plaintiffs have demonstrated several reasonable connections between the material support provided by defendants and the two embassy bombings. Sudan provided the safe harbor necessary to allow al Qaeda to train and organize its members for acts of large-scale terrorism from 1992 to 1996. Sudan facilitated its safe harbor through constant vigilance by its security services and the provision of documentation required to shelter al Qaeda from foreign intelligence services and competing terrorist groups. Iran's training and technical support was specifically required for the successful execution of al Qaeda's plot to bomb the two embassies. Hence, plaintiffs have established that the 1998 embassy bombings were caused by Iran and Sudan's provision of material support.

### B. Federal Cause of Action

Once jurisdiction has been established over plaintiffs' claims against all defendants, liability on those claims in a default judgment case is established by the same evidence if "satisfactory to the Court." 28 U.S.C. § 1608(e). Plaintiffs' claims are brought under section 1605A(c), the newly created federal cause of action, or, in the alternative, under applicable state or foreign law. Section 1605A(c) authorizes claims against state sponsors of terrorism to recover compensatory and punitive damages for personal injury or death caused by acts described as follows.

> (c) Private right of action.—A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—
>
> (1) a national of the United States,

35

(2) a member of the armed forces,

(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a) (1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

The plain meaning approach to statutory construction governs the Court's interpretation of § 1605A(c). See Estate of Doe, 2011 WL 3585963, at *13-*14. A straightforward reading of § 1605A(c) is that it creates a federal cause of action for four categories of individuals: a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of such a person. Absent from these four categories are non-U.S. national family members of the victims of terrorist attacks. The statutory language that follows the listing of the four categories of individuals in § 1605A(c) does not expand the private right of action beyond those four categories. The cause of action is further described as "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official employee or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages." Id.

Plaintiffs argue that the statutory language creates a cause of action for any individual victim or claimant "for which the courts of the United States may maintain jurisdiction." But the plain language of the statute does not support this construction. Indeed, the text refers back to the waiver of sovereign immunity as to a foreign state for terrorist acts as provided in section (a)(1). Nonetheless, the family member plaintiffs contend that, even if they do not fit expressly within the

four categories listed in § 1605A(c)(1)-(4), once the immunity of the defendants has been waived as to their claims, the intent of Congress indicates that the immediate family members of U.S. government employees, despite their status as foreign nationals, are entitled to bring claims through a federal statutory cause of action and seek damages for their losses, including for solatium and pain and suffering.

Plaintiffs explain that the legislative history reveals that a purpose of the 2008 amendments to the FSIA was to "fix[] the inequality" of rights between U.S. citizens and non-U.S. citizens to seek relief from the perpetrators of terrorist acts. See 154 Cong. Rec. S54 (daily ed. Jan. 22, 2008) (statement by Sen. Lautenberg). And, plaintiffs continue, Congress was prompted to create a federal statutory cause of action that would resolve the disparity among the various state laws regarding the recovery of emotional distress by immediate family members that existed prior to the statutory amendments. See 154 Cong. Rec. S54 (daily ed. Jan. 22, 2008) (statement by Sen. Lautenberg) (noting that the amendments would fix the problem of "judges hav[ing] been prevented from applying a uniform damages standard to all victims in a single case because a victim's right to pursue an action against a foreign government depends upon State law"). Indeed, if foreign national immediate family members of victims do not have a cause of action under § 1605A(c), then Senator Lautenberg did not completely "fix" the problem of disparate damages standards for this particular category of claimants. But it is not the court's role to fix a problem that Congress failed to address. See Estate of Doe, 2011 WL 3585963, at *14. As Cicippio-Puleo instructed, "the Supreme Court has declined to construe statutes to imply a cause of action where Congress has not expressly provided one." 353 F.3d at 1033.

Some courts have found jurisdiction and a cause of action under §1605A and, in so doing, have noted that because § 1605A(c) incorporates the elements required to waive the foreign state's

37

immunity and vest the court with subject matter jurisdiction under section 1605A, "liability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met." Calderon-Cardona v. Democratic People's Republic of Korea, 723 F. Supp. 2d 441, 460 (D.P.R. 2010); see also Kilburn v. Islamic Republic of Iran, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (explaining that the elements of immunity and liability are "essentially the same [under the new amendments] in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action" under § 1605A(c)); Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 72 (D.D.C. 2010) (analyzing liability and jurisdiction together); Brewer, 664 F. Supp. 2d at 52 ("[I]f immunity is waived, the Act provides for economic damages, solatium, pain and suffering, and punitive damages."); Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 64-69 (D.D.C. 2008) (analyzing liability under the same elements required for jurisdiction and finding liability where extrajudicial killing and material support elements satisfied). But that is not true here. In each of those cases, the claimants fit within the four categories of individuals who are explicitly provided a cause of action under § 1605A(c) of the statute. The elements for a waiver of immunity and for liability, then, may indeed be the same. But not for individuals who do not fit within the four categories listed in § 1605A(c). See Estate of Doe, 2011 WL 3585963, at *15.

Hence, those plaintiffs who are foreign national family members of victims of the terrorist attacks in Nairobi and Dar es Salaam lack a federal cause of action. Nonetheless, they may continue to pursue claims under applicable state and/or foreign law. Although § 1605A created a new federal cause of action, it did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity. See Estate of Doe, 2011 WL 3585963, at *15 (citing Simon, 529 F.3d at 1192). Indeed, plaintiffs injured or killed as a result of state-sponsored terrorist attacks have pursued claims under both the federal cause of

action and applicable state law, and are precluded only from seeking a double recovery. See id.

### C. Choice of Law

In circumstances where the federal cause of action is not available, courts must determine whether a cause of action is available under state or foreign law and engage in a choice of law analysis. Federal courts addressing FSIA claims in the District of Columbia apply the choice of law rules of the forum state. Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 840 (D.C. Cir. 2009); Dammarell, 2005 WL 756090, at *18. This Court will therefore look to the choice of law rules of the District of Columbia in this case.

Under District of Columbia choice of law rules, the court must first determine whether a conflict exists between the law of the forum and the law of the alternative jurisdiction. If there is no true conflict, the court should apply the law of the forum. See USA Waste of Md, Inc. v. Love, 954 A.2d 1027, 1032 (D.C. 2008) ("A conflict of laws does not exist when the laws of the different jurisdictions are identical or would produce the identical result on the facts presented."). If a conflict is present, the District of Columbia employs a "'constructive blending' of the 'government interests' analysis and the 'most significant relationship' test" to determine which law to apply. Oveissi, 573 F.3d at 842; Dammarell, 2005 WL 756090, at *18 (citation omitted).

In Dammarell, an FSIA case that involved the 1983 bombing of the U.S. embassy in Beirut, Lebanon, this Court explained that "under the governmental interests analysis as so refined, we must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." 2005 WL 756090, at *18. For the "'most significant relationship' component of the analysis, the D.C. Court of Appeals directs courts to section 145 of the Restatement of the Conflict of Laws, which identifies four relevant factors: (i) 'the place where the injury occurred'; (ii) 'the

place where the conduct causing the injury occurred'; (iii) 'the domicile, residence, nationality, place of incorporation and place of business of the parties'; and (iv) 'the place where the relationship, if any, between the parties is centered.'" Id. (citing Restatement (Second) of Conflict of Laws § 145 (1971)). The Restatement also references the "needs of the interstate and the international systems, the relevant policies of the forum, the relevant policies of other interested states, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied." Id.; see also Oveissi, 573 F.3d at 842; Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 266 (D.D.C. 2006). As a general rule, the law of the forum governs, "unless the foreign state has a greater interest in the controversy." Kaiser-Georgetown Cmty. Health Plan v. Stutsman, 491 A.2d 502, 509 (D.C. 1985).

Three conceivable choices of law are presented in this case: the law of the forum state (the District of Columbia), the laws of the place of the tort (Kenya and Tanzania), or the law of the domicile state or country of each plaintiff (including domestic and foreign locations). See Dammarell, 2005 WL 756090, at *18. In previous FSIA terrorism cases involving U.S. citizen plaintiffs, this Court ruled that the law of the domicile state of each plaintiff should provide the rule of decision, noting each state's interest in the welfare and compensation of the surviving family members of individuals killed in the terrorist attacks. See id. at *21 (citing cases). Here, as in Estate of Doe, the choice of law analysis pertains only to non-U.S. national family members of victims of the terrorist attacks (who lack a federal cause of action), and the balance of interests suggests a different outcome from the FSIA cases involving U.S. citizen plaintiffs.

Consistent with Dammarell and other FSIA cases, United States domestic law remains more appropriate in state-sponsored terrorism cases than foreign law. Furthermore, in light of the 2008 amendments to FSIA that seek to promote uniformity and extend access to U.S. federal